UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

|  |  |  |
|---|---|---|
| | x | |
| In re SYNOVUS FINANCIAL CORP. | : | Civil Action No. 1:09-cv-01811-JOF |
| | : | |
| | : | CLASS ACTION |
| This Document Relates To: | : | |
| | : | **AMENDED CLASS ACTION** |
| ALL ACTIONS. | : | **COMPLAINT** |
| | : | |
| | x | |

By and through their undersigned counsel, Lead Plaintiffs the Labourers' Pension Fund of Central and Eastern Canada ("Canadian Labourers") and the Sheet Metal Workers' National Pension Fund ("Sheet Metal Workers") (collectively, "Plaintiffs") allege the following against Synovus Financial Corp. ("Synovus" or the "Company"), Richard E. Anthony ("Anthony"), Frederick L. Green III ("Green"), Thomas J. Prescott ("Prescott"), and Mark G. Holladay ("Holladay") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation:  (a) review and analysis of public filings made by Synovus and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning Synovus, the other Defendants and related non-parties; (e) consultation with experts; and (f) interviews with factual sources, including individuals formerly employed by Synovus, the Sea Island Company, and other industry participants.

## I.   SUMMARY OF THE ACTION

1.    This is a federal securities class action against Synovus and certain of its officers and/or directors for violations of the federal securities laws.  Plaintiffs bring

this action on behalf of themselves and the Class under the Securities Exchange Act of

1934 (the "Exchange Act").  Plaintiffs allege that between October 26, 2007 and April

22, 2009, inclusive (the "Class Period"), Defendants engaged in a fraudulent scheme

to artificially inflate the Company's stock price by concealing from the market its true

lending relationship with the Sea Island Company ("Sea Island"), Sea Island's dire

financial condition, and the significant risk that Sea Island would not be able to make

payment on its exorbitant loans from Synovus.  As a result of the fraud described

below, shareholders suffered millions of dollars in losses.

2.     Synovus is a diversified financial services company and a registered bank

holding company for approximately 31 affiliate banks, which provide commercial and

retail banking services, among others.  As a financial services company that provides

banking services, a significant part of Synovus' income is derived from the interest it

earns on its loans.  As a result, loan growth is an important metric for the Company,

which it regularly reports to the market as a measure of its financial performance.

3.     As a way to boost its loan growth, Synovus entered into a lending

relationship with Sea Island, a real estate and hospitality business that owns and

operates the Sea Island Resorts and develops and sells real estate on Sea Island,

Georgia and surrounding coastal properties.  The Sea Island Company is a family

business that has been owned by the prominent Jones family for generations.

4.    The current head of the Sea Island Company, A.W. "Bill" Jones III ("Jones III"), took over the family business in the 1990s. At the time, Jones III was a close personal friend of the then-CEO of Synovus, James Blanchard ("Blanchard"). When Jones III sought financing to renovate Sea Island's main property, the Cloisters hotel and other related facilities, Blanchard stepped to the plate. Although the loans to the Sea Island Company were insider loans, they were quickly approved with little more than a handshake on the "good ol' boys system."

5.    While Synovus divided out the Sea Island Company loan to various affiliate banks, the loan was held and serviced at Columbus Bank & Trust ("CB&T"), a Synovus charter bank in Columbus, Georgia – the same city where Synovus is based. While the loan to Sea Island was internally known to be incredibly risky, Synovus required the affiliate banks to take a portion of the loan and to renew it. The affiliate banks had no opportunity to underwrite the loan or challenge its merits. Combined with Jones III's lavish and wasteful spending, the Sea Island loans became a ticking time bomb for Synovus. All told, Sea Island owed Synovus upwards of $220 million.

6.    By the end of 2006, with the renovation projects way over budget and Sea Island in a precarious financial position, it became apparent that Sea Island could not make timely principal payments on its loans, despite being given ever-increasing

- 3 -

financing from Synovus.  At the same time, and in a desperate attempt to create the cash flow necessary to timely pay its loans, Sea Island sold more and more of its property, much of it encumbered by its loans from Synovus.  Knowing this was the only way to stave off default and put off the day of reckoning, Synovus released this collateral to help facilitate the fervent land deals.  Despite 2007 being the best year for land sales in Sea Island's history, it quickly became apparent that the land sales would not be enough to allow Sea Island to timely repay Synovus.

7.     As a result, throughout the Class Period, Defendants knew, or were severely reckless in not knowing, that the loans to Sea Island presented a significant risk of default.  The Company was provided with detailed monthly information on Sea Island's deteriorating financial condition – the same information provided to Sea Island's own finance committee.   Even ramped up real estate sales and other drastic actions could not turn Sea Island around.

8.     Despite this knowledge, throughout the Class Period, Defendants misled the market as to its true relationship with Sea Island, its significant Sea Island lending exposure, Sea Island's troubled financial condition, and the impact that this would have on Synovus' financial condition.   In such a way, Defendants' false and misleading statements and omissions artificially inflated Synovus' Class Period stock price.

9.      Beginning on July 8, 2008, the market slowly began to learn the truth regarding Synovus' lending relationship with Sea Island and its commercial real estate exposure through a series of partial revelations, including that: Jones III had resigned from Synovus' Board of Directors; Synovus' fourth quarter loan loss provision would be approximately $350 million; Synovus had stopped lending to new projects in the hotel sector; and that Sea Island Company was Synovus' largest customer. Defendants buttressed the effect of these revelations on the Company's stock price by issuing a series of false and misleading statements and omissions, which continued to prop up the Company's stock price.

10.     However, at the end of the Class Period, Defendants were no longer able to conceal the truth regarding the Sea Island relationship, Sea Island's troubled financial condition, and Synovus' significant financial exposure to Sea Island. After the market closed on April 22, 2009, Defendants revealed that the Company's nonperforming loans had increased by $519 million from the previous quarter, primarily due to "one resort/hotel relationship" – the Sea Island Company – which was no longer performing and had to be restructured. The market was shocked by this revelation as it made its way into the market over the next few trading days, causing Synovus' stock price to plummet to $3.00 per share, a 26% decline from the stock's price on April 22, 2009, which resulted in millions of dollars in investor losses. At the

same time investors were suffering, Defendants Prescott and Holladay lined their pockets. In fact, buoyed by Defendants' misrepresentations, these Defendants unloaded significant percentages of their common stock holdings, for proceeds totaling more than $2 million dollars.

## II.    JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §1391(b). Many of the false and misleading statements were made in or issued from this District. Synovus has a substantial presence in Georgia, particularly in Atlanta, and many of the acts and transactions giving rise to the violations of law complained of occurred in this District.

13.    In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.        Plaintiffs

14.    Lead Plaintiff Canadian Labourers, as set forth in its certification already filed with the Court and incorporated by reference herein, purchased the common stock of Synovus at artificially inflated prices during the Class Period and has been damaged thereby.  On January 28, 2010,[1] the Court appointed Canadian Labourers to serve as Co-Lead Plaintiff in this action.

15.    Lead Plaintiff Sheet Metal Workers, as set forth in its certification already filed with the Court and incorporated by reference herein, purchased the common stock of Synovus at artificially inflated prices during the Class Period and has been damaged thereby.  On January 28, 2010, the Court appointed Sheet Metal Workers to serve as Co-Lead Plaintiff in this action.

### B.        Defendants

16.    Defendant Synovus is a diversified financial services company and a registered bank holding company. The Company provides financial services, including commercial and retail banking, financial management, and insurance, mortgage and leasing services.   Synovus was incorporated in 1972 and is

---

[1]     The Court's Order appointing the Co-Lead Plaintiffs was docketed on February 2, 2010.

headquartered in Columbus, Georgia.  As detailed below, Synovus operates through approximately 31 banking subsidiaries and other non-bank subsidiaries.

17.     Defendant Anthony is, and at all relevant times was, Chairman of the Board and CEO of Synovus. Anthony participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings set forth herein.

18.     Defendant Green was, at all relevant times, a director, President, and Chief Operating Officer ("COO") of Synovus until his resignation from the Company on May 28, 2009. Green participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings set forth herein.

19.     Defendant Prescott is, and at all relevant times was, Executive Vice President and Chief Financial Officer ("CFO") of Synovus. Prescott participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings set forth herein.

20.     Defendant Holladay is, and at relevant times was, Executive Vice President and Chief Risk Officer of Synovus. Holladay participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings set forth herein.

21.     Defendants Anthony, Green, Prescott, and Holladay are collectively referred to herein as the "Individual Defendants."

22.     During the Class Period, the Individual Defendants, as senior executive officers of Synovus, were privy to confidential and proprietary information concerning Synovus, its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Synovus, as discussed in detail below. Because of their positions with Synovus, the Individual Defendants had access to non-public information about Synovus' business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

23.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of §20(a)

of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Synovus' business.

24.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their executive and managerial positions with Synovus, each of the Individual Defendants had access to the adverse undisclosed information about Synovus' business prospects, financial condition, and performance as particularized herein, and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about Synovus and its business issued or adopted by the Company materially false and misleading.

25.    The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their

issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

26.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Synovus, by virtue of his high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

27.     As senior executive officers and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Synovus' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Synovus' securities would be based upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

28.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Synovus' publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme deceived the investing public regarding Synovus' business, operations, management and the intrinsic value of Synovus common stock and caused Plaintiffs and other members of the Class to purchase Synovus common stock at artificially inflated prices.

29.   Defendants are liable for: (i) making false statements; and/or (ii) failing to disclose adverse facts known to them about Synovus. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Synovus common stock was a success, as it: (i) deceived the investing public regarding Synovus' prospects and business; (ii) artificially inflated the price of Synovus common stock; and (iii) caused Plaintiffs and other members of the Class to purchase Synovus common stock at inflated prices.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Confidential Witnesses

30.   Plaintiffs' allegations herein concerning the falsity of Defendants' statements and the scienter of the Company and the Individual Defendants are based upon, in part, interviews with numerous witness, including former employees of Synovus and its affiliate banks, former employees of Sea Island, and other industry participants.  These witnesses provided information regarding the various methods employed by Defendants in furtherance of their scheme to defraud Synovus shareholders.  These witnesses[2] included:

---

[2]   All confidential witnesses are referred to in the masculine to protect their identities.

31.     A CB&T Commercial Specialist[3] who worked directly on the Sea Island loans. This former CB&T employee explained that from the time he started with CB&T in January of 2007, "we knew it was a bad loan."  "We were just digging a hole.  You could look at the loan and know it is bad."

32.     A former Synovus Senior Vice President of Commercial Real Estate[4] who described how the Sea Island loans were serviced out of CB&T.

33.     A former Synovus Financial Analyst[5] who explained how the Sea Island loan was serviced.

_____

[3]     CB&T is a Synovus charter bank.  The former CB&T Commercial Specialist worked for CB&T from January 2007 through June 2009.  In this capacity, this former CB&T employee assisted CB&T commercial lenders by, among other things, tracking loans and processing loan documents.  This witness provided assistance to commercial lenders Josh Dunlap and Judson Grantham, who reported to Executive Vice President Philip Badcock, the head of Regional Lending.  As explained below, Badcock was Synovus' primary contact with Sea Island.

[4]     The former Synovus Senior Vice President ("SVP") of Commercial Real Estate worked for Synovus from June 2006 through June 2007.  This witness worked at the Citizens Bank and Trust, one of Synovus' charter banks in Carrollton, Georgia.

[5]     The former Synovus Financial Analyst worked as a financial analyst in the Accounting Department in Columbus, Georgia from 2005 through 2007.  This former employee reported to Accounting Manager Jennifer Stillman who in turn reported to Chief Accounting Officer Liliana McDaniel.  Liliana McDaniel reported to Defendant Prescott.  The former Synovus Financial Analyst was responsible for providing support for month-end reporting and closing, as well as providing reports to senior management regarding Loan Growth and Retail Analysis.

34.     A former CB&T Vice President of Commercial Lending[6] who explained the pressure put on CB&T to renew the Sea Island loan from Synovus' corporate office, even though the loans were known to be incredibly risky: "There was no way for us not to renew the loan. When it came to Sea Island, we couldn't turn it down."

35.     A former Sea Island Senior Accounting Manager[7] who dealt directly with the employees at CB&T "who managed the relationship" between the two companies.

36.     A former Chief Financial Officer of Sea Island[8] who was in charge of accounting, budgeting, and finances and who dealt directly with Philip Badcock at Synovus regarding the loans to Sea Island.

---

[6]     The former CB&T Vice President ("VP") of Commercial Lending was employed with the CB&T Bank of Middle Georgia in Warner, Georgia from November 2006 until February 2009. Initially, the former CB&T VP of Commercial Lending was first employed as Credit Analyst and was promoted to Vice President-Commercial Lender in October of 2007. As a credit analyst, he created and managed the credit of the CB&T Bank of Middle Georgia. As VP, he reported to Kristy Drexler and managed a portfolio of commercial customers.

[7]     The former Sea Island Accounting Manager worked for Sea Island between July 31, 2006 and April 24, 2009. This witness was an assistant to Sea Island Controller Mike Warren, who reported to Sea Island Vice President of Finance and Real Estate Ron Roberts. In this capacity, this former employee was responsible for preparing a monthly reporting package that was distributed via e-mail to upper management, including Jones III. This package included information on Sea Island debt.

37.     A former Sea Island Purchasing Agent[9] who described how Sea Island "was the most wasteful entity that [he] ever came across."

38.     A former Cloister Project Manager[10] who described the massive cost overruns associated with the refurbishment of the Cloister hotel and other construction projects run by Sea Island.

39.     A Sea Island Accounts Payable Associate[11] who described how Synovus was Sea Island's main source of money.

---

[8]     This witness was CFO of Sea Island from July 1996 until the end of July 2008.

[9]     The former Sea Island Purchasing Agent worked for Sea Island as a Purchasing Agent from 2005 through 2008.  During this time, this employee reported to Sea Island Controller Mike Warren.  In this capacity, the former Sea Island Purchasing Agent was responsible for cutting purchase orders and paying invoices.  This employee received requisition requests from over 200 Sea Island departments.  When this employee received a requisition, he would type it up, call the vendor and make sure the goods were delivered properly.  Once goods were delivered, he would review the invoice and submit it to the accounting department for processing.  This former employee acted as the purchasing agent for items that "were not part of the structure," such as tools for maintenance and cooking supplies.

[10]     The former Cloister Project Manager worked for the Baston-Cook Construction Company ("Baston-Cook") at Sea Island from 2003 through 2006.  Baston-Cook was hired by Sea Island as the General Contractor to rebuild the Cloister, some condos, a memorial, and a chapel.  The former Cloister Project Manager served as the Project Manager for the Cloister hotel project.

[11]     The former Sea Island Accounts Payable Associate worked for Sea Island for approximately 13 months, ending in March 2007.  This former Sea Island employee

40.     A former Sea Island Resort Beach Club Manager[12] who explained that when Sea Island renovated the Cloister hotel, "Bill Jones wanted it to become the resort choice of billionaires, not just millionaires."  This former Sea Island employee reviewed reports on the resorts' occupancy levels, which were under 20 percent in the second half of 2007.

41.     A Sea Island Guest Services Supervisor[13] who confirmed that occupancy reports on Sea Island's intranet showed that occupancy rates were in the area of 20% during 2007.

42.     A former General Manager at the Cloister hotel[14] who explained that when Sea Island's loans "[were] coming due, there was a lack of funds."

_____

reported to then-controller Mike Warren, who reported to the former Sea Island CFO. In his capacity as an Accounts Payable Associate, this former Sea Island employee was responsible for cutting checks to Sea Island Vendors.  In addition, he compiled a payables aging report, which showed the number of days that Sea Island's payables were outstanding.

[12]     The former Sea Island Resort Beach Club Manager worked for Sea Island from 2005 until March 2008 and reported to the Director of the Beach Club John Meyers. In this capacity, this former Sea Island employee oversaw the Beach Club operations, including budgeting and day-to-day operations such as housekeeping, the front desk, and life guards.

[13]     The former Sea Island Guest Services Supervisor was employed with Sea Island from June 2006 through April 2008.

**B.    Background**

43.    Synovus, incorporated in 1972, is a diversified financial services company and a registered bank holding company located in Columbus, Georgia. As of December 31, 2008, Synovus acted as a holding company for 31 wholly-owned regional, subsidiary banks located primarily in Alabama, Georgia, Florida, and Tennessee. Each regional bank has its own board of directors and internal reporting structure.

44.    Through its subsidiaries, the Company provides financial services, including commercial and retail banking, financial management, and insurance, mortgage, and leasing services. The Company's commercial banking services include commercial, financial, agricultural, and real estate loans. The Company's retail banking services include: accepting customary types of demand and savings deposits; making individual, consumer, installment and mortgage loans; safe deposit services; leasing services; automated banking services; automated fund transfers; Internet based banking services; and bank credit card services, including MasterCard and Visa

---

[14]    The former General Manager at the Cloister hotel worked in this capacity from 2003 through February 2008.

services.  In addition, Synovus provides various other financial services to customers through wholly-owned non-bank subsidiaries.

45.    As a financial services company that provides banking services, a significant part of Synovus' income is the product of interest it earns on its loans.  As a result, the Company focuses on loan growth as a way to increase its income.  Accordingly, Synovus regularly reported its loan growth figure to the market as a key metric of its financial performance.  As a way to boost loan growth, Synovus sought to draw big banking clients with large financial needs, such as Sea Island.

**C.    Synovus Aligns Itself With the Sea Island Company**

**1.    A. W. "Bill" Jones III Seeks to Transform Sea Island Into a Billionaire's Playground**

46.    Sea Island is an affluent resort island located in the barrier islands off the Atlantic coast of Glynn County, Georgia.  Sea Island was historically owned by the Jones family, who through the Sea Island Company owns and operates the Sea Island Resorts.  The Sea Island Company also develops and sells real estate on Sea Island and surrounding coastal properties.

47.    The Sea Island Company is a family-owned hospitality and real estate corporation that has been owned by the Jones family for generations.  Indeed, since 1937, the Jones family slowly grew the Sea Island Resorts, which includes the famed Cloister hotel.  The Sea Island Resorts catered to families from across the South, who

traveled to Sea Island during the summer to stay in rental homes brokered by the Sea Island Company or in rooms at the Cloister.

48.     Around 1992, Jones III took over the family business from his father Bill Jones II.  After inheriting the family business, Jones III was determined to take the Sea Island Company up-scale.  Indeed, Jones III sought to make Sea Island Company "the finest resort company in the world" and stated to *Cigar Aficionado* magazine that "We want to be No. 1 in everything."  To achieve this, Jones began a host of large-scale development projects.  First, in 2001, Jones III completed the $52 million Lodge and Retreat Golf Course on St. Simons Island.

49.     Jones III then set his sight on remaking the Cloister.  Jones III sought to turn Sea Island into the "Pebble Beach of the East."  The plan included rebuilding Sea Island's Cloister hotel and beach club into a playground for billionaires, transforming Sea Island from merely a regional hot spot into a world-renowned destination.   The facilities of this renovated resort were to include amenities such as: fine dining, a luxury spa, squash courts, koi ponds, and high-end condos.

### 2. Synovus Used Its Inside Relationship with Jones III to Provide Financing For His Renovation Project

50.     Jones III needed financing for these large-scale plans.  At the time, Jones III was close friends with Blanchard, the then-CEO of Synovus.[15]  Blanchard had a large home on Sea Island and, among other hobbies, the two shared passions for golf and hunting.  As a result of this relationship, in 2000, Blanchard offered Jones III a seat on Synovus' Board of Directors, and Jones III offered Blanchard a seat on the Sea Island Company's Board of Directors.

51.     Through Blanchard, Synovus learned that Sea Island and Jones III were seeking financing for their renovation projects.  As a result, Synovus sought to lure Sea Island away from its bank, SunTrust Banks, Inc. ("SunTrust").  Approving the financing to Sea Island was not difficult – the loans were approved with a golf course handshake and, within 30 days, Synovus presented Sea Island with a term sheet. Jones III documented the ease with which he was able to secure financing from Synovus in an interview with *Cigar Aficionado* magazine at the time construction began on the Cloister renovation in 2003: "The banks almost pay you to borrow money today."

---

[15]     Blanchard served as CEO of Synovus from 1971 until being named Chairman of the Synovus Board of Directors in July 2005.

### 3.     The Sea Island Loan

52.     In total, Synovus would loan Sea Island upwards of $220 million, increasing the amount available multiple times during the 2000s.  In spite of this, and as former Synovus insiders described, the loans to Sea Island were known to be extremely risky, "terrible," made "on the good ol' boys system," and "everybody in the bank knew it was a bad loan."

53.     The Sea Island loans initially were approved with minimal oversight by Synovus' Board of Directors.  Indeed, one former board member, C. Edward Floyd, a Florence, South Carolina surgeon who served on the Company's board from 1995 through 2006, and was on its governance committee at the time the Sea Island loans were made, told a reporter: "I didn't know the size of the loans when they were made."[16] This former board member also stated that the interlocking directorships of Jones III and Blanchard were never mentioned at Board meetings.

54.     While Synovus approved loans for the Sea Island project, other financial institutions turned Sea Island down.  According to two former SunTrust Banks, Inc. ("SunTrust") executives, SunTrust rejected Sea Island Company's renovation

---

[16]     *See* Peter Waldman, *How Sea Island Became a Paradise Lost, Bloomberg Businessweek* (December 30, 2010), http://www.businessweek.com/print/magazine/content/10-02/b4162044100276.htm (last visited June 8, 2010).

proposal because it was too risky.[17]   As one banking analyst with FIG Partners commented, "Synovus was never in the market for $250 million loans; it did this one to win Sea Island away from SunTrust."[18]  Moreover, this analyst noted that "It was a bizarre circumstance: Synovus was so excited to have Sea Island.  SunTrust was certainly excited to let it go."[19]

55.     While Synovus was not the only lender for the renovation project, it was the lead lender – tasked with managing the entire redevelopment of the resort and related facilities.  And, as witnesses described, and the Company finally would admit towards the end of the Class Period, Sea Island was Synovus' biggest customer.

56.     Synovus' loans to Sea Island originated out of CB&T, one of Synovus' charter banks.  When Synovus made large loans, such as the loan it extended to Sea Island, it would "divvy out a percentage of the loan and required capital among the various Synovus charters."  Synovus told the charters "how much of the loan they

---

[17]     *See* Peter Waldman, David Milenberg, & Laurence Viele Davidson, *Insider Loans Distrusted by Bair as Georgia Failures Lead U.S.,* Bloomberg.com (December 8, 2009), http://www.bloomberg.com/apps/news?pid=20601109&sid=aukpiXHglqP4 (last visited June 8, 2010).

[18]     *Id*.

[19]     *Id*.

were going to take." The charters did not have the opportunity to underwrite the loan or challenge the merits of the loan they were being told to take. "Nobody was going to say no to doing the loan."

57.     Multiple witnesses confirmed that CB&T was "forced to purchase a piece of the [Sea Island] loan." As one former employee explained, "There was no way for us not to renew the loan." "When it came to Sea Island, we couldn't turn it down. If they said buy, you bought it."

58.     Every year, when the Sea Island loan would come up for renewal, Synovus would receive a credit memorandum that detailed Sea Island's financial performance. This credit memorandum was prepared by an employee in the Synovus Credit Department at the Columbus, Georgia headquarters and sent to the Presidents of each of the affiliates annually. The credit memo was approximately 20-30 pages and contained detailed information regarding Sea Island operations. Indeed, it drilled down the Sea Island operations "to how much they were losing each day."

59.     The former CB&T VP of Commercial Lending would report to his Board of Directors on what was in the credit memo that was received from Synovus headquarters. Based on this credit memo, "we all knew it was a bad deal." "Sea Island was losing money like crazy – and that was common knowledge" throughout Synovus. Indeed, as detailed below, by the end of 2006, Sea Island had informed

Badcock that it could not make principal payments on the loans from Synovus.  When the former CB&T VP of Commercial Lending discussed the Sea Island loan with the Board of Directors, "there was a general consensus that we wish we had never done this."  "But our board had been castrated."  As this former employee explained, when he began working for Synovus in November of 2006, each affiliate board of directors had "some control," but by the time he left the Company in February 2009, the Synovus executives had "chopped away all the power."

60.     Sea Island first opened the line of credit with Synovus when Sea Island began renovations, and the credit line was extended on multiple occasions.  If Sea Island needed an advance (*e.g.*, to make payroll), it could draw down its credit line provided by Synovus.

### 4.     Jones III's Lavish and Wasteful Spending Causes the Renovation to Go Way Over Budget

61.     Once Jones III had financing in place, he used the services of architect Peter Capone ("Capone") of Capone and Associates, Michael Ramsey of the Architectural Design Group, and interior designer Pamela Hughes  ("Hughes") of Hughes Design Group to make his dream a reality.  These individuals were tasked with replacing the original Cloister building and rebuilding it into a modern day luxury resort.  Capone, who served on Sea Island's board of directors, would ultimately be paid $50 million for his work on the Sea Island projects.

62.     The renovation envisioned by Jones III was not the typical luxury hotel renovation. Hughes, an interior designer who worked on the Cloister, filled the resort with custom-made furniture from China, woven carpets from Turkey, antique hardwoods from shipwrecks at the bottom of North American rivers, and draperies from 18th Century English looms.   The hotel's $65 million spa housed koi ponds, 26 treatment rooms, organic food, nutritional counseling, and squash courts with a resident squash pro who was top-ranked in the world.

63.     The large expense of the project was exacerbated by wasteful spending. Sea Island allowed interior designers and developers to purchase everything related to the new hotel.  For example, the hotel chefs bought all new equipment and supplies, and did not carry anything over from the old hotel.  Additionally, new furniture was purchased for Sea Island executives and, even if the furniture was used for only a few months, the company would again buy all new furniture if the executive was replaced. The former Sea Island Purchasing Agent explained that "it was obvious the Sea Island business practices were awful" and that Sea Island "spent and spent with no regard to how much was wasted."  The practice of wasteful spending was so prevalent at Sea Island that the employees had a running joke that "Bill Jones II knew how to make money and Bill Jones III knew how to spend it."

64.    Likewise, the costs of the renovation project were magnified by a constant change in orders.  Sea Island let Capone, the design architect, "play God" and make large purchasing decisions on his own.  For example, Capone ordered a $20,000 molded plaster crest that was supposed to go above a fireplace in the Cloister.  When it arrived, Capone did not like it and sent it to a warehouse on the north side of the island.  Likewise, the ceilings were "re-painted time and time again" and fixtures were moved around multiple times.

65.    As another example of these costly changed orders, Capone ordered thousands of Ballast rails – a type of hand rail – that were never installed but rather just disappeared.  In addition, delayed decisions increased the expense of the project. To that end, because the Cloister hotel kitchen equipment was delivered too late, Sea Island incurred an additional $115,000 in employee overtime.  As a result of all the change orders, Sea Island "absolutely went way over budget in building the Cloister." With respect to the Sea Island project, the former Cloister Project Manager noted that "[t]here was no way the project ever made sense.  But nobody was ever watching over Peter [Capone]."

66.    As a result of this kind of lavish and wasteful spending, Sea Island's development project turned out to be much more expensive than planned.  By way of example, it is estimated that the cost per hotel room exceeded $1 million, compared to

a typical five-star hotel which can be built for $400,000 per room. As the renovation went over budget for each remodeling job, Sea Island Company required more and more funding from Synovus.  Synovus, for its part, was happy to oblige.

67.     As a result of the cost overruns associated with the renovation project, Synovus continuously made loan advances to the Sea Island Company beyond what was originally called for, significantly increasing its lending exposure to Sea Island. As Defendant Anthony admitted at the end of the Class Period:

> I would say *in the latter stages of the renovation that took place in this credit, there were some advances that we made that went beyond the original expectations as plans changed, as cost overruns were incurred and needs became apparent. So the original concept would not have been to this level.* This is a *much higher exposure than we think is appropriate for our Company going forward.* We have a large borrower policy limit that will be well below this, but this is where we are at this point in time. But I tend to agree with the, I think, the tone of your question, in that our size needs to have tighter limits on large borrower concentrations, and we are clearly moving in that direction.

68.     To be sure, Synovus had a large borrower limit that the loans to Sea Island greatly exceeded.  In total, Synovus made at least $220 million in loans to the Sea Island Company, in addition to the hundreds of millions in loans that Sea Island received from other lenders.  In total, by mid-2008, Sea Island had $600 million in debt.

**D.      The Sea Island Company Faces Significant Financial Problems**

69.     In March 2006, the new Cloister resort reopened, now with just 100 hotel rooms.   Shortly after its grand reopening, the Sea Island Company began to experience financial problems caused by several factors, including low occupancy rates, massive loan debt, and the declining real estate market and resulting economic slump.  Sea Island was struggling financially, presenting a significant risk to Synovus, which had tremendous exposure to Sea Island – its largest customer.

**1.      The Sea Island Company Has Trouble Filling Rooms at the Renovated Cloister**

70.     First, by catering to billionaires, the new up-scale Cloister resort was too expensive for much of Sea Island's traditional clientele.   Indeed, room rates at the resort started at $1,000 per night, such that the hotel simply "out-priced themselves."

71.     At the same time, occupancy rates at the Sea Island resort plummeted.  A Delivering Service Quality Report on the Company intranet, which showed the occupancy levels for each segment of the resort, including the Cloister hotel, the Lodge and the Beach Club, demonstrated this.  In 2005, occupancy levels were described as being "pretty good."  However, by early 2007, "there were long periods of times where the occupancy levels were in the teens," meaning at least 80 percent of the rooms in the Cloister hotel went unoccupied.   With only 100 rooms, that would

mean just 20 rooms would be occupied at a time.  Sea Island's low occupancy rates were no doubt exacerbated by the economic slump that occurred into 2008.

72.    These occupancy reports were provided to Synovus' Badcock on a monthly basis.  Indeed, Synovus received the same financial information – on the same email – that Sea Island gave to the finance committee of its own board of directors.  Such information included occupancy figures, a real estate sales report called the Lot Sales Report, budgets, cash flows, capital expenditure reports, and detailed reports on Sea Island's actual spending.

73.    Yet, despite the extraordinarily low occupancy rates at the Cloister in the second half of 2007, and despite that this information was provided to Synovus on a monthly basis, Defendant Holladay told investors on the first day of the Class Period, in response to an analyst question on Sea Island, that the property was "doing very well" and that "their occupancies in the resorts are high. And we have really not seen anything that gives us any lack of confidence there."

## 2.    Sea Island Takes Drastic Steps to Unload Property – With Synovus' Permission

74.    The declining real estate market also took its toll on Sea Island.  As a result of the lavish renovation project, Sea Island was saddled with approximately $600 million in debt.  The Sea Island Company had intended to make payments on its loans to Synovus and other lenders through real estate sales.  However, when the real

estate slump occurred, the Sea Island Company got into financial trouble. In 2004 and 2005, Sea Island achieved roughly $250-$300 million in annual real estate sales.

75.     By 2007, Sea Island ramped up its efforts to sell property – much of it encumbered by the loans from Synovus – in a frantic effort to continue making timely payments on its loans. Because the property to be sold was pledged collateral to Synovus, Synovus had to release the parcels before any transactions could occur. To help Sea Island generate the cash flow necessary to stay current on its loans, Synovus allowed these sales to take place, thereby reducing the collateral it held on the Sea Island loans. However, despite these efforts to sell off property to raise money, Sea Island did not have the requisite cash flow to pay its loans.

### 3.     The Sea Island Company Struggles to Pay Invoices and Vendors

76.     Sea Island's financial struggles were evident from its difficulties making payment on its invoices and to vendors. Indeed, in 2005 and 2006, Sea Island always paid on time. However, by 2007, Sea Island "began slowing down" in paying invoices. By 2008, slow-paying vendors was routine. By way of example, throughout 2007, the former Sea Island Purchasing Agent was directed to find less expensive vendors. Accordingly, this witness sought a less expensive pool supply vendor. This former employee found such a vendor, a pool supply company in Wisconsin, that offered discounts and free freight. When the former Sea Island

Purchasing Agent sent the pool supply company Sea Island's financial information to set up the account, he was told that Sea Island would have to "pre-pay everything." This former employee learned from the pool supply company that this situation was due to Sea Island's credit report coming up "bad."

77.     Another witness, Sea Island's former Accounts Payable Associate, noted that when he first started working for Sea Island in early 2006, Sea Island was doing check runs two times a week and the turnaround on any account payable was always within 14 days.  However, approximately six to eight months into his employment, toward the end of 2006, the Company started "holding back checks."  Indeed, any check over $500 required the signature of Controller Warren.  In late 2006, the checks "just started sitting on [Warren's] desk."  This former Sea Island employee stated that "builders were calling all the time looking for their money."  The builders of the Cloister hotel "were fuming" and they would threaten to quit and stop construction all the time if they did not get paid.  It got to the point in late 2006 that builders would only get paid if they threatened to stop work, and then the builders would only receive half payment.  In particular, this former Sea Island employee recalled that one builder, JD Moore, was always having trouble getting paid.

78.     The former Sea Island Accounts Payable Associate created a payables aging report, which showed the days outstanding of the company's payables.  The

report was broken into payables that were past due by 30, 60, or 90 days. This former Sea Island employee would highlight any payable that was outstanding for more than 30 days and submit the report to his boss. By the end of his employment with Sea Island in early 2007, this witness recalled that "at least half of all payables were more than 30 days overdue."

### 4.    Sea Island Attempts to Cut Costs

79.    Sea Island never missed a forecast in the company's history until 2006. While the company tried to trim costs in 2007, the company would never get back on track.

80.    In 2008, Sea Island's financial situation became so dire that it fired more than 400 workers, or 20% of its staff. The Sea Island Company explained that a review of operations along with the economic downturn led to this staff reduction.

### E.    Defendants Knew That the Sea Island Loans Had A Significant Risk of Default

#### 1.    Defendants Continued to Loan Money to Sea Island Despite its Financial Problems

81.    As explained above, Sea Island provided Synovus with detailed information regarding its budgeting, financial performance, occupancy rates, and real estate sales – identical information was provided to Sea Island's finance committee. In addition, Badcock would call Sea Island to ask specific questions about Sea

Island's operations.  By the end of 2006, it became apparent that Sea Island could not pay the principal due on its loans to Synovus.  Sea Island informed Badcock of the dire situation facing Sea Island.

82.     CB&T held Loan Meetings and Bad Debt Meetings two or three times a week, which took place on Tuesday afternoons and Friday mornings.  All CB&T Division Heads participated in these meetings, as did Badcock and John Dodge.  The meetings were often focused on Sea Island.  In preparation for the meeting, the former CB&T Commercial Specialist prepared a report based on loan information he received from an MNI Software.  This report showed every past due loan with a balance of at least $1,000,000.  According to the former CB&T Commercial Specialist, "[e]very week, [I] would look up the loans, and every week, Sea Island was on the list."  Moreover, this former CB&T employee recalled that "[e]very week, Dodge and Badcock would talk to Steve Nelson about the Sea Island loan."

83.     As of January 2007, the Sea Island loan was "marked past due" and "showed a negative balance in the millions."  Furthermore, by this time, Synovus "switched the Sea Island loan to non-accruing."  It "was a big deal" internally to switch the Sea Island loan to non-accruing (stopped accruing interest) "because it was the biggest loan on [Synovus'] books."

84. Despite the problems with the Sea Island loan, the former CB&T commercial specialist explained that CB&T continued to lend money to Sea Island because "our high up people got perks. They could go and vacation at Sea Island for free whenever they wanted."

### 2. Synovus Carefully Monitored Sea Island and Was Aware of its Struggling Financial Condition

85. Defendants were keenly aware of Synovus' significant lending exposure to Sea Island. As explained above, the Company was provided with detailed financial data on a routine basis by Sea Island. In addition, Synovus attended annual meetings in 2006, 2007, and 2008 at Sea Island, where Sea Island's entire financial position and future prospects were discussed. Most importantly, at the end of 2006, Synovus was specifically told by Sea Island that it would not be able to repay its loans when they came due and would require a restructuring of the loans. At this point, Badcock and other Synovus employees would make quarterly visits to Sea Island to inspect both the property and the company's records. Indeed, in 2008, Sea Island was only paying interest and was making no principal payments on its loans from Synovus.

86. In addition, Synovus agreed to release some of the collateral securing its loans to Sea Island in order to allow Sea Island to sell property and generate the cash flow necessary to repay its loans. While these sales put off the day of reckoning temporarily, they did not provide the cash flow necessary to repay the loans.

87. Furthermore, as admitted by Defendant Green on January 22, 2009, Sea Island was Synovus' largest customer. In addition to the size of the loan, several former Synovus employees revealed that Defendants' internal policies dictated that they be kept apprised of Synovus' loan portfolio and the Sea Island loans. For example, according to the former Synovus SVP of Commercial Real Estate, a loan the size of Sea Island's was "obviously a corporate commitment," which had to go to the Company Board of Directors for approval. "A loan that size had to be approved by [the Synovus] Board Loan Committee," which met once a month in Columbus, Georgia and reviewed loans internally within Synovus.

88. Moreover, according to the former Synovus Credit Analyst, any loan above $25,000 would have to be approved by Defendant Anthony. Indeed, the credit approval process at Synovus required that any loan over $25,000 must have Defendant Anthony's signature on a credit approval form. Additionally, Defendant Holladay was responsible for setting and maintaining the Company reserves for bad debt. Defendant Holladay was "responsible for letting all of [its] affiliate banks know what each had to reserve."

89. In addition, Defendants admitted that they carefully monitored the loans to Sea Island. This is evident from multiple statements made by Defendants throughout the Class Period, in which they represented that they were carefully

reviewing Synovus' portfolio, and were proactively and aggressively managing credit weaknesses.  For example:

> (a)   On January 24, 2008, Defendant Green stated:

***This past quarter, we've reviewed our entire portfolio with a fine-tooth comb.*** The purpose was to recognize all of our problems as quickly as possible, and to make sure that we're not inadvertently dragging current problems into future periods. So at this point, our credit issues have been contained both geographically and by product type. ***We'll be in a continuous review process throughout the year, looking for signs of creepage.***

> (b)   Also, on this date, Defendant Anthony told investors:

You can tell by Fred's description that ***we as a company are proactive and aggressive in managing these problems***, and we are very sensitive to any potential weakness in other products and in other markets. So, we will watch that carefully.

90.   In addition, Defendants consistently represented that they were monitoring the Sea Island loan portfolio through their "constant contact" and "frequent interaction" with Sea Island – Syonovus' largest customer – and its principals.  For example:

> (a)   On October 23, 2008, Defendant Anthony told investors that:

***[w]e certainly are in constant contact with [Sea Island]*** and they are working on strategic flexible for their future and I think doing the right things.

> (b)   On January 22, 2009, Defendant Green represented:

- 37 -

Nancy, what we say about Sea Island is they are our largest customer.  I won't get into the net amount of our loan there, but what I will say is that loan is a performing loan.  ***We have very frequent interaction with the Company and the principles, because of the size of the loan and that being our largest customer.***  As I said, it is a performing loan.

91.     Moreover, on April 22, 2009, Defendant Anthony admitted that Defendants were aware of the significant loan exposure to the Sea Island Company, stating:

It is a large credit, and we started – well, first of all there – ***I would say in the latter stages of the renovation that took place in this credit, there were some advances that we made that went beyond the original expectations as plans changed, as cost overruns were incurred and needs became apparent.*** So the original concept would not have been to this level. This is a much higher exposure than we think is appropriate for our Company going forward. We have a large borrower policy limit that will be well below this, but this is where we are at this point in time. But I tend to agree with the, I think, the tone of your question, in that our size needs to have tighter limits on large borrower concentrations, and we are clearly moving in that direction.

92.     As a result of Defendants' careful monitoring of Synovus' loan portfolio, their regular receipt of financial updates from Sea Island, the inside relationships with the Sea Island Company, and Defendants' admitted "constant" contact and "frequent interaction" with Sea Island and its principals, Defendants knew of Sea Island's significant financial problems.  Indeed, Defendants knew, or were severely reckless in not knowing, that occupancy rates at the renovated Cloister hotel were down substantially in October 2007, Sea Island's real estate sales could not make up for its

financial shortfalls, Sea Island would require an immediate restructuring of its loans and could only pay interest on the notes, and that there was a significant risk that Sea Island would not be able to continue to make payment to Synovus and other lenders on the hundreds of millions of dollars of loans it had borrowed.

93.     While beginning on July 8, 2008 the market slowly began to learn the truth regarding Synovus' lending relationship with Sea Island and its commercial real estate exposure through a series of partial revelations, at the same time, Defendants continued to mislead the market about its true relationship with Sea Island, Synovus' significant exposure to Sea Island, Sea Island's troubled financial condition, and the impact that Sea Island's struggles would have on Synovus' large exposure to Sea Island.  Indeed, as detailed below, throughout the Class Period, Defendants made, among others, the following misrepresentations:

- "Tony, I heard you ask about Sea Island. *I can tell you that area is, believe it or not, doing very well.  Their, you know, sales are on target, their occupancies in the resorts are high. And we have really not seen anything that gives us any lack of confidence there.*"  ¶97;

- What I would say is, *Sea Island Company has been a customer for a number of years and a good one.* We have a large relationship . . . and *they are certainly a good customer with a good relationship.*  ¶125;

- *The loan is performing, Kevin, and nothing is really different.* They released information to the public a couple months ago about the fact that their financing package had been modified and increased and was in place. And they have had some successes and continue to really represent a premier brand on the East Coast. Be but we certainly are in constant contact

with them and they are working on strategic flexible for their future and I think doing the right things.  ¶135;

- ***Nancy, what we say about Sea Island is they are our largest customer.*** I won't get into the net amount of our loan there, but what I will say is that loan is a performing loan.  We have very frequent interaction with the Company and the principles, because of the size of the loan and that being our largest customer. ***As I said, it is a performing loan.*** ¶153.

94.    Defendants' false assurances and omissions created a false impression to the market that Synovus had minimal risk in its exposure to Sea Island, that Sea Island's financial position was positive, and that Sea Island would continue to make payment on its outstanding loans.  In such a way, Defendants' false statements and omissions artificially inflated Synovus' stock price throughout the Class Period, until the truth was revealed on April 22, 2009.

95.    On that day, Defendants revealed that nonperforming loans had increased by $519 million from the fourth quarter of 2008, ***primarily due to "one resort/hotel relationship, which is being restructured, and was classified as non-performing during the quarter***." Through this revelation, the market learned for the first time of the true extent of Synovus' exposure to Sea Island, Sea Island's troubled financial condition, and the significant, negative impact that this exposure had on Synovus' financial position.   The market was shocked by this revelation as it made its way into the market over the next few trading days, causing Synovus' stock price to plummet to

$3.00 per share, a 26% decline from the stock's price on April 22, 2009, and resulting in millions of dollars in investor losses.

96.     At the same time that Defendants misled shareholders, causing them to suffer millions in losses, Defendants Holladay and Prescott lined their own pockets through their insider sales of Company stock while in possession of material, non-public information for proceeds totaling more than $2 million. *See* ¶¶176-179 below.

## V.   DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

97.     The Class Period begins on October 26, 2007, the first trading day after Synovus reported its third quarter 2007 financial results and held a conference call with analysts after the market's close on October 25, 2007.  In this conference call, Defendants responded to a question about Sea Island:

**ANTHONY DAVIS:**

Outside of those two markets, the Carolina and Georgia coastal markets, places like Sea Island, what are you seeing in those areas? What's happening in risk classifications in C&I? You are seeing it spill over I guess outside of the development part?

**RICHARD ANTHONY:**

Tony I'll ask Mark to go into more detail. But the markets by state that we really have not had any problems with will be South Carolina, Tennessee and Alabama. And Georgia, outside of the ones we just mentioned in Atlanta. And he can go over the details by state if that would be.

**ANTHONY DAVIS:**

Thanks.

**MARK HOLLADAY:**

***Tony, I heard you ask about Sea Island. I can tell you that area is, believe it or not, doing very well. Their, you know, sales are on target, their occupancies in the resorts are high. And we have really not seen anything that gives us any lack of confidence there.***

\*     \*     \*

98.     As a result of Defendants' positive third quarter 2007 financial results and reassurances about the Company's loans to Sea Island, Synovus' stock closed at $26.07 per share on October 26, 2007, up from a close of $25.59 per share on October 25, 2007, on volume nearly twice the previous trading day.

99.     On November 13, 2007, after the market's close, Synovus filed its quarterly report for the third quarter of fiscal year 2007 on Form 10-Q with the SEC, the period ended September 30, 2007.  The 2007 third quarter 10-Q reaffirmed the financial results and statements announced in the press release on October 25, 2007. The 10-Q failed to disclose any information regarding the Company's loans to Sea Island.

100.     Moreover, Defendants Anthony and Prescott signed Sarbanes-Oxley ("SOX") certifications which stated in pertinent part:

1.      I have reviewed this quarterly report on Form 10-Q of Synovus Financial Corp.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

101.   For the reasons stated above in the Substantive Allegations section, and as detailed herein, the statements contained in ¶¶97, 99-100, which touted, among other things, the Company's relationship with Sea Island, were materially false and

misleading when made or omitted material facts to make such statements not false or misleading because:

(a)     Synovus had far greater exposure to losses as a result of its practice of issuing insider loans than the Company told investors;

(b)     Synovus had far greater exposure to losses as a result of its loans to Sea Island than the Company told investors;

(c)     Synovus' loans to Sea Island exceeded the Company's large borrower policy limit, a fact the Company did not disclose to investors;

(d)     Sea Island was not "doing very well";

(e)     Sea Island's sales were not "on target";

(f)     Occupancies in Sea Island's resorts were not "high";

(g)     Synovus had no reasonable basis to claim that it had confidence in Sea Island's ability to timely repay its loans;

(h)     Sea Island was "past due" on its payments to Synovus;

(i)     Sea Island required an immediate restructuring of its loans from Synovus; and

(j)     the effort to reassure investors about Synovus' credit quality and relationship with Sea Island was part of a scheme to inflate the stock price.

102.   As a result of the foregoing, Defendants' positive statements about the Company, its earnings, financial condition, guidance and prospects were lacking in a reasonable basis at all times and materially false and misleading.  Moreover, any risk warnings that may have been provided by Defendants in their Class Period statements were not meaningful, were themselves false and misleading, and do not shield Defendants from liability on the basis that such statements were "forward-looking" in that when such statements were made, as detailed above in the Substantive Allegations section, Defendants had actual knowledge of the falsity of the statements being made, recklessly disregarded contrary information demonstrating the falsity of such statements and/or Defendants omitted material facts that would have made such statements not false.

103.   On January 24, 2008,[20] Synovus reported its fourth quarter 2007 results. The Company's press release stated in part:

> **Columbus, Ga., January 24, 2008 -** Synovus reports diluted earnings per share of $1.60 for 2007 compared to $1.90 for 2006. Net income was $526.3 million for the year compared to $616.9 million last year.  The 2007 results include $31.0 million (net of income taxes and minority interest) in expenses related to the distribution of Synovus' ownership

---

[20]    The adjustment in the Company's stock price beginning on January 2, 2008, is a product of the Company's stock dividend issued on December 31, 2007 to shareholders of record.

interest in TSYS to Synovus' shareholders in a spin-off transaction and $22.5 million (net of income taxes) of litigation expenses associated with indemnification obligations arising from Synovus' ownership interest in Visa. Excluding these expenses, diluted earnings per share for 2007 was $1.76. The 2006 results included $33.2 million (net of income taxes and minority interest) for the impact of the Bank of America contract termination fee of $68.9 million, which was partially offset by the acceleration of the amortization of related contract acquisition costs of $6.0 million. Excluding these items, diluted earnings per share for 2006 was $1.80.

For the fourth quarter, diluted earnings per share was $0.25 compared to $0.54 for the fourth quarter of 2006. Net income was $81.9 million for the fourth quarter compared to $175.5 million for the same period last year. The fourth quarter of 2007 results include $25.0 million (net of income taxes and minority interest) in expenses related to the distribution of Synovus' ownership interest in TSYS to Synovus' shareholders in a spin-off transaction and $15.2 million (net of income taxes) in Visa litigation expenses. Excluding these expenses and the aforementioned 2006 contract termination fee, diluted earnings per share for the fourth quarter of 2007 was $0.37, compared to $0.44 in the same period a year ago.

Shareholders' equity at December 31, 2007, was $3.44 billion, which represented a strong 10.45% of year-end assets. Total assets ended the year at $32.9 billion, an increase of 3.3% over December 31, 2006. The ratio of nonperforming assets to loans and other real estate was 1.67%, compared to 1.16% last quarter and 0.50% at December 31, 2006. The net charge-off ratio for the fourth quarter of 2007 was 0.91% compared to 0.51% last quarter and 0.39% in the fourth quarter of last year. The allowance for loan losses at December 31, 2007 was 1.39% of loans, compared to 1.38% last quarter and 1.28% at December 31, 2006. The provision for loan losses covered net charge-offs by 1.18x for the quarter.

Synovus Chairman and Chief Executive Officer Richard E. Anthony said, "2007 was a challenging year for credit. We continued to experience further weakness in our residential construction and

residential development portfolios.  These loan categories represent 54.1% of nonperforming loans at the end of the year and 41.7% of net charge-offs recognized in 2007. ***We continue to take actions to aggressively manage these portfolios.*** The increases in nonperforming residential construction and development loans were in the panhandle of Florida, Atlanta, and Tampa Bay areas. At December 31, 2007, 70% of Synovus' total nonperforming assets and 81% of total residential construction and development nonperforming loans are in these markets."

\*      \*      \*

104.   Also on January 24, 2008, after the market's close, the Company hosted a conference call with various securities analysts.  During the call, Defendants sought to assuage any investor or analyst concerns regarding the Company's credit risk and portfolio:

**Fred Green**  - *Synovus Financial Corp. - President and COO*

Thank you, Tom, and good afternoon, everyone. Credit issues continue to dominate the headlines lately, so I'll just jump right in on ours. I suspect that most of you on the call are very familiar with our company. So this might be a little redundant to begin with. But as we said last quarter, we do not have any subprime exposure. We do not have any [seaves] and we do not have any CDOs.

\*      \*      \*

Let me shift now to what we do have. What's created are credit issues and what we're doing to work our way through them. Seventy-five percent of our nonperforming assets are housing-related, broken out at 65% in residential construction and development loans and 10% in land loans. These NPAs are concentrated in west Florida and Atlanta with 70% of our NPAs in these markets. It's close to a 50/50 split between the

- 48 -

two markets. And incidentally, these markets comprise 31% of our total loan portfolio for Synovus.

Credit losses for 2007 are very similar. Forty percent of our total losses were in west Florida and 20% in Atlanta. And then, the residential construction and development category, 88% of the losses in that segment came again from these two markets.

In 2008, we expect to continue to have some pressure in this sector and in these markets. ***We've been aggressive in our approach of recognizing problems and reserving appropriately.***

***This past quarter, we've reviewed our entire portfolio with a fine-tooth comb. The purpose was to recognize all of our problems as quickly as possible, and to make sure that we're not inadvertently dragging current problems into future periods. So at this point, our credit issues have been contained both geographically and by product type. We'll be in a continuous review process throughout the year, looking for signs of creepage. But at this point, we don't see any signs that it exists today. On the problems that we do have, we beefed up our special assets, resources so that we can work our way through our nonperforming loans and our other real estate quicker and at a better resolution.*** There still is a price discovery process taking place in Florida, and although we have not built this into the plan, we do hope that the recent fed rate cut and any future fiscal or monetary stimulus will help establish values in those markets quicker.

I also want to point out a little bit about how aggressively – or how I guess, I should say conservatively, we're looking at loans and reserving appropriately. And we've never shared this with you, but our methodology for these type of loans that I just discussed, we would allocate 22.7% reserves on all loans that migrate to substandard, but are still accruing. So at the point in which we're concerned about their ability to continue to pay us, but they haven't hit that point. They're still accruing the interest. We reserve 22.7% of the value of that loan.

If these loans continue to deteriorate and we recognize that they can no longer perform, we'll run an impairment test that calls for us to get a

currently fair value appraisal, discounted about 10% for selling costs. We can work through the [math], but generally, a $4 million loan that might have had an original appraisal of 5 to 8% after we reserve – again, still accruing. That loan is around 60% of the original amount.

If we look at the loans that this quarter have moved into our MPA category compare the charge offs that were result of this going through this impairment test that I just mentioned, the charge offs have actually been less in the aggregate than the 22.7% reserve. We previously established – we continue to establish as these type loans migrate toward that substandard category.

***So again, we are attacking the problem as quickly as possible. We're aggressively working through it. And our desire is as this credit cycle turns, we'll be the one of the first to come out of it.***

105.   In addition, Defendant Anthony told investors:

## Richard Anthony  - Synovus Financial Corp. - Chairman of the Board and CEO

Fred, thank you. And thank you, Tommy, for those reports. I'm going to repeat just quickly two or three things that Fred mentioned, because I guess it's important for everybody to understand this about our approach to credit in the company. As he said, in our portfolio, the credit weakness is largely contained to and confined to the Atlanta and west Florida markets. These weaknesses are still concentrated heavily in construction and development.

***You can tell by Fred's description that we as a company are proactive and aggressive in managing these problems, and we are very sensitive to any potential weakness in other products and in other markets. So, we will watch that carefully. But at this point, we have not seen any further deterioration***

As we look to the future, these credit challenges will continue to evolve. There is obviously in our industry and in our economy a high level of uncertainty about the – I guess the depth of this cycle, but we will give

you and I will give you now just a few thoughts concerning some of the drivers that will affect our financial results in 2008.

We believe that our charge-off ratio this year will be somewhat higher than the 2007 annual charge-off ratio of 46 basis points. We believe that our NPAs and nonperforming assets could increase during the first half of this year. And we think there's a possibility – a good possibility that some improvement will be seen in the second half. We believe that additional margin pressure will be felt in our results due to these recent rate cuts and an extremely competitive marketplace for deposits.

So, what we're doing in communicating about the future is giving our directional thoughts. We will continue to update the investment community when appropriate, and we will add facts and color when those thoughts are more clearly developed as we experience results moving through the first half of 2008.

And let me conclude before we get to the Q&A session by talking about our more focused company, our new Synovus, if that is a term that you like.

The key strategy – and this goes back three years – is our emphasis on the middle market, our commercial strategy, our aspiration and belief that we can become the premier commercial bank in the southeast. This will help us be a more diversified company, and it will help us, we think, be more balanced in our risk management of the loan portfolio.

We believe that a strength in our company continues to be the markets that we have placed ourselves in the major southeastern markets. So we have made a number of strategic moves over the last five or six years that should serve us well over the next 10 years. ***Our capital position, as I mentioned earlier, is strong, stronger than most.*** We have a tier one capital ratio of between 9.3% and 9.4%. Our equity-to-asset ratio is 10.4%. These are the measures at the end of the year.

We believe that it is essential that we take a more intense approach than ever in managing our infrastructure, our expense base down to the optimal level. We will be looking at processes throughout the company.

We will have an internal focus. And if needed, we will use external resources as we determine the right size of our cost structure in Synovus.

***Our risk management is stronger than it ever has been.*** It's been changed somewhat with the recent mobilization of our credit function. We believe that the team now available to Mark Holladay, our Chief Credit Officer, in working with the chief credit officers of each regional CEO's management team give us a good combination and blend of line support and staff support and management of the credit function.

We will continue as we have for years to lead with people that will be our differentiator, our model.  We'll continue to be an attraction, we think, for talent.  Our decentralized approach will be balanced with a proper level of consistent processes, and we have moved toward this more efficient approach very strongly in recent years that will continue throughout 2008. So we are excited about the prospects. We are excited to show what we can do in this difficult period. We look forward to reporting these activities and results to you regularly. And at this time, I want to pause and open up the floor for questions that we'll be happy to answer.

106.   During the question and answer session that followed their opening remarks, Defendants failed to disclose Synovus' inside loans to the Sea Island Company, nor did they disclose the tremendous risks associated with those loans:

### Richard Anthony  - *Synovus Financial Corp. - Chairman of the Board and CEO*

The thought that escaped me has to do with the notion of getting out ahead and being a little more conservative, and really, we have a pretty – we have a very clear defined methodology that has to do with long grades and reserves, a lot of which Fred was talking about through his example.

So, there's limited ability in the accounting world today to go out and take charges that are deemed to be abnormally conservative. We

certainly are realistic and conservative in the way that we grade our loans, but all of our provisioning is tied to either actual charge offs or losses or migration into loan grades, either positive or negative.

**James Allman** *Analyst*

Very good. And could you quickly excellent on whether or not you've seen weakness in any other markets, any significant manner besides Atlanta and the west coast of Florida?

**Fred Green  - Synovus Financial Corp. - President and COO**

*No.*

**Mark Holladay  - Synovus Financial Corp. - Chief Credit Officer**

*No, we have not. Any metrics on that, I think we've given them really.*

107.   Defendant Anthony concluded the call:

**Richard Anthony  - Synovus Financial Corp. - Chairman of the Board and CEO**

I just want to thank, everybody, for your questions and for participating in the predictively. *The questions were primarily about credit but I believe firmly that our team has an approach that will enable us to manage through this part of this cycle extremely well. It's also important for most us in leadership, not let this credit weakness that we're working through become a destruction for our banks and their growth in business development efforts. We're seeing to it through the way we organize responsibilities for that destruction will not occur. We look forward to continuing to update investment community. And thank you for joining us today.*

108.   On February 29, 2008, Synovus filed its annual report for the year 2007 on Form 10-K, the period ended December 31, 2007.  The 2007 10-K reaffirmed the

financial results and statements announced in the press release above in ¶103.  In addition, the 10-K failed to inform investors about the risks associated with the loans to Sea Island.  However, the 10-K stated: "Risk of loan defaults and foreclosures are unavoidable in the banking industry, and *we try to limit our exposure to this risk by monitoring our extensions of credit carefully*."

109.   Moreover, Defendants Anthony and Prescott signed SOX certifications as set forth in ¶100 above.

110.   As this information made its way into the market, Synovus' stock price reacted positively, closing at an artificially inflated price of $11.74 per share on March 3, 2008.

111.   For the reasons stated above in the Substantive Allegations section, and as detailed herein, the statements contained in ¶¶103-109, which touted, among other things, the Company's relationship with Sea Island and credit quality, were materially false and misleading when made or omitted material facts to make such statements not false or misleading because:

(a)   Synovus had far greater exposure to losses as a result of its practice of issuing insider loans than the Company told investors;

(b)   Synovus had far greater exposure to losses as a result of its loans to Sea Island than the Company told investors;

(c)     Synovus' loans to Sea Island exceeded the Company's large borrower policy limit, a fact the Company did not disclose to investors;

(d)     Synovus had not "been aggressive in our [its] approach of recognizing problems and reserving appropriately";

(e)     Synovus was not "conservatively" examining its loan portfolio and "reserving appropriately";

(f)     Defendant Green had no reasonable basis to state that Synovus would "be the one of the first to come out of" the economic downturn;

(g)     Sea Island was "past due" on its payments to Synovus;

(h)     Sea Island required an immediate restructuring of its loans from Synovus;

(i)     Synovus' "risk management" was not "stronger than it ever has been"; and

(j)     the effort to reassure investors about Synovus' credit quality and relationship with Sea Island was part of a scheme to inflate the stock price.

112.   As a result of the foregoing, Defendants' positive statements about the Company, its earnings, financial condition, guidance and prospects were lacking in a reasonable basis at all times and materially false and misleading.  Moreover, any risk warnings that may have been provided by Defendants in their Class Period statements

were not meaningful, were themselves false and misleading, and do not shield Defendants from liability on the basis that such statements were "forward-looking" in that when such statements were made, as detailed above in the Substantive Allegations section, Defendants had actual knowledge of the falsity of the statements being made, recklessly disregarded contrary information demonstrating the falsity of such statements and/or Defendants omitted material facts that would have made such statements not false.

113.   On April 24, 2008, Synovus issued a press release entitled "Synovus Reports Earnings per Share of $0.24 for First Quarter of 2008." The release stated in part:

> **Columbus, GA, April 24, 2008 -** Synovus reports net income for the first quarter of 2008 totaling $81.0 million, or $0.24 per diluted share, compared to income from continuing operations of $100.4 million, or $0.30 per diluted share, for the first quarter of 2007.
>
> Return on average assets from continuing operations for the quarter was 0.99% and return on average equity from continuing operations was 9.43% compared to 1.33% and 10.91%, respectively, in the same period last year. Shareholders' equity on March 31, 2008, was $3.53 billion, which represented a very strong 10.45% of quarter-end assets. Total assets ended the quarter at $33.8 billion, an increase of 7.5% for continuing operations from the same period last year.
>
> The ratio of nonperforming assets to loans, impaired loans held for sale, and other real estate was 2.49%, compared to 1.67% last quarter and 0.68% in the first quarter of last year. Of the $173 million increase in nonperforming loans, 84% was in the Atlanta area. The net charge-off ratio for the quarter was 0.95% compared to 0.91% last quarter and

0.13% in the first quarter of last year. The allowance for loan losses was 1.46% of loans at March 31, compared to 1.39% at the end of last quarter and 1.30% at March 31, 2007. The provision expense for the quarter was $91.0 million, compared to $70.6 million last quarter, and $20.5 million in the first quarter last year. The provision for loan losses covered net charge-offs by 143% for the quarter.

*"I am confident that we will come out of this credit cycle as a strong financial services institution*," said Synovus Chairman and Chief Executive Officer Richard E. Anthony. "With the deterioration in our residential construction and residential development portfolios, primarily in and around Atlanta, *we continue to take actions to aggressively deal with these portfolios and get these issues behind us as quickly as possible*. The Atlanta portfolio represents 58% of Synovus' total nonperforming loans in the residential construction and development portfolios. The residential construction and development portfolios in Florida have become more stable than the Atlanta area portfolios. *Our primary focus is to proactively manage the credit issues until they are resolved so that we can be the high performing company that we have historically been. We have added resources in our special assets group and are working with our customers to assist them during this challenging economic environment. We believe that our strong capital position gives us the capability to work through this situation effectively*."

\* \* \*

114.   Also on April 24, 2008, after the market's close, the Company hosted a conference call with various securities analysts.  During the call, Defendant Anthony failed to mention the serious troubles facing Sea Island:

### Richard Anthony - *Synovus Financial Corp. - Chairman and CEO*

I'll comment on credit before I turn the program over to Don Howard and David Dunbar. The biggest metric that is creating attention, and we're certainly aware of the need to work this down, is the

nonperforming asset percentage, which was at 2.49%, up pretty sharply from the 1.67 at the end of last year. NPAs increased by $236 million, with increases of 173 million in nonperforming loans, 42 million in impaired loans held for sale – which is an indicator of our proactive stance on that category – and then 20 million increased – a 20 million increase in other real estate. Atlanta is where the bulk of this occurred, a 145 million increase in nonperforming loans there.

The only migration beyond the containment that we've been describing, which has to do with Atlanta and the West Coast of Florida, is that we did have some weaknesses that we addressed in Myrtle Beach, in that market, where nonperformers were up $30 million. 73% of the increase in nonperforming loans within the one-to-four family properties category. Charge-offs, 95 basis points, up slightly from the 91 basis points in the fourth quarter of '07. The dollar amount was 64 million. The breakdown would be 28 million in West Florida, including the 21 million in charge-offs on loans that are in the process of being sold. Atlanta, 18 million. Myrtle Beach, 4.8 million.

The provision expense was $91 million, which exceeded net charge-offs by 27 million. Our reserve ratio ended the quarter at 1.46%, up 7 basis points from the end of last year. Past dues, if you look at the 90-day and still accruing category, we were at 16 basis points, compared to 13 at the end of the previous quarter. And total past dues were up from 1.02% at the end of last quarter to 1.39% at the end of the quarter.

***So, in summary, credit weakness is certainly our top priority to tackle. It is a major part of our story. It is largely confined to the Atlanta market, to some degree, of course, the West Coast of Florida, and Myrtle Beach, as I said earlier. We are confident that we continue to be proactive. We have plans to dispose of these distressed assets using techniques, including [auctions], incentives, portfolio sales, and realtor engagement.***

115.    Then, in response to an analyst question, the Individual Defendants stated they did a thorough review of Synovus' 25 largest loans:

**Jefferson Harralson  - KBW - Analyst**

That's helpful to get into your mindset. One more question and then move on. On the commercial real estate growth, the income (inaudible) properties – you had some very strong growth there. Can you comment on where that's coming from and what's driving it?

**Richard Anthony  - Synovus Financial Corp. - Chairman and CEO**

We can. We've done quite a bit of analysis. In fact, Mark and team have developed a top five in size list of transactions that occurred during the quarter in each of the major categories. Of course, we wouldn't give you the names, but by type of income-producing properties. Mark, do you want to comment on what drove the growth?

**Mark Holladay  - Synovus Financial Corp. - EVP and Chief Credit Officer**

I really do want to reemphasize what Richard said before I get into the detail. There are really two dynamics occurring in the market. The first is that acquisitions in the past several years have gone straight to the CMBS market. If you look back at our growth over '05 and the first – '06 and the first half of '07, we grew about 1.5% in that area, and about 2% for the first half of '07. As the CMBS market shutdown, some of that growth is accelerated. So we're seeing opportunities for our good customers who are acquiring properties. About 57% of our activity is tied to that kind of area. The rest of the growth is tied to actual new construction. So we're not out there generating a lot of new construction activity. It's fairly normalized. Certainly, we've tightened underwriting requirements there.

*We have just finished a review of the top 25 loans that we made in those income categories. I'm walking away feeling very good about it. Our capital requirements have ranged from 21% to 30% cash in the projects. We're stressing those properties to hold rates of about 7.5%. They all have good, strong guarantors. The guarantors have good liquidity. And we're doing very careful global analysis on the customers. The growth is really spread throughout those three or four*

*or five sectors. We've seen some office warehouse, probably the largest area of activity; some hotels would probably fall second in line, and then some multi-family and retail. Our commercial development is down, but those types of properties are – really that's what's causing the growth.*

116.   As a result of the rosy picture painted by Defendants of Synovus' credit risk and reserves making its way into the market, Synovus' stock rose to close at an artificially inflated price of $11.81 per share on April 25, 2008.

117.   On May 12, 2008, Synovus filed its quarterly report for the first quarter of fiscal year 2007 on Form 10-Q with the SEC, the period ended March 31, 2008. The 2008 first quarter 10-Q reaffirmed the financial results and statements announced in the press release on April 24, 2008.  The 10-Q failed to disclose any information regarding the Company's loans to Sea Island.

118.   Moreover, Defendants Anthony and Prescott signed SOX certifications as set forth in ¶100 above.

119.   As this information made its way into the market, the market reacted positively, causing Synovus' stock price to close at an artificially inflated price of $12.45 per share on May 13, 2008.

120.   For the reasons stated above in the Substantive Allegations section, and as detailed herein, the statements contained in ¶¶113-115, 117-118, which touted, among other things, the Company's relationship with Sea Island and credit quality,

were materially false and misleading when made or omitted material facts to make such statements not false or misleading because:

      (a)    Synovus had far greater exposure to losses as a result of its practice of issuing insider loans than the Company told investors;

      (b)    Synovus had far greater exposure to losses as a result of its loans to Sea Island than the Company told investors;

      (c)    Synovus' loans to Sea Island exceeded the Company's large borrower policy limit, a fact the Company did not disclose to investors;

      (d)    Synovus' credit troubles were not "largely confined to the Atlanta market";

      (e)    Sea Island was "past due" on its payments to Synovus;

      (f)    Sea Island required an immediate restructuring of its loans from Synovus;

      (g)    Synovus' "risk management" was not "stronger than it ever has been"; and

      (h)    the effort to reassure investors about Synovus' credit quality and relationship with Sea Island was part of a scheme to inflate the stock price.

     121.  As a result of the foregoing, Defendants' positive statements about the Company, its earnings, financial condition, guidance and prospects were lacking in a

reasonable basis at all times and materially false and misleading.  Moreover, any risk

warnings that may have been provided by Defendants in their Class Period statements

were not meaningful, were themselves false and misleading, and do not shield

Defendants from liability on the basis that such statements were "forward-looking" in

that when such statements were made, as detailed above in the Substantive

Allegations section, Defendants had actual knowledge of the falsity of the statements

being made, recklessly disregarded contrary information demonstrating the falsity of

such statements and/or Defendants omitted material facts that would have made such

statements not false.

122.   On July 8, 2008, Synovus filed on Form 8-K with the SEC a statement

that read: "Effective July 7, 2008, Alfred W. Jones III resigned as a director of

Synovus Financial Corp."

123.   On July 24, 2008, Synovus announced its results for the second quarter of

2008.  The release stated in part:

> **Columbus, Ga., July 24, 2008 -** Synovus reports net income for the
> second quarter of 2008 totaling $12.1 million, or $0.04 per diluted share,
> compared to income from continuing operations of $105.8 million, or
> $0.32 per diluted share, for the second quarter of 2007.  The second
> quarter of 2008 results include the impact of a non-cash goodwill
> impairment charge of $27 million or $0.08 per diluted share as discussed
> below. This charge has no impact on tangible equity or regulatory capital
> ratios since goodwill is already excluded from these measures.

Shareholders' equity as of June 30, 2008, was $3.43 billion, which represented a very strong 10.02% of quarter-end assets. Total assets ended the quarter at $34.2 billion, an increase of 7.1% when compared to total assets for continuing operations a year ago. The Tier 1 Capital Ratio was 8.91%, the Total Risk-Based Capital Ratio was 12.28%, and the Tangible Common Equity to Tangible Assets Ratio was 8.64%.

The ratio of nonperforming assets to loans, impaired loans held for sale, and other real estate was 3.00%, compared to 2.49% last quarter and 0.87% in the second quarter of last year. Nonperforming loans were $627 million for the second quarter of 2008, an increase of $111 million from the first quarter of 2008. The rate of increase in nonperforming loans slowed in the second quarter (22%) as compared to the previous quarter (51%). Of the $111 million increase in nonperforming loans, 46% were in the Atlanta area. The Atlanta market represents 58% of Synovus' total nonperforming loans in the residential construction and development portfolios. The net charge-off ratio for the quarter was 1.04% compared to 0.95% last quarter and 0.25% in the second quarter of last year. The allowance for loan losses was 1.52% of loans at June 30, 2008, compared to 1.46% at the end of last quarter and 1.30% at June 30, 2007. The provision expense for the quarter was $93.6 million, compared to $91.0 million last quarter, and $20.3 million in the second quarter last year. The provision for loan losses covered net charge-offs by 133% for the quarter. Total loans past due and still accruing as a percentage of loans outstanding improved from 1.39% last quarter to 1.33% in the second quarter. Past due loans over 90 days and still accruing as a percentage of loans outstanding improved from 0.16% last quarter to 0.14% in the second quarter.

Net interest income for the second quarter was $273.4 million compared to $288.5 million in the second quarter of last year. The net interest margin for the quarter was 3.57%, compared to 3.71% last quarter and 4.00% in the second quarter of last year. Of the 14 basis point decrease in the margin from the previous quarter, 3 basis points were related to increased credit costs. Total loans grew 4.9% (annualized) on a sequential quarter basis. Commercial income producing properties grew 15.4%, commercial and industrial loans grew 6.7% and retail loans grew 16.2%, while residential construction loans declined 33.9%, and

residential development loans declined 15.1% on an annualized sequential quarter basis. Total core deposits (excludes brokered deposits) grew 4.1% (annualized) on a sequential quarter basis.

Non-interest income was $107.7 million for the quarter. After excluding a $9.9 million net after-tax gain on the sale of MasterCard stock, non-interest income was down 5% compared to the second quarter last year with increases in brokerage and investment banking revenue of 17.9%, bankcard fees of 22.7%, and fiduciary and asset management fees – which include trust, financial planning, and asset management fees of 1.9%, while mortgage banking income and service charges on deposit accounts were down 26.1% and 7.1%, respectively.

*       *       *

124.   Also on July 24, 2008, after the market's close, the Company hosted a conference call with various securities analysts.  During the call, Defendants touted the Company's credit strength:

**Richard Anthony - *Synovus Financial Corp. - Chairman and CEO***

*       *       *

Credit obviously was the story for the quarter, as it has been for the past few quarters. The pattern that we experienced was very similar to the pattern that you have seen earlier this year and late last year. Our charge-off experience for the quarter was right in the range of 1%, 1.04%. This compares to 95 basis points in the first quarter of 2008. Our nonperforming assets reached a level of 3% in this harsh credit environment.

I would say that the primary story continues to be the Atlanta impact that we're feeling right now. 46% of our increase of $111 million in the quarter occurred in Atlanta. That has to do with nonperforming loans. And, the Atlanta market represents 58% of our total nonperforming loans in the residential, construction and development portfolios.

- 64 -

So we want to give you a little guidance on credit as we look out into the future. ***We would anticipate, for the remainder of the year, our charge-offs remaining in that 1% range. We see our nonperforming asset percentage going up some, but at a slowing pace for the remainder of this year.*** So we've got a few more quarters of this difficult credit environment to work through.

***I do think that we are definitely doing the right things in credit.*** At the top of the list would be the importance of having a good disposition strategy. We have had an auction in the quarter that we felt pretty good about, so we will schedule other absolute auctions, primarily for Atlanta properties, over the remainder of 2008. Now, I don't know the number, but we could have as many as three or four of those as we continue to study the benefits and the experience that we're getting from that particular technique.

We've had some note sales. We'll continue to pursue that particular option to reduce NPAs. And certainly, our ongoing work with our builders to create incentives for them to move properties works, but it doesn't generate the volume and the numbers that we think are necessary to really work down our nonperforming asset totals.

\*   \*   \*

125.   During the same conference call, an analyst specifically inquired into the relationship between Sea Island and Synovus:

**Tony Davis** - *Stifel Nicolaus - Analyst*

Considering Jimmy Blanchard's recognition from their Board and Bill Jones stepping down from yours, I wonder what details you could give us on the seeming conflict of interest here, I guess, with Sea Island Company, and, if you could give us any detail on that current relationship?

**Richard Anthony** - *Synovus Financial Corp. - Chairman, CEO*

- 65 -

*What I would say is, Sea Island Company has been a customer for a number of years and a good one. We have a large relationship that really is easier to manage without Bill being on our Board. He had offered to really move off a couple of quarters ago, and they are certainly a good customer with a good relationship. But for us to work on some of their needs, with his being an insider, would have just really slowed us down. So we think that it was best for everybody to eliminate these potential conflicts.*

**Tony Davis** - *Stifel Nicolaus - Analyst*

Finally, we shouldn't infer that deteriorating credit was a major factor here?

**Richard Anthony** - *Synovus Financial Corp. - Chairman, CEO*

*No.*

126.    Analysts seized on the positive statements about the Company's relationship with Sea Island.  In a report issued on July 25, 2008, Morgan Keegan & Co., Inc. maintained a market perform rating on Synovus and noted Defendants' statement that the resignation of Bill Jones from Synovus' board of directors "was not due to worsening credit related to SNV's lending relationship with Sea Island. . ." Likewise, JP Morgan & Co., in a report also issued on July 25, 2008, took comfort in Defendants' statement that Sea Island was not experiencing "any credit quality issues."

127.    On August 6, 2008, the Columbus Ledger-Enquirer published a story detailing Sea Island's troubles.  In particular, the article stated:

A longtime commercial customer of Synovus Financial Corp. is cutting its work force sharply because of the slumping economy and real estate market.

Columbus-based Synovus declined Tuesday to discuss Sea Island Co. and its decision to lay off between 300 to 400 employees, as well as any impact the upscale hotel and development firm's business might have on the regional bankholding company.

"Basically we're in a position, as we would always be with a customer, and we just cannot provide any additional information on a customer relationship," said Synovus spokeswoman Alison Dowe.

Sea Island Co., which dates to 1928, is headquartered on the Georgia coast near Brunswick. The firm has developed several ritzy resorts in the area, most notably The Cloister on Sea Island and The Lodge on St. Simons Island. A late-July check of the rates at The Cloister showed rooms averaging between $750 and $1,700 per night.

Monday's announcement by Sea Island Co. that it is eliminating jobs follows the July 7 resignation of Bill Jones, Sea Island Co. chairman and chief executive officer, from the Synovus board of directors.

In a recent interview with the Ledger-Enquirer, Richard Anthony, Synovus chairman and CEO, commented on Jones and his resignation from the board.

"Bill, he has been, and continues to be, a very good customer and friend," Anthony said. "He just felt like he needed to spend time on his business, and we can probably serve him better without his being an insider."

Asked if Sea Island has any nonperforming loans with Synovus, Anthony responded that they did not and that the company remains a "good customer."

The CEO also was queried about the bank's dealings with Sea Island Co. during a July 24 conference call with brokerage analysts, the same day

Synovus reported a 93-percent drop in second-quarter profits. Stifel Nicolaus & Co. analyst Tony Davis asked for details on the two entities' credit relationship.

Anthony said Jones had offered to resign a couple of quarters ago.

"For us to work on some of their needs, with his being an insider, would have just really slowed us down," Anthony said. "So we think that it was best for everybody to eliminate these potential conflicts."

Davis responded: "We shouldn't infer that deteriorating credit was a major factor here?"

No, Anthony said.

Sea Island Co., in a story published Tuesday in The Brunswick News, said its hotel bookings this summer have been strong. But, the company said its real estate offerings are suffering because of a sagging economy.

A financial review led to the pending layoffs at the company, which employs about 2,100 and is the largest private employer in Glynn County. The cuts amount to between 15 percent to 19 percent of the firm's work force.

"The results of the review, combined with the national economic downturn, made it clear that it is necessary to reduce current staffing to one that matches company business needs," the company said in a statement reported by the Brunswick newspaper.

Anthony, in the Ledger-Enquirer interview, said there are no current plans to fill Jones' seat on the Synovus board. A governance committee determines the mix and number of seats on the board. There are currently 21 voting directors, two advisory directors and 11 emeritus directors on the board.

Jones does remain on the board of directors at TSYS, a Columbus-based payment and credit-card processing firm. The TSYS board has 25 directors, eight of which are emeritus directors.

128.   Two days later, on August 8, 2008, Synovus filed its quarterly report for the second quarter of fiscal year 2008, the period ended June 30, 2008, on Form 10-Q with the SEC.  The 2008 second quarter 10-Q reaffirmed the financial results and statements announced in the press release on July 24, 2008.  The 10-Q failed to disclose any information regarding the Company's loans to Sea Island.

129.   Moreover, Defendants Anthony and Prescott signed SOX certifications as set forth in ¶100 above.

130.   As this information made its way into the market, the market reacted positively, and Synovus' stock price closed at an artificially inflated price of $11.01 per share on August 11, 2008, up from a close of $10.56 per share on August 8, 2008.

131.   For the reasons stated above in the Substantive Allegations section, and as detailed herein, the statements contained in ¶¶122-125, 128-129, which touted, among other things, the Company's relationship with Sea Island and credit quality, were materially false and misleading when made or omitted material facts to make such statements not false or misleading because:

(a)   Synovus had far greater exposure to losses as a result of its practice of issuing insider loans than the Company told investors;

(b)   Synovus had far greater exposure to losses as a result of its loans to Sea Island than the Company told investors;

(c)    Synovus' loans to Sea Island exceeded the Company's large borrower policy limit, a fact the Company did not disclose to investors;

(d)    Sea Island did have "deteriorating credit";

(e)    Synovus had no reasonable basis to project that, for the remainder of 2008, its charge-offs would "remain[] in that 1% range";

(f)    Synovus was not "definitely doing the right things in credit";

(g)    Sea Island was "past due" on its payments to Synovus;

(h)    Bill Jones III's resignation from the Synovus Board was directly related to Sea Island's extreme financial hardships;

(i)    Sea Island required an immediate restructuring of its loans from Synovus; and

(j)    the effort to reassure investors about Synovus' credit quality and relationship with Sea Island was part of a scheme to inflate the stock price.

132.   As a result of the foregoing, Defendants' positive statements about the Company, its earnings, financial condition, guidance and prospects were lacking in a reasonable basis at all times and materially false and misleading.  Moreover, any risk warnings that may have been provided by Defendants in their Class Period statements were not meaningful, were themselves false and misleading, and do not shield Defendants from liability on the basis that such statements were "forward-looking" in

that when such statements were made, as detailed above in the Substantive Allegations section, Defendants had actual knowledge of the falsity of the statements being made, recklessly disregarded contrary information demonstrating the falsity of such statements and/or Defendants omitted material facts that would have made such statements not false.

133.   On October 23, 2008, Synovus announced its results for the third quarter of 2008.  The release stated in part:

> **Columbus, Ga., October 23, 2008 -** Synovus reported a net loss for the third quarter of 2008 of $26.9 million, or $0.08 per share, compared to income from continuing operations of $83.6 million, or $0.25 per diluted share for the third quarter of 2007.
>
> "Credit issues, along with a weakening economy, created the need for aggressive actions to appropriately value, write down and dispose of problem credits," said Richard Anthony, Chairman and CEO. "Additionally, we have grown our deposits to enhance our liquidity position and plan to participate in the capital purchase program announced by the Treasury Department on October 13, 2008, which could add approximately $300 to $900 million of Tier 1 capital to our balance sheet. These actions will further strengthen Synovus for the future."
>
> The ratio of nonperforming assets to loans, impaired loans held for sale, and other real estate was 3.58%, as of September 30, 2008, compared to 3.00% last quarter and 1.16% in the third quarter of 2007. Nonperforming loans were $770 million as of September 30, 2008, an increase of $143 million from the second quarter of 2008. The Atlanta market represents 56% of Synovus' total nonperforming loans in the residential construction and development portfolios. The net charge-off ratio for the quarter was 1.53% compared to 1.04% last quarter and 0.51% in the third quarter of 2007. During the quarter, Synovus

recognized an $18 million loss on $70 million of non-performing assets after identifying these assets for loan sales or auctions. Two auctions were completed in the quarter with proceeds of $28 million. Another auction and two loan sales are scheduled to close in November which are expected to reduce nonperforming assets by $24 million. The allowance for loan losses was 1.68% of loans as of September 30, 2008, compared to 1.52% as of June 30, 2008 and 1.38% as of September 30, 2007. The provision expense for the quarter was $151.4 million, compared to $93.6 million last quarter, and $58.8 million in the third quarter of 2007. The provision for loan losses covered net charge-offs by 144% for the quarter.

During the third quarter, Synovus reassessed its largest loans, representing approximately 14% of the entire portfolio. While all except for one of these loans were performing, Synovus concluded that the financial condition of certain borrowers had weakened. This resulted in the downgrade of certain credits and a corresponding increase in provision expense of $40 million in the quarter.

*     *     *

Total loans grew 2.9% (annualized) on a sequential quarter basis. The net interest margin for the quarter was 3.42%, compared to 3.57% last quarter and 3.97% in the third quarter of 2007. Net interest income for the third quarter was $267.8 million compared to $290.8 million in the third quarter of 2007.

*     *     *

Shareholders' equity as of September 30, 2008 was $3.39 billion, which represented a strong 9.87% of quarter-end assets. Total assets as of September 30 were $34.4 billion, an increase of 6.7% when compared to total assets from continuing operations a year ago. As of September 30, 2008, the Tier 1 Capital Ratio was 8.83%, the Total Risk-Based Capital Ratio was 12.22%, and the Tangible Common Equity to Tangible Assets Ratio was 8.50%.

*     *     *

Anthony concluded, ***"As we look out into the fourth quarter of 2008, we believe that the third quarter elevated level of charge-offs and loan loss provision should decrease and should drive improved performance in the quarter as compared to the third quarter. In looking out to 2009, based upon our assumptions regarding current economic conditions and credit conditions persisting throughout 2009, we believe that the 2009 charge-off ratio will be in the 1.15% to 1.30% range."***

\*        \*        \*

134.   Also on October 23, 2008, after the market's close, the Company hosted a conference call with various securities analysts.  During the call, Defendants touted the Company's credit strength and future prospects:

**Richard Anthony** - *Synovus Financial Corp. - Chairman and CEO*

\*        \*        \*

I'd like to shift now to the future and give you anything that I can that might be helpful as you try to gauge our performance in the fourth quarter and in 2009. Our chargeoffs as a percentage were 153 in the third quarter. I did mention some special factors. We believe that the fourth quarter provision will moderate from the third quarter's level due to some of the extra costs that we absorbed of the reviews that I mentioned earlier. ***But our guidance for chargeoffs in the fourth quarter would be approximately 1.15%. If you use that number in your projections, I believe that you would find that we should have a chance at being profitable, fundamentally, during the quarter. And in 2009 our guidance for the chargeoff ratio would be in the 115 to 130 range.*** This is our best estimate in a difficult environment that is hard to pin down. But we, upon review, have determined those are the appropriate ranges for us to work with in our forward planning at this point.

Before we open up the floor for questions I want to close with a reminder that we've got some positives that sometimes can be forgotten in this

- 73 -

environment that is so concentrated on credit and really just day-to-day and month to month performance. But we continue to believe in our operating model, which has got community banking powerfully connected to an array of services and expertise that you would expect from a $34 billion regional bank. Our business customers, our middle market companies find our responsive model to be appealing. We think it stands out.

Our markets, first of all, the southeast in general is going to be, for the next five, ten, or twenty years, a good place to live, a good place to work, and a good place to have a banking presence. We have moved into the key southeastern markets. We continue to strengthen through leadership changes when necessary through the addition of talent. Our capabilities in these markets whether they be Nashville or Birmingham or Memphis or Tampa or Jacksonville and I can go on and on. And even though Atlanta has got plenty to be concerned about in the real estate marketplace, we're very bullish on Atlanta, long term. So the quality of our markets is going to serve us well over time.

Our strategy is sound. We're not jerking things around there. We are sticking with our emphasis on the C&I strategy the middle market, the business owners that wants that trusted advisor can give service effectively, respond quickly and resolve problems at the local level. That's the way we do business and it's relationship based.

Another positive that we touched on during the call already, but we need to remember it because I think we're doing very well in this regard, has do with liquidity. Liquidity in general, and certainly, the shared products I mentioned earlier. And from a credit perspective I know we'll get questions about migration, about indicators beyond the residential portfolio, but, I can say in general, our income-producing investment properties are holding up very well. They still look strong. The portfolio, when I hear of these indicators and weaknesses in our industry, our consumer portfolio still is doing very well. And our credit card business, it's not large. It's a little less than $300 million in size. But our indicators there, whether it be past dues or chargeoffs, are well below industry averages. And I think it is a tribute to our style of relationship banking.

\*        \*        \*

135.   During the same conference call, an analyst again specifically inquired into the relationship between Sea Island and Synovus.  Defendant Anthony put a positive spin on the Sea Island relationship:

**Kevin Fitzsimmons -** *Sandler O'Neill & Partners - Analyst*

Most of my questions have been answered but I know it came up on the last conference call, Richard. And the subject of Sea Island Company and that issue came up in the Q and A last time. I was just wondering if you you could update us on the status of that.  Is it on the watch list or nonaccrual status or in good standing?

**Richard Anthony -** *Synovus Financial Corp. - Chairman, CEO*

***The loan is performing, Kevin, and nothing is really different.*** They released information to the public a couple months ago about the fact that their financing package had been modified and increased and was in place. And they have had some successes and continue to really represent a premier brand on the East Coast. Be but we certainly are in constant contact with them and they are working on strategic flexible for their future and I think doing the right things.

136.   Also on October 23, 2008, analyst Morgan Keegan & Co., Inc. maintained a rating of "Outperform" on Synovus in large measure because of "management's continued aggressive approach in disposing its troubled assets via loan sales and auctions."  The report also credited the Sea Island relationship, stating management's position that Sea Island "continue[d] to perform as expected with no changes during the quarter."

- 75 -

137.   On November 10, 2008, after the market's close, Synovus filed its quarterly report for the third quarter of fiscal year 2008, the period ended September 30, 2008, on Form 10-Q with the SEC.  The 2008 third quarter 10-Q reaffirmed the financial results and statements announced in the press release on October 23, 2008.  The 10-Q failed to disclose any information regarding the Company's loans to Sea Island.

138.   Moreover, Defendants Anthony and Prescott signed SOX certifications as set forth in ¶100 above.

139.   For the reasons stated above in the Substantive Allegations section, and as detailed herein, the statements contained in ¶¶133-135, 137-138, which touted, among other things, the Company's relationship with Sea Island and credit quality, were materially false and misleading when made or omitted material facts to make such statements not false or misleading because:

(a)   Synovus had far greater exposure to losses as a result of its practice of issuing insider loans than the Company told investors;

(b)   Synovus had far greater exposure to losses as a result of its loans to Sea Island than the Company told investors;

(c)   Synovus' loans to Sea Island exceeded the Company's large borrower policy limit, a fact the Company did not disclose to investors;

(d)     Sea Island was not "performing";

(e)      Synovus had no reasonable basis to project a decrease in the level of charge-offs and loan loss provisions;

(f)     Sea Island was "past due" on its payments to Synovus;

(g)     Sea Island required an immediate restructuring of its loans from Synovus; and

(h)     the effort to reassure investors about Synovus' credit quality and relationship with Sea Island was part of a scheme to inflate the stock price.

140.   As a result of the foregoing, Defendants' positive statements about the Company, its earnings, financial condition, guidance and prospects were lacking in a reasonable basis at all times and materially false and misleading.  Moreover, any risk warnings that may have been provided by Defendants in their Class Period statements were not meaningful, were themselves false and misleading, and do not shield Defendants from liability on the basis that such statements were "forward-looking" in that when such statements were made, as detailed above in the Substantive Allegations section, Defendants had actual knowledge of the falsity of the statements being made, recklessly disregarded contrary information demonstrating the falsity of such statements and/or Defendants omitted material facts that would have made such statements not false.

141. Defendants' positive portrayal of the Sea Island relationship helped soothe analysts. On December 16, 2008, analyst Sterne, Agee & Leach, Inc. issued a report reiterating its "Buy" rating on Synovus after meetings with Company management. The report stated, in pertinent part:

> The company offered no additional information on the Sea Island exposure while discussion of the Bill Heard relationship was quite detailed *giving us added comfort that the bank may suffer relatively little loss if any on this credit.*

142. In response to the Sterne, Agee & Leach, Inc. report, shares of Synovus closed at $8 per share on December 16, 2008, up from a close of $7.27 per share on December 15, 2008.

## VI. THE TRUTH BEGINS TO EMERGE

143. On July 8, 2008, the truth began to emerge when Synovus filed on Form 8-K with the SEC a statement that read: "Effective July 7, 2008, Alfred W. Jones III resigned as a director of Synovus Financial Corp." As the market digested this information, Synovus' stock price dropped from a close of $8.52 on July 8, 2008 to close at $8.03 on July 9, 2008.

144. Moreover, Defendants continued to mislead the market as to the true nature of Synovus' lending relationship with Sea Island, its large exposure to Sea Island, and the credit quality of the Sea Island loans, thus maintaining the artificial

inflation of the Company's stock price.   Indeed, on the July 24, 2008 analyst

conference call, Defendants stated as follows:

**Tony Davis** - *Stifel Nicolaus - Analyst*

Considering Jimmy Blanchard's recognition from their Board and Bill
Jones stepping down from yours, I wonder what details you could give
us on the seeming conflict of interest here, I guess, with Sea Island
Company, and, if you could give us any detail on that current
relationship?

**Richard Anthony** - *Synovus Financial Corp. - Chairman, CEO*

***What I would say is, Sea Island Company has been a customer for a
number of years and a good one. We have a large relationship that
really is easier to manage without Bill being on our Board. He had
offered to really move off a couple of quarters ago, and they are
certainly a good customer with a good relationship. But for us to work
on some of their needs, with his being an insider, would have just
really slowed us down. So we think that it was best for everybody to
eliminate these potential conflicts.***

**Tony Davis** - *Stifel Nicolaus - Analyst*

Finally, we shouldn't infer that deteriorating credit was a major factor
here?

**Richard Anthony** - *Synovus Financial Corp. - Chairman, CEO*

***No.***

145.   On January 2, 2009, Synovus updated its outlook for the fourth quarter of

2008 in a press release, which stated in part:

Synovus (NYSE:SNV), the Columbus, Georgia-based financial services company, announced today its updated outlook for the fourth quarter of 2008.

Synovus expects its fourth quarter loan loss provision, ORE liquidation costs, and charge-offs to remain at elevated levels related to current economic conditions. Synovus also expects to increase its loan loss reserve during the quarter. The current estimate for the fourth quarter loan loss provision is approximately $250 million with a fourth quarter estimated charge-off ratio of approximately 2.2%. The largest component of these elevated charges relates to Atlanta market residential real estate credits. Additionally, Synovus is assessing its goodwill for potential impairment during the fourth quarter.

*     *     *

146.   The next day, on January 3, 2009, the Company corrected its updated outlook:

**Columbus, GA, January 3, 2009 -** On January 2, 2009, Synovus Financial Corp. (NYSE:SNV), the Columbus, Georgia-based financial services company, issued a press release that incorrectly stated the Company's current estimate for the fourth quarter loan loss provision as approximately $250 million with a fourth quarter estimated charge-off ratio of approximately 2.2%. The correct current estimate for the fourth quarter loan loss provision is approximately $350 million with a fourth quarter estimated charge-off ratio of approximately 3.2%.

*     *     *

147.   Also, on January 5, 2009, Morgan Keegan downgraded Synovus to market perform. In this analyst report, Morgan Keegan noted that "[w]hile asset quality for the CRE (44% of loans) category has weakened industry-wide over the last

- 80 -

few months, we expect this portfolio to come under increased stress given the impact of the ongoing recession."

148.   On January 6, 2009, Synovus spokesman Patrick Reynolds stated in an interview that Synovus "stopped lending to any new projects in the retail sector, in the shopping sector, or the hotel sector" in June.

149.   Thereafter, on January 12, 2009, Moody's Investors Service changed the rating outlook on Synovus and its subsidiaries (including, CB&T) to negative from stable.  Moody's stated that the negative outlook reflects Synovus' high commercial real estate concentration in the southern U.S. and, in particular, the continued sizable deterioration in its residential construction portfolios in Atlanta and West Florida. Indeed, Moody's noted that as of September 30, 2008, Synovus' commercial real estate portfolio, excluding owner-occupied properties, amounted to almost five times its Tier 1 capital.

150.   On January 13, 2009, *Bloomberg* reported that Synovus' commercial real estate could see a second wave of loan losses and referenced Synovus' cessation of lending to the hotel sector:

*     *     *

Synovus, which reports quarterly results on Jan. 22, said Jan. 2 that losses on loans and uncollectible debt will "remain at elevated levels." The Columbus, Georgia-based company plans to reserve about $250 million to help cover Atlanta real-estate loans. The bank said in

November it would sell the U.S. government's Troubled Asset Relief Program $973 million in preferred stock and warrants.

The lender has had five quarters of lower profit and losses, and its stock has fallen 44 percent in 12 months, compared with 28 percent for the KBW Regional Bank Index. The bank's real-estate loan portfolio makes up 78 percent of total loans, according to Deutsche Bank data. Almost a fifth of loans are in commercial real-estate projects like shopping centers and hotels, Synovus spokesman Patrick Reynolds said in an interview Jan. 6.

*     *     *

Synovus "stopped lending to any new projects in the retail sector, in the shopping sector, or the hotel sector" in June, Reynolds said.

*     *     *

151.    As these disclosures made their way into the market, Synovus' common stock price continued to decline, falling from a close of $8.20 on January 2, 2009 to a low of $4.51 per share on January 20, 2009.

152.    On January 22, 2009, Synovus reported its financial results for the fourth quarter and full year of 2008.  In a press release, the Company stated in pertinent part:

**Columbus, Ga., January 22, 2009 -** Synovus reported a net loss for the fourth quarter of 2008 of $637 million, or $1.93 per share, compared to income from continuing operations of $53.1 million, or $0.16 per diluted share for the fourth quarter of 2007. The fourth quarter 2008 results include provision expense of $364 million and a $443 million non-cash goodwill impairment charge. Excluding the goodwill impairment charge, Synovus' net loss would have been $195 million, or $0.59 per share, for the quarter.

For the full year 2008, Synovus reported a net loss of $584 million, or $1.77 per share, compared to income from continuing operations of $343

million, or $1.04 per share for 2007. Excluding the goodwill impairment charges of $480 million in 2008, Synovus' net loss would have been $105 million, or $0.32 per share, for the year.

Synovus previously announced that it was reviewing its goodwill for potential impairment. Based on the results of this review, Synovus recorded a non-cash $443 million (pre-tax and after-tax) goodwill impairment charge during the fourth quarter of 2008. This charge had no impact on Synovus' tangible capital levels, regulatory capital ratios, or liquidity. Additionally, goodwill impairment has no connection to or utilization of capital received from the U.S. Treasury as part of the Capital Purchase Program.

"As the economy continued to deteriorate in the fourth quarter, credit quality in the residential construction and development portfolios, especially in Atlanta, continued to weaken," said Richard Anthony, Chairman and CEO. "We are taking actions to recognize and liquidate these non-performing credits as efficiently and economically as possible. During the fourth quarter, our sequential quarter core deposit growth was 11% (annualized). We believe this puts us in a very strong liquidity position at the end of one of the worst years the financial services industry has faced. Additionally, in the fourth quarter, we received approximately $968 million from the sale of preferred stock and warrants to the U.S. Treasury as part of the government's Capital Purchase Program. As of December 31, 2008, our Tier 1 Capital Ratio was 11.22%, Total Risk-Based Capital Ratio was 14.55%, and Tangible Common Equity to Tangible Assets Ratio was 7.91%. We believe the strength of our liquidity and strong capital structure positions us well for the future."

The provision expense for the quarter was $363.9 million, compared to $151.4 million last quarter. The provision for loan losses covered net charge-offs by 159% for the quarter. For the full year 2008, provision expense of $700 million exceeded net charge-offs by $231 million. The ratio of nonperforming assets to loans, impaired loans held for sale, and other real estate was 4.16%, as of December 31, 2008, compared to 3.58% last quarter. Nonperforming loans were $922 million as of December 31, 2008, an increase of $152 million from the third quarter of

2008. The Atlanta market represents 29% of Synovus' total loans in the residential construction and development portfolios and 45% of the nonperforming loans in the residential construction and development portfolios.

The net charge-off ratio for the quarter was 3.25% compared to 1.53% last quarter. The net charge off ratio for the full year 2008 was 1.71%. The allowance for loan losses was 2.14% of loans as of December 31, 2008, compared to 1.68% as of September 30, 2008.

During the fourth quarter, Synovus continued to refine its non-performing asset disposal strategy. In addition to the individual bank teams aggressively identifying and liquidating non-performing assets, Synovus formed a separate subsidiary to purchase certain non-performing assets from its subsidiary banks, assess the economics of disposal of these assets, and centrally and effectively manage the liquidation of these assets. This entity has acquired approximately $500 million of these assets as of December 31, 2008 and has identified approximately $150 million of these assets for liquidation in the near term. These assets have been written down an additional $50 million in the fourth quarter to reflect the estimated proceeds from liquidation.

In the current environment, Synovus has focused on growing deposits faster than loans. Total core deposits (excludes brokered deposits) grew 11.1% (annualized) on a sequential quarter basis and 5.1% over the 2007 year end balance.  Shared deposit products that provide up to $7,750,000 of FDIC insurance per individual account were up $852 million in certificate of deposit and money market accounts in the fourth quarter.

Total loans grew 3.9% (annualized) on a sequential quarter basis. Commercial and industrial loans grew 5.9% and retail loans grew 5.5%, while residential construction and development loans declined 15.3% on a sequential quarter annualized basis. The net interest margin for the quarter was 3.20%, compared to 3.42% last quarter. Net interest income for the fourth quarter was $258.0 million compared to $286.7 million in the fourth quarter of 2007.

Reported non-interest expense for the fourth quarter 2008 was $723.2 million. Excluding the goodwill impairment charge, non-interest expense for the fourth quarter of 2008 was $280.5 million compared to $235.2 million in the fourth quarter 2007. The increase consisted primarily of a $59.0 million increase in losses and costs related to foreclosed real estate, $3.7 million increase in professional fees, and a $3.8 million increase in FDIC insurance and other regulatory fees. Synovus' efforts to manage headcount during 2008 have resulted in a reduction of 451 positions and have caused employment expenses to trend downward by $1.9 million on a linked quarter basis. For the full year 2008, no executive bonuses were paid.

Anthony concluded, ***"As we look out into 2009, we are fully committed to actively and aggressively deal with our non-performing assets through the activities of our front line bankers as well as the separate subsidiary structured to enhance this capability from the corporate level. We believe continued strong core deposit growth and the U.S. Treasury funds enable us to be aggressive in resolving these credit issues while allowing us to look to the future for growth."***

153.   Also on January 22, 2009, after the market's close, the Company hosted a conference call with various securities analysts.  During the call, an analyst again specifically inquired into the relationship between Sea Island and Synovus. While the Individual Defendants again tried to dispel any concerns about the Sea Island loans, they revealed for the first time that Sea Island was Synovus' largest customer:

**Nancy Bush**  - *NAB Research - Analyst*

Good afternoon, guys. Hey, Nancy. If I missed it, I'm sorry. Did you address the Island at all, and the size of the exposures, et cetera, et cetera? It's been much independent the news lately, I think down in Atlanta.

**Richard Anthony**  - **Synovus Financial Corp. - Chairman, CEO**

- 85 -

It has, and I'm going to ask Fred to make a comment there.

**Fred Green  - Synovus Financial Corp. - COO**

***Nancy, what we say about Sea Island is they are our largest customer.***
I won't get into the net amount of our loan there, but what I will say is
that loan is a performing loan.  We have very frequent interaction with
the Company and the principles, because of the size of the loan and that
being our largest customer.  As I said, it is a performing loan.

**Nancy Bush  - NAB Research - Analyst**

Has that loan been restructured?   Is that part of its remaining
performing?   Because my understanding is that Sea Island, the
development, is not in great shape.

**Fred Green  - Synovus Financial Corp. - COO**

They are in, as you know, the resort business. That's an area that's
suffering throughout the country.  That loan has not been restructured.
We are talking to them about opportunities to do that, but at this point it
has not been restructured and is current as well.

**Richard Anthony  - Synovus Financial Corp. - Chairman, CEO**

And the reference Fred is making would have to do with a longer term.
The Company is performing within the maturities that have been
established and with all the covenants and payment requirements, but if
possible, we would like to work out a longer term maturity and those
conversations are going on. ***There are other bank partners in with us,
and the activity levels have been pretty good down there.  I was down
there last weekend and was impressed with what I saw.***

154.    Analyst SunTrust Robinson Humphrey issued a report on January 22, 2009 expressing, for the first time, serious concerns about the Company's relationship with Sea Island, stating:

> The **struggling Sea Island Company is SNV's largest customer**.  Our industry contacts tell us occupancy levels are fairly low, and the company appears to be discounting room rates materially via multiple special offers.  While the loan is performing as of today, **we are very concerned about the health of this credit in the coming months**.

155.    While this revelation that Sea Island was Synovus' largest customer  and that Defendants "have very frequent interaction with [Sea Island] and the principles, because of the size of the loan and that being our largest customer" caused the market to call into question Synovus' true lending relationship with Sea Island and its related financial exposure, Defendants buttressed this announcement by stating that the loan was current and performing, and that activities levels at Sea Island were "pretty good."  Defendants' misleading positive statements had the effect of propping up Synovus' stock price and maintaining its artificial inflation.

156.    On March 2, 2009, Synovus filed its annual report for fiscal year 2008, the period ended December 31, 2008, on Form 10-K with the SEC.  The 2008 10-K affirmed the fourth quarter 2008 loan loss provision of approximately $350 million announced on January 3, 2009.  The 2008 10-K failed to disclose any information

- 87 -

regarding the Company's loans to Sea Island.  Moreover, Defendants Anthony and Prescott signed SOX certifications as set forth in ¶100 above.

157.   Also, on March 2, 2009, analyst SunTrust Robinson Humphrey issued a report lowering its estimates on Synovus, and noting the Company "is unlikely to turn a profit until at least 2011."

158.   As this information made its way into the market, the market reacted negatively, with Synovus shares closing at $2.47 per share on March 5, 2009, down from $3.48 on February 27, 2009, the last trading day before March 2, 2009.

159.   Finally, on April 22, 2009, and despite its previous positive commentary about its relationship with Sea Island, Synovus could no longer hide the deteriorating nature of its relationship with Sea Island and issued a press release which stated in pertinent part:

> **Columbus, Ga., April 22, 2009** - Synovus reported a net loss for the first quarter of 2009 of $136.7 million, or $0.46 per common share, compared to net income of $81.0 million, or $0.24 per diluted share, for the first quarter of 2008. The first quarter 2009 results include provision expense of $290.4 million.
>
> Business Highlights
>
> - Sequential quarter core deposit growth was 7.5% (annualized).
>
> - Capital Ratios remain strong – Tier 1 Capital Ratio was 11.05%, Total Risk-Based Capital Ratio was 14.21%, and Tangible Common Equity to Tangible Assets Ratio was 7.8%.

- TARP capital infusion contributed to $3.8 billion in new and renewed loans during the first quarter of 2009.

- Mortgage loan originations were $687 million, up 162% over last quarter and 103% over the first quarter of 2008.

- Salary and personnel expenses were down 8.3% from the first quarter of 2008.

"As the economy continued to deteriorate in the first quarter, credit quality in the residential construction and development portfolios, especially in Atlanta, continued to weaken," said Richard Anthony, Chairman and CEO. "We are proactively recognizing problem assets and are taking actions to liquidate these non-performing assets as efficiently and economically as possible. Our core deposit growth strengthens our liquidity position, and along with our strong capital position, we believe that we will be able to come out of this credit crisis as a strong bank holding company. We are doing everything we can to return to profitability, repay the U.S. Treasury, and restore our dividend as soon as possible."

Credit

The provision expense for the quarter was $290.4 million, compared to $363.9 million last quarter. The provision for loan losses covered net charge-offs by 118% for the quarter. The ratio of nonperforming assets to loans, impaired loans held for sale, and other real estate was 6.25%, as of March 31, 2009, compared to 4.16% last quarter. ***Nonperforming loans were $1.4 billion as of March 31, 2009, an increase of $519 million from the fourth quarter of 2008. The increase is primarily related to one resort/hotel relationship, which is being restructured, and was classified as non-performing during the quarter.*** The Atlanta market represents 27% of Synovus' total loans in the residential construction and development portfolios and 45% of the nonperforming loans in the residential construction and development portfolios. The net charge-off ratio for the quarter was 3.53% compared to 3.25% last

quarter. The allowance for loan losses was 2.32% of loans as of March 31, 2009, compared to 2.14% as of December 31, 2008.

Deposits

In the current environment, Synovus has focused on growing core deposits faster than loans. Total core deposits (total deposits less national market brokered deposits) grew 7.5% (annualized) on a sequential quarter basis and 6.9% over the first quarter of 2008. Shared deposit products that provide up to $7,500,000 of FDIC insurance per individual account were up to $1.83 billion in certificate of deposit and money market accounts in the first quarter, up from $214 million in the first quarter of 2008.

Loans and Margin

Total loans declined 2.8% (annualized) on a sequential quarter basis. Commercial and industrial loans declined 3.3%, retail loans declined 5.8%, and residential construction and development loans declined 30.3%, while investment properties grew 20.6% on a sequential quarter annualized basis. Total loans grew 2.3% over the first quarter of 2008. The net interest margin for the quarter was 3.05%, compared to 3.20% last quarter. Net interest income for the first quarter was $243.2 million compared to $278.6 million in the first quarter of 2008.

\*     \*     \*

160.   On the same conference call, Defendants admitted that the Sea Island loans exceeded the Company's large borrower policy and that the exposure was "much higher" than Defendants deemed to be appropriate:

**Steven Alexopoulos - *JPMorgan - Analyst***

Hi, guys. I had a few more questions on this $220 million or so restructured hotel loan?

- 90 -

**Richard Anthony - *Synovus Financial Corp. - CEO***

Yes.

**Steven Alexopoulos - *JPMorgan - Analyst***

Is that the entire loan relationship that you have for that borrower?

**Fred Green - *Synovus Financial Corp. - President, COO***

That would represent 90% plus of it.

**Steven Alexopoulos - JPMorgan - Analyst**

What you guys estimate for the value of the collateral on that loan?

**Fred Green - *Synovus Financial Corp. - President, COO***

The collateral far exceeds the debt.

**Steven Alexopoulos - *JPMorgan - Analyst***

You would not need a specific reserve, though?

**Fred Green - *Synovus Financial Corp. - President, COO***

No. It has got a reserve, as all of our loans would have, but as it relates to impairment testing, obviously we have gone through that and have not taken any writedowns on it because of the appraised value.

**Steven Alexopoulos  - *JPMorgan - Analyst***

Okay. Richard, could you just review for us quick why you hold such a large credit on the balance sheet? I guess it's little over 8% of tangible equity.

**Richard Anthony  - *Synovus Financial Corp. - CEO***

It is a large credit, and we started – well, first of all there – I would say in the latter stages of the renovation that took place in this credit, there were some advances that we made that went beyond the original expectations as plans changed, as cost overruns were incurred and needs became apparent. So the original concept would not have been to this level. ***This is a much higher exposure than we think is appropriate for our Company going forward. We have a large borrower policy limit that will be well below this, but this is where we are at this point in time.*** But I tend to agree with the, I think, the tone of your question, in that our size needs to have tighter limits on large borrower concentrations, and we are clearly moving in that direction.

161.   Numerous analysts, including FIG Partners, Sterne Agee & Leach, Inc., SunTrust Robinson Humphrey, and Fox-Pitt Kelton Cochran Caronia Waller, issued reports on April 22, 2009 and April 23, 2009, identifying the soured "one resort/hotel relationship" as Sea Island.  Likewise, the Columbus Ledger-Enquirer reported on April 22, 2009, that the customer at issue was indeed Sea Island.

162.   The revelation of the true nature of the Sea Island loans and the Company's considerable exposure caused the price of Synovus stock to drop dramatically.  While Synovus closed at $4.06 per share on April 22, 2009, the stock closed at just $3.00 per share on April 27, 2009 – a 26% decline, resulting in millions of dollars in investor losses.

## VII.   POST-CLASS PERIOD REVELATIONS

163.   The full extent of Sea Island's financial woes continued to be revealed to the market after April 2009.  Indeed, on July 23, 2009, Sea Island announced it had

finalized the terms of its April 22, 2009 restructuring agreement with its lenders and, had consolidated as much as $400 million in outstanding debt into a three-year credit facility that matures in July 2012.

164.   On May 28, 2009, Synovus announced that Defendant Green resigned as President of the Company.

165.   Thereafter, in October 2009, Sea Island announced that it was selling nearly 18,000 acres of property that had been slated for a massive residential and mixed-use development.

166.   In November of 2009, Wells Fargo & Company took over the deeds to Sea Island's Frederica golf course community and an undeveloped 400-acre parcel on St. Simons Island.

167.   On January 27, 2010, Sea Island revealed that it had reached a forbearance agreement with its lenders, including Synovus and CB&T.  While under this agreement the Sea Island loan is technically in default, Synovus had agreed to a grace period to help Sea Island work through payment issues or exit.  Sea Island also disclosed that it had taken several actions to alleviate its financial condition, but that they had not been sufficient.  These actions included:

- Laying off employees
- Surrendering deeds to the Frederica development

- Seeking buyers for 28 square miles of raw land in Glynn and Camden counties
- Attempting to sell its Ocean Forest Golf Club to club members
- Seeking an outside "white knight" investor to provide it with cash

168.   Finally, on February 18, 2010, the Sea Island Company announced that it had engaged Goldman Sachs to lead its evaluation of Sea Island's strategic alternatives.

## VIII.  ADDITIONAL SCIENTER ALLEGATIONS

169.   The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; and knowingly or severely recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

170.   Indeed, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Synovus and its business practices, their control over and/or receipt of Synovus' allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Synovus, were active and culpable participants in the fraudulent scheme alleged herein.   The Individual Defendants knew and/or

- 94 -

severely recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and/or severe recklessness and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

171.   In addition to the numerous allegations throughout the Complaint, herein incorporated by reference, demonstrating the Individual Defendants' scienter, for the reasons further detailed herein, each of the Individual Defendants had knowledge of or recklessly disregarded that the public statements and documents the Company issued or disseminated were materially false and misleading.  (*See, e.g.*, Section IV).

172.  Defendants also undertook the affirmative obligation to obtain knowledge in order to ensure that the Company's disclosures to the market were truthful by executing SOX certifications (*see, e.g.*, ¶100).

173.   The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; and knowingly or severely recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

A.        **Individual Defendants' Suspicious Insider Trading**

174.    While in possession of non-public adverse information regarding the true financial condition of Sea Island, its low occupancy rates, the extreme cost overruns associated with the Cloister renovation, its financial struggles, and Sea Island's inability to pay on the loan, in November of 2007, Defendants took full advantage of the artificial inflation of Synovus' common stock caused by Defendants' misrepresentations.   In fact, Defendants Holladay and Prescott disposed of huge quantities of their stock and reaped massive proceeds.  For instance, on November 30, 2007, Defendant Holladay sold 62,785 shares of common stock for proceeds of more than $1.5 million.

|  | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Mark G. Holladay | 11/30/2007 | 50,407 | $24.74 | $1,247,069 |
|  | 11/30/2007 | 12,378 | $24.73 | $306,108 |
|  |  | 62,785 |  | $1,553,177 |

175.    Likewise, on November 29, 2007, Defendant Prescott sold 21,744 shares of common stock for proceeds of $528,187.

| Insider | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Thomas J. Prescott | 11/29/2007 | 8,700 | $24.30 | $211,410 |
|  | 11/29/2007 | 4,722 | $24.26 | $114,556 |
|  | 11/29/2007 | 2,322 | $24.31 | $56,448 |
|  | 11/29/2007 | 2,000 | $24.27 | $48,540 |
|  | 11/29/2007 | 2,000 | $24.29 | $48,580 |
|  | 11/29/2007 | 1,200 | $24.32 | $29,184 |
|  | 11/29/2007 | 500 | $24.34 | $12,170 |

| 11/29/2007 | 300 | $24.33 | $7,299 |
|---|---|---|---|
| | 21,744 | | $528,187 |

176.   The Individual Defendants' stock sales were unusual and suspicious in that such sales were executed at times calculated to maximize their personal benefit from the artificial inflation of Synovus' stock price.   Both Holladay and Prescott began trading after Defendants falsely assured investors that Sea Island was "doing very well," its sales were on "target," and the occupancies in the resorts were high.   At this time, Synovus' stock traded at prices over $24.00.   Accordingly, Defendants Holladay and Prescott's stock sales were conspicuously well-timed.

177.   Further, the stock sales were unusual and suspicious in amount. Defendant Prescott liquidated 21,744 shares of common stock for proceeds of $528,187.  In so doing, Defendant Prescott liquidated more than 20% of his common stock holdings.   Likewise, Defendant Holladay's stock sales were unusual and suspicious in amount.  As detailed above, Defendant Holladay sold 62,785 shares of common stock for proceeds of $1,553,177.   This amount was unusual in that it represented more than 52% of his common stock holdings.

## IX.   PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

178.   The market for Synovus' publicly traded securities was open, well-developed, and efficient at all times.   As a result of these materially false and

misleading statements and failures to disclose, Synovus' publicly traded securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Synovus' publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to Synovus, and have been damaged thereby.

179.   At all relevant times, the market for Synovus' securities was an efficient market for the following reasons, among others:

(a)   Synovus' stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)   As a regulated issuer, Synovus regularly made public filings, including its Forms 10-K, Forms 10-Q and related press releases with the SEC and the NYSE;

(c)   Synovus regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Synovus was followed by several securities analysts employed by major brokerage firms, such as Sandler O'Neill & Partners, Sterne, Agee & Leach, Inc., and Stifel Nicolaus, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large.  Each of these reports was publicly available and entered the public marketplace.

180.   As a result of the foregoing, the markets for Synovus' securities promptly digested current information regarding Synovus from all publicly available sources and reflected such information in the prices of Synovus' securities.

181.   Under these circumstances, all purchasers of Synovus' securities during the Class Period suffered similar injury through their purchase of Synovus' securities at artificially inflated prices and a presumption of reliance applies.

182.   At the times they purchased or otherwise acquired Synovus' securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.  As a result, the presumption of reliance applies.  Plaintiffs will also rely, in part, upon the presumption of reliance established by a material omission.

183.   In sum, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's securities traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiffs and the other members of the Class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

## X.    LOSS CAUSATION

184.   As detailed herein, Defendants' fraudulent scheme artificially inflated Synovus' stock price by issuing materially false statements and failing to disclose that: (a) Synovus had far greater exposure to losses as a result of its practice of issuing insider loans than the Company told investors; (b) Synovus had loaned hundreds of millions of dollars to Sea Island – its largest customer – to renovate the Cloister hotel and surrounding property; (c) the Sea Island Company's CEO, Jones III, sat on the Synovus Board of Directors and was able to borrow hundreds of millions of dollars to complete the Cloister renovation with minimal oversight from Synovus' board of

directors; (d) Synovus' loans to Sea Island exceeded the Company's large borrower policy limit, a fact the Company did not disclose to investors; (e) Synovus had made advances to Sea Island that far exceeded the original expectations of the loan due to cost overruns; (f) Sea Island was struggling financially due to insufficient real estate sales and declining occupancy levels at is resorts, which presented a serious risk as to its ability to make payment on its outstanding loans to Synovus;  (g)  as a result of Sea Island's deteriorating credit, Synovus had no reasonable basis to believe that Sea Island would timely repay its loan; (h) Synovus had far greater exposure to losses as a result of its loans to Sea Island – which was "past due" throughout the Class Period – than the Company told investors; (i) Synovus' credit troubles extended beyond the Atlanta market; and (j) Synovus' effort to reassure investors about its credit quality and relationship with Sea Island was part of a scheme to inflate the stock price.

185.   These false and misleading statements, individually and collectively, concealed Synovus' true financial circumstances and future business prospects, resulting in the stock being artificially inflated until, as indicated herein, the relevant truth about Synovus was revealed.  While each of these misrepresentations was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate Synovus' stock price and the image of its future business prospects to give the market the false notion that: (a) Synovus was aggressively managing its loan portfolio

and its associated credit quality; (b) inside relationships did not play a significant role in Synovus' lending decisions; (c) the Sea Island relationship was beneficial to Synovus; and (d) Synovus was confident that the Sea Island loans would continue to perform. Defendants' false and misleading statements had the intended effect and caused, or were a substantial contributing cause of Synovus' stock trading at artificially inflated levels, reaching as high as $26.86, throughout the Class Period.

186.   As stated above in Section VI, through multiple revelations, the true picture of Defendants' illicit scheme, and the Company's true financial condition was not revealed to the market all at once.  Rather, the truth began to emerge on July 8, 2008, when the Company announced that Jones III was resigning as a Synovus director, and the market began to ask questions, causing the truth to emerge, and the risk caused by Defendants' fraud materialized slowly through a series of partial revelations, which cast doubt on the veracity of the Company's Class Period statements, for example:

- **July 8, 2008:**  Company filed an 8-K, revealing that "Effective July 7, 2008, Alfred W. Jones III resigned as a director of Synovus Financial Corp."  As the market digested this information, Synovus' stock price dropped from a close of $8.52 on July 8, 2008 to close at $8.03 on July 9, 2008.

- **January 2-20 2009:** Company updated its outlook for the fourth quarter of 2008 in a press release, which stated that Synovus expects its fourth quarter loan loss provision, ORE liquidation costs, and charge-offs to

remain at elevated levels related to current economic conditions.  This press release also stated that Synovus expects to increase its loan loss reserve during the quarter and that the current estimate for the fourth quarter loan loss provision is approximately $250 million with a fourth quarter estimated charge-off ratio of approximately 2.2%.  On January 3, 2009, the Company corrected this updated outlook, stating that "[t]he correct current estimate for the fourth quarter loan loss provision is approximately $350 million with a fourth quarter estimated charge-off ratio of approximately 3.2%."  On January 12, 2009, Moody's Investors Service changed the rating outlook on Synovus and its subsidiaries (including, CB&T) to negative from stable.  Moody's stated that the negative outlook reflects Synovus' **high commercial real estate concentration** in the southern U.S. and, in particular, the continued sizable deterioration in its residential construction portfolios in Atlanta and West Florida.  Indeed, Moody's noted that as of September 30, 2008, **Synovus' commercial real estate portfolio, excluding owner-occupied properties, amounted to almost five times its Tier 1 capital**.  Thereafter, on January 13, 2009, *Bloomberg* reported that Synovus' commercial real estate could see a second wave of loan losses and referenced a cessation of lending to the hotel sector.  As these revelations made their way into the marketplace, Synovus' common stock price continued to decline, falling to as low as $4.51 per share on January 20, 2009 from a close of $8.20 on January 2, 2009.

- **January 22, 2009:**  Synovus announces that Sea Island was its largest customer and that Defendants "have very frequent interaction with [Sea Island] and the principles, because of the size of the loan and that being our largest customer," which caused the market to call into question Synovus' true lending relationship with Sea Island and its related financial exposure.  Also, on this date, Analyst SunTrust Robinson Humphrey issued a report expressing serious concerns about the Company's relationship with Sea Island.

- **March 2, 2009:**  After the market closed, Synovus filed its annual report for fiscal year 2008 on Form 10-K with the SEC, the period ended December 31, 2008.  This report affirmed the fourth quarter 2008 loan loss provision of approximately $350 million, announced on January 3,

2009.  Also on March 2, 2009, analyst SunTrust Robinson Humphrey issued a report lowering its estimates on Synovus, and noting the Company "is unlikely to turn a profit until at least 2011."  As this news made its way into the market, the market reacted negatively, with Synovus shares closing at $2.47 per share on March 5, 2009, down from $3.48 on February 27, 2009.

187.   As a result of this series of partial revelations of the true nature of the lending relationship between Sea Island and Synovus, Synovus' elevated charge-offs and its high commercial real estate concentration, and its significant lending exposure to Sea Island, doubt was cast on the veracity of Defendants' prior public statements.  Additionally, these partial revelations were the natural and direct consequence (*i.e.*, materialization of the risk) of the fraud described herein.  As a result of the market becoming increasingly aware of Synovus' financial problems, the artificial inflation began to slowly fall out of Synovus' stock price.

188.   As further detailed above in Section VI, this stock drop would have been even more significant had the full truth regarding Synovus' business and financial condition been known.  However, in the face of market concerns regarding Synovus' Sea Island loan exposure and Sea Island's ability to perform on its loans, Defendants continued to make false and misleading statements in order to maintain an appearance that the Company's lending relationship with Sea Island was sound and to artificially prop up Synovus' stock price, for example:

- "What I would say is, Sea Island Company has been a customer for a number of years and a good one. We have a large relationship that really is easier to manage without Bill being on our Board. He had offered to really move off a couple of quarters ago, and they are certainly a good customer with a good relationship. But for us to work on some of their needs, with his being an insider, would have just really slowed us down. So we think that it was best for everybody to eliminate these potential conflicts." When asked by a Stifel Nicolaus analyst, whether the market should infer that deteriorating credit was a major factor in this resignation, Defendant Anthony responded "No."

- "[w]hat we say about Sea Island is they are our largest customer. I won't get into the net amount of our loan there, but what I will say is that loan is a performing loan. We have very frequent interaction with the Company and the principles, because of the size of the loan and that being our largest customer. As I said, it is a performing loan."

- "[Sea Island is] in, as you know, the resort business. That's an area that's suffering throughout the country. That loan has not been restructured. We are talking to them about opportunities to do that, but at this point it has not been restructured and is ***current as well***."

- "The Company is performing within the maturities that have been established and with all the covenants and payment requirements, but if possible, we would like to work out a longer term maturity and those conversations are going on. There are other bank partners in with us, and ***the activity levels have been pretty good down there. I was down there last weekend and was impressed with what I saw***."

189.   These false and misleading statements and omissions, among others, had

the intended effect of preventing the market from learning the full truth and keeping

the Company's stock price artificially inflated throughout the Class Period. A truer picture of Synovus' business, operations and relationship with Sea Island were disclosed to the market on April 22, 2009, when the Company issued a Form 8-K, attaching a press release, which reported Synovus' first quarter results for 2009 and disclosed for the first time its true financial exposure to Sea Island. Indeed, the Company disclosed that its nonperforming loans had increased by $519 million primarily due to one resort/hotel relationship, believed to be the Sea Island by analysts and the media, which was classified as non-performing during the quarter. When Synovus provided the market with these revelations of its truer financial condition and its truer lending relationship with and exposure to Sea Island, it was an indication to the market that Defendants' prior Class Period statements were false and misleading. As a result of the information revealed to the market on April 22, 2009, which made its way into the marketplace over the subsequent trading days, the market cast doubt on the veracity of Defendants' prior statements, causing Synovus' stock to drop approximately 26%, as it closed at just $3.00 per share on April 27, 2009.

190. The market's negative reactions to Synovus' April 22, 2009 revelations are demonstrated in the stock chart below:



191.   The rapid decline in Synovus' stock price following the Company's April 22, 2009, disclosure was a direct and foreseeable consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market, as well as the materialization of the risk created by Defendants' fraud.  Thus, the revelation of truth and the materialization of the risk created by Defendants' fraud at the close of the Class Period, as well as the resulting clear market reaction, support a reasonable inference that the market understood that Defendants' prior public statements were false and misleading.

192.   In sum, as the truth about Defendants' prior misrepresentations and concealments was revealed, and the risk created by Defendants' fraud materialized, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiffs and members of the Class suffered economic losses.

193.   The timing and magnitude of Synovus' stock price decline negates any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

194.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and members of the Class were a direct and proximate result of Defendants' scheme and misrepresentations and omissions that artificially inflated Synovus' stock price and the subsequent significant decline in the value of Synovus' stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## XI.   NO SAFE HARBOR

195.   The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein,

Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Synovus who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XII.  PLAINTIFFS' CLASS ACTION ALLEGATIONS

196.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired the publicly traded common stock of Synovus between October 26, 2007 and April 22, 2009, inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

197.   Because Synovus has millions of shares of stock outstanding and because the Company's shares were actively traded on the NYSE, members of the Class are so numerous that joinder of all members is impracticable.  According to Synovus' SEC filings, as of shortly before the close of the Class Period, Synovus had approximately 330 million shares outstanding.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that Class members number at least in the thousands and that they are geographically dispersed.

198.   Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

199.   Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel experienced and competent in class actions and securities litigation.  Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Class they seek to represent.

200.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it

impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

201.  Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)  whether Defendants violated the federal securities laws as alleged herein;

(b)  whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)  whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(d)  whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)  whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

(f)  whether the market prices of Synovus' securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

- 111 -

(g)     whether the members of the Class have sustained damages as a result of the decline in value of Synovus' stock when the truth was revealed and the artificial inflation came out and, if so, what is the appropriate measure of damages.

## COUNT I
## FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 OF PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

202.   Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

203.   During the Class Period, Synovus and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, Plaintiffs, and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Synovus' publicly traded securities; and (iii) cause Plaintiffs and other members of the Class to purchase Synovus' publicly traded securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Synovus and the Individual Defendants, and each of them, took the actions set forth herein.

204.   These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts,

practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Synovus' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of Synovus, as alleged below.

205. In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, product marketing and promotion, financial condition, and operational performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

206. Synovus and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce

and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, sales performance, product marketing and promotion, operations, and future prospects of Synovus as specified herein.

207.   These Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Synovus' value and performance and continued substantial sales, financial and operational growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Synovus and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Synovus' securities during the Class Period.

208.   The Individual Defendants' primary liability and controlling person liability arise from the following facts:  a) the Individual Defendants were high-level executives at the Company during the Class Period; b) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers, were privy to,

and participated in the creation, development, and reporting of, the Company's internal sales and marketing plans, projections, and/or reports; c) the Individual Defendants enjoyed significant personal contact and familiarity with, was advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

209.   Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness and for the purpose and effect of concealing Synovus' operating condition, sales, product marketing and promotional practices, and future business prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by the Individual Defendants' overstatements, misstatements and omissions of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual

knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

210.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Synovus' securities were artificially inflated during the Class Period.  In ignorance of the fact that market prices of Synovus' publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or disregarded with deliberate recklessness by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Synovus' securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price decline on or about April 22, 2009, when the artificial inflation was released from Synovus stock.

211.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true performance, sales, marketing, promotion and other fraudulent business practices,

future prospects and intrinsic value of Synovus, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Synovus publicly traded securities during the Class Period; or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

212.   By virtue of the foregoing, Synovus and the Individual Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

213.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as evidenced by, among others, the stock price decline on or about April 22, 2009, when the artificial inflation was released from Synovus stock.

### COUNT II
### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

214.   Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

215.   The Individual Defendants acted as controlling persons of Synovus within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue

of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's fraudulent marketing practices and actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

216.   In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

217.   As set forth above, Synovus and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the

Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the stock price decline on or about April 22, 2009, when the artificial inflation was released from Synovus stock.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

(a)     Declaring that this action is a proper class action and certifying Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel for the proposed Class;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Such other and further relief as the Court deems appropriate.

## XIV.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  June 11, 2010         ROBBINS GELLER RUDMAN
                                    & DOWD LLP

                                               s/ John C. Herman
                                        JOHN C. HERMAN

JOHN C. HERMAN
Georgia Bar No. 348370
RYAN K. WALSH
Georgia Bar No. 735190
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA 30326
Telephone:  404/504-6500
404/504-6501 (fax)
jherman@rgrdlaw.com
rwalsh@rgrdlaw.com

MOTLEY RICE LLC
JOSEPH F. RICE
JAMES M. HUGHES
WILLIAM S. NORTON
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
jrice@motleyrice.com
jhughes@motleyrice.com
bnorton@motleyrice.com

***Co-Lead Counsel for Plaintiffs***

- 120 -

KOSKIE MINSKY LLP
MICHAEL MAZZUCA
20 Queen Street West
Suite 900, Box 52
Toronto, Ontario M5H 3R3
Telephone:  416/977-8353
416/977-3316 (fax)

***Additional Counsel for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 11, 2010, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send a Notice of

Electronic Filing to all counsel of record.

ROBBINS GELLER RUDMAN
& DOWD LLP


s/ John C. Herman
JOHN C. HERMAN

JOHN C. HERMAN
Georgia Bar No. 348370
RYAN K. WALSH
Georgia Bar No. 735190
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA 30326
Telephone:  404/504-6500
404/504-6501 (fax)
jherman@rgrdlaw.com
rwalsh@rgrdlaw.com