**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

City of Pompano Beach General
Employees' Retirement System
*Individually and on Behalf of All
Others Similarly Situated* and Charles
K. Miller,

          Plaintiffs,

       v.

Synovus Financial Corp., et al.,

          Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.
1:09-cv-01811-JOF

## OPINION & ORDER

This matter is before the court on Defendants' motion to dismiss [45] and Plaintiffs'

motion to strike certain exhibits [48].

## I.    Background

### A.    Procedural History

Plaintiff, City of Pompano Beach General Employees' Retirement System ("Pompano

Beach"), filed the instant class action litigation against Defendants, Synovus Financial

Corp., and certain of its officers, Richard Anthony, Frederick L. Green III, Thomas J.

Prescott, and Mark. G. Holladay, on July 6, 2009, alleging violations of the Securities

Exchange Act of 1934, specifically §§ 10(b) and 20(a) and SEC Rule 10b-5. The complaint

AO 72A
(Rev.8/82)

proposes a class of all persons who had purchased or otherwise acquired common stock of Synovus Financial Corp. between October 26, 2007, and April 22, 2009 (the "Class Period").

The complaint alleges that "Defendant engaged in a fraudulent scheme to artificially inflate the Company's stock price by concealing from the market its true lending relationship with the Sea Island Company, Sea Island's dire financial condition, and the significant risk that Sea Island would not be able to make payment on its exorbitant loans from Synovus." *See* Amended Cmplt., ¶ 2.

In a previous order, the court appointed the Labourers' Pension Fund of Central and Eastern Canada ("Canadian Labourers") and Sheet Metal Workers' National Pension Fund ("Sheet Metal") as Co-Lead Plaintiffs and Coughlin Stoia and Motley Rice as Co-Lead Counsel. Plaintiffs filed an Amended Complaint on June 11, 2010. *See* Docket Entry [42]. The matter is now before the court on Defendants' fully briefed motion to dismiss.

### B.    Amended Complaint

Plaintiffs filed suit against Synovus, as well as individual Defendants: Richard E. Anthony, Chairman of the Board and CEO of Synovus; Frederick L. Green III, Director, President, and Chief Operating Officer of Synovus until his resignation on May 28, 2009; Thomas J. Prescott, Executive Vice President and Chief Financial Officer of Synovus; and Mark G. Holladay, Executive Vice President and Chief Risk Officer of Synovus. *See*

AO 72A
(Rev.8/82)

Amended Cmplt., ¶¶ 17-20.  Plaintiffs allege that each of the Individual Defendants "by virtue of his high-level position[] with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest level, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition." *Id.*, ¶ 26.

Plaintiffs allege a 270-paragraph, 120-page Amended Complaint.  The court will summarize the background and context of the Amended Complaint here and will discuss in detail Plaintiffs' allegations of false statements below.[1]  Sea Island is a resort island located on the islands off of the Atlantic coast of Georgia in Glynn County.  For several generations, Sea Island has been owned by the Jones family and run through the Sea Island Company which operates the resort, including the Cloister Hotel, and sells real estate on Sea Island.  In 1992, Bill Jones III took over leadership of the Sea Island Company and made plans to expand and extensively renovate the resort.

---

[1]In the course of alleging their Amended Complaint, Plaintiffs refer to several confidential witnesses.  These individuals include: a CB&T Commercial Specialist who worked directly on the Sea Island loans; a former Synovus Senior Vice President of Commercial Real Estate, who worked at Citizens Bank and Trust in Carrollton; a former Synovus Financial Analyst; a former CB&T Vice President of Commercial Lending who worked at CB&T Bank of Middle Georgia; a former Sea Island Senior Accounting Manager; a former Chief Financial Officer of Sea Island; a former Sea Island Purchasing Agent; a former Cloister Project Manager who worked for Baston-Cook Construction at Sea Island; a Sea Island Accounts Payable Associate; a former Sea Island Resort Beach Club Manager; a Sea Island Guest Services Supervisor; and a former General Manager of the Cloister Hotel.

3

Bill Jones III was friends with Jimmy Blanchard, then-Chief Executive Officer of Synovus. In 2000, Blanchard offered Jones III a seat on Synovus's Board of Directors and Jones III offered Blanchard a seat on the Sea Island Company's Board. Sea Island left its usual banker, SunTrust, and started a financing relationship with Synovus. Plaintiffs allege that Synovus offered Sea Island extensive financing, which eventually led to loans of $220 million, to lure it away from SunTrust. The Synovus loans to Sea Island originated out of CB&T Bank in Columbus, Georgia, one of Synovus's charter banks.

Plaintiffs allege that the strategy of the renovation at Sea Island was misguided because Bill Jones aimed to make the resort a "playground for billionaires." Plaintiffs further aver that during the course of the renovation project, cost overruns were astronomical and were not managed well by Sea Island. Once the resort reopened, Plaintiffs contend that occupancy rates were so low that Sea Island could not keep current on the Synovus loan. Specifically, Plaintiffs aver that as of 2006, Sea Island was "past due" on its loan with Synovus, was paying interest only, and required immediate restructuring of the loan.

Beginning in October 2007, Plaintiffs allege a series of false statements and omissions made during five time periods: (1) October 25, 2007 and November 13, 2007; (2) January 24, 2008 and February 29, 2008; (3) April 24, 2008 and May 12, 2008; (4) July 8, 2008, July 24, 2008, August 6, 2008 and August 8, 2008; and (5) October 23, 2008 and November 10, 2008. These false statements were contained in press releases issued in

4

conjunction with Synovus's quarterly earnings reports, as well as conference calls made with industry analysts after the issuance of those reports. Plaintiffs also contend that filings made by Synovus with the Securities & Exchange Commission contained false statements. Among other issues, Plaintiffs argue that Synovus wrongfully failed to discuss the full scope of its exposure to losses on the Sea Island loan and instead left investors with the false impression that the loan continued to perform as expected. Plaintiffs aver that these false statements propped up the price of Synovus stock at an artificially high level.

Under Plaintiffs' theory as alleged in the Amended Complaint, however, the "truth begins to emerge" starting with the announcement of Jones III's resignation from the Board of Synovus, which occurred on July 8, 2008. Plaintiffs contend that although this announcement caused a drop in the stock, Defendants continued to mislead the market thereafter with positive comments at the July 24, 2008, conference call and press releases in association with its fourth quarter 2008 earnings results.

Plaintiffs aver that further cracks appeared in Defendants' false statements when Synovus stated on January 3, 2009, that the correct current estimate for its fourth quarter loss provision was $350 million with a fourth quarter estimate charge-off ratio of approximately 3.2%. Industry analysts began downgrading Synovus stock at this point and the bank announced that it had stopped lending to any new projects in the retail, shopping or hotel sectors.

5

In the closing call of January 22, 2009, Synovus revealed for the first time that Sea Island was its biggest customer, but that the loan was still performing. Defendants also indicated that there was the possibility that the loan would be restructured, but that Sea Island was currently performing within the maturities set forth in the loan. Although these comments revealed more about the Sea Island situation, Plaintiffs aver that Defendants' "misleading positive statements" continued to prop up Synovus's stock price.

On April 22, 2009, Synovus issued its first quarter results which included specific information about the Sea Island loan and noted that nonperforming loans had increased from the fourth quarter of 2008 by $519 million, primarily as a result of one resort/hotel relationship. Thus, Synovus had declared the Sea Island loan to be nonperforming. At the April 22, 2009, closing call, Defendant Anthony made comments concerning the appropriateness of a loan that size. Plaintiffs allege that as a result of these revelations, Synovus stock dropped from $4.06 per share on April 22, 2009, to $3 per share on April 27, 2009, a 26% decline.

Plaintiffs' Amended Complaint also makes numerous allegations regarding scienter. These allegations relate both to insider stock sales, as well as Synovus's loan procedures and the exchange of information within the bank. Based on these assertions, Plaintiffs allege that Defendants knew of or were severely reckless in not knowing of Sea Island's significant financial problems and the consequential effects this would have on the loan.

6

AO 72A
(Rev.8/82)

To satisfy the element of loss causation, Plaintiffs allege that Defendants' false and misleading statements concealed Synovus's true financial condition resulting in an artificial inflation of the stock.  Plaintiffs allege Defendants did this to give the market the false impression that: (a) Synovus was aggressively managing its loan portfolio and credit role; (b) inside relationships did not play a significant role in Synovus's lending decisions; (c) the Sea Island relationship was beneficial to Synovus; and (d) Synovus was confident the Sea Island loans would continue to perform.  Plaintiffs allege that the "timing and magnitude of Synovus' stock price decline negates any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct."

## C.    Contentions

In support of their motion to dismiss, Defendants argue that Plaintiffs fail to establish that the Sea Island loan was "material" to Synovus's financial status or that Defendants were under any obligation to disclose detailed information on the Sea Island loans.  Defendants further contend that Plaintiffs' allegations sound more in corporate mismanagement than fraud.  Defendants also aver that Plaintiffs have failed to adequately plead scienter or loss causation.

In response, Plaintiffs contend that they have specifically pled materially false statements made by certain individual Defendants.  Plaintiffs argue that they have

7

AO 72A
(Rev.8/82)

sufficiently pled scienter through their numerous confidential witnesses who show that the financial condition of Sea Island was known or should have been known to Synovus executives because of the information passed from Sea Island to Synovus. Plaintiffs further contend that they have sufficiently alleged loss causation because they state that their losses were caused by the false statements of Defendants artificially propping up the stock price, but when the truth was revealed over time, the price of the stock dropped.

## II.    Discussion

### A.    Motion to Strike

In their motion to strike, Plaintiffs argue that the court should not consider certain exhibits attached to Defendants' motion to dismiss because they are not documents referenced in the Amended Complaint. If the court were to consider those documents, Plaintiffs aver, it would convert Defendants' motion to dismiss into a motion for summary judgment. The court notes that Plaintiffs do not move to strike Exhibits 1-2, 6, 10, 25, and 27-30 to Defendants' motion. These exhibits are Securities and Exchange Commission filings, documents referenced in the Amended Complaint, and Class Period share price data.

Generally, on a motion to dismiss, the court may not consider documents that are not attached to Plaintiffs' complaint. *See*, *e.g.*, *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999); *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1369 (11th Cir. 1997). However, the court may consider "a document central to the complaint that the defense

8

AO 72A
(Rev.8/82)

appends to its motion to dismiss . . ., provided that its contents are not in dispute." *Id.* Save Exhibit 26, none of the documents referenced in Plaintiffs' motion to strike are central to the complaint and are therefore due to be stricken. Exhibit 26 is purportedly an occupancy report for the Sea Island resorts. However, Plaintiffs most definitively dispute the contents of Exhibit 26. Therefore, the court may not consider Exhibit 26 on Defendants' motion to dismiss.

Therefore, the court GRANTS Plaintiffs' motion to strike and strikes Exhibits 3-5, 7, 8, 9, 11-13, 14, 15, 16-24, and 26 from Defendants' motion to dismiss.

### B.    Motion to Dismiss

In some respects, the court finds that Plaintiffs complain of corporate mismanagement at the Sea Island Company, but that is germane only to a limited degree and then only in the discussion of loss causation. The court must first focus on the aspects of Plaintiffs' allegations that address potential securities fraud. The parties know where this story ends. Defendants argue that the Sea Island loan was not a material part of Synovus's business, but the collapse of Sea Island led to a hit of $500 million for its creditors. There is no reading of this case which supports a belief that the Sea Island loan was not a significant part of Synovus's loan portfolio.

The Eleventh Circuit has discussed many of the issues relevant to this litigation in its numerous opinions on securities class actions cases, including in particular detail *Mizzaro*

9

*v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008).  *See also Thompson v. RelationServe Media, Inc.*, 610 F.3d 628 (11th Cir. 2010); *Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006).  In the course of its analysis, the court also relies on its own decision in *Anastasio v. Internap Network Services Corp., et al.*, Civil Action No. 08-CV-3462 (N.D. Ga. Sept. 15, 2010) (Forrester, J.), as well as *In re HomeBanc Corporation Securities Litigation*, 706 F. Supp. 2d 1336 (N.D. Ga. 2010) (Batten, J.); *Waterford Township General Employees Retirement System v. SunTrust Banks, Inc.*, 2010 WL 3368922 (N.D. Ga. 2010) (Thrash, J.); and *In re Coca-Cola Enterprises Inc. Securities Litigation*, 510 F. Supp. 2d 1187, 1200-01 (N.D. Ga. 2007) (Thrash, J.).

In *Mizzaro*, the plaintiffs alleged that the defendants violated securities laws in failing to disclose that corporate earnings had been inflated as a result of the widespread practice in retailer's stores of falsely reporting as defective certain products delivered by suppliers in order to obtain unwarranted chargebacks for goods that had been lost to shoplifters or that the store later sold at zero cost.

The Eleventh Circuit first reviewed the securities regulation landscape and noted that:

Section 10(b) makes it unlawful to:

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

10

15 U.S.C. § 78j(b).  Rule 10b-5, in turn, forbids:

any person, directly or indirectly, . . .

(a)     To employ any device, scheme, or artifice to defraud,

(b)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

*Id.* at 1236.

The court also noted that "a securities fraud claim based on failure to reveal information to investors [] has six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" *Id.* at 1236-37 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

As a fraud claim, securities class allegations must meet the heightened requirements of Rule 9(b). *Id.* Further, in 1995, Congress passed the Private Securities Litigation Reform

11

Act ("PSLRA") which altered Rule 9(b)'s particularity requirement by mandating that a securities fraud class action complaint:

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78*u*-4(b)(1)(B).

The court in *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003), had an extended discussion of the impact of the PSLRA on the particularity with which a plaintiff must plead a false statement. The court finds that *Adams* is the best collective statement of where the law stands on this requirement. The court presumes familiarity with the opinion and draws the following principles from the court's discussion. The court's review of the complaint must focus "on whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Id.* at 1099. The court considers the level of detail, the "coherence and plausibility" of the facts considered together, whether the source of plaintiff's knowledge is disclosed, the reliability of the source, and any other indicia. *Id.* The facts alleged must be more than "rumor or hunch." *Id.* at 1101. If considering the manner in which the facts are alleged, a "reasonable person would believe that the defendant's statements were false or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements." *Id.* at 1099. *See also ABC Arbitrage Plaintiffs Group v. Tchuruk*,

12

291 F.3d 336 (5ᵗʰ Cir. 2002); *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000); *In re Theragenics Corp. Sec. Litig.*, 105 F. Supp. 2d 1342 (N.D. Ga. 2000) (Thrash, J.).

The PSLRA also raised the standard for pleading scienter such that in any securities fraud class action:

> in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78*u*-4(b)(2) (emphasis added).  The facts supporting a strong inference of scienter must be alleged "for each defendant with respect to each violation." *Mizzaro*, 544 F.3d at 1238 (quoting *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004)).

As to the substantive intent requirements, a plaintiff must show either an "intent to deceive, manipulate, or defraud," or "severe recklessness."  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 (11ᵗʰ Cir. 1999).  "Severe recklessness" has been described as:

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 1282 n.18.  *See also Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5ᵗʰ Cir. 1981).  In summary, to survive a motion to dismiss, a plaintiff must plead "'with

13

AO 72A
(Rev.8/82)

particularity facts giving rise to the strong inference' that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." *See Mizzaro*, 544 F.3d at 1238.

The *Mizzaro* court referenced the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), to discuss what a "strong inference" of scienter meant. *Id.* In *Tellabs*, the Supreme Court held that "strong inference" means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *See Tellabs*, 551 U.S. at 324. The Eleventh Circuit went on to explain:

> Because the strong-inference inquiry asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard," "courts must consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." *Id.* at 2509, 2511. Moreover, the inquiry is "inherently comparative" because courts "must take into account plausible opposing inferences." *Id.* at 2510, 2509. *Tellabs* explained how to balance opposing inferences this way:
>
>> To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the "most plausible of competing inferences." . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible" – it must be cogent and compelling, thus strong in light of other explanations.

14

> *Id.* at 2510. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 2511.

*Id.* at 1238-39 (noting that what a reasonable person *would* think is different than what a reasonable person *could* think).

The *Mizzaro* court then went on to address an issue relevant to the instant case – how to evaluate scienter in light of allegations made by unidentified, confidential witnesses. *Id.* at 1239. The court concluded that "the weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider. Confidentiality, however, should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." *Id.*

Finally, with respect to the Individual Defendants, Plaintiffs allege that they are liable as "control persons" under § 20(a) of the Exchange Act which provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulations thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

AO 72A
(Rev.8/82)

15 U.S.C. § 78t(a).  The statute "imposes derivative liability on persons that control primary violators of the Act."  *See*, *e.g.*, *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir. 2008).  To state a claim under § 20(a), Plaintiffs must show: (1) that Synovus committed a primary violation of the securities laws; (2) that the Individual Defendants had the power to control the general business affairs of Synovus; and (3) that the Individual Defendants "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability."  *See Mizzaro*, 544 F.3d at 1237 (citation omitted).

### 1.    Pleading False Statements with Particularity

The court agrees with Defendants that to a certain extent, Plaintiffs have employed a method of pleading which quotes in block form the entirety of certain press releases from various quarters when Synovus reported its earnings.  Plaintiffs then place in bold certain of the statements made in the press release or certain portions of the transcript of conference calls with analysts that occurred after the release of earnings statements.  Plaintiffs also do not directly link an alleged false statement with the facts Plaintiffs contend demonstrate that the statement is false.

However, unlike more egregious examples of this so-called "puzzle pleading"[2] where plaintiffs simply state that all of the press release was misleading, Plaintiffs do attempt to

---

[2]*See*, *e.g.*, *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 926 (S.D. Ind. 2008); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073 (N.D. Cal 2001).

16

plead at the conclusion of each time period how they believe the statements made by Defendants were misleading. Therefore, the court will not dismiss Plaintiffs' pleadings as "puzzle pleadings," but will take Plaintiffs at their allegations and focus on the portion of the press release or conference call transcripts that have been highlighted by Plaintiffs. The court will not dig through pages of press releases to try to locate any alleged misstatements.

The court will consider each of the misstatements alleged by Plaintiffs in their Amended Complaint keeping in mind the fact that a false statement or omission is "material" only if its disclosure would alter the total mix of facts available to an investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision. *Basic, Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988).

The Amended Complaint divides the allegedly false statements made by Defendants into five time periods: (1) October 25, 2007 and November 13, 2007; (2) January 24, 2008 and February 29, 2008; (3) April 24, 2008 and May 12, 2008; (4) July 8, 2008, July 24, 2008, August 6, 2008, and August 8, 2008; and (5) October 23, 2008 and November 10, 2008.

Because it is a theme to which the court refers throughout its discussion of whether Plaintiffs have pled false statements with sufficient particularity, the court notes at the outset that Plaintiffs have not dealt with "timing" issues in an adequate manner. As the court discusses more fully below, during the early period of Plaintiffs' Amended Complaint, that

17

is during 2006 and 2007, Plaintiffs make sufficiently specific allegations regarding the status of the Sea Island loan on Synovus's books. But the court cannot presume that the status of the loan as it existed in 2007 continued on a downward decline or on a continuum of what was happening in that original time frame. For example, one might expect that coming immediately after an expensive renovation and restructuring, Sea Island might have difficulty managing the loan as it had reduced income during that time period due to lack of occupancy. However, occupancy rates and income may have increased with the re-opening, thereby generating additional income for Sea Island; or it is possible that the situation never improved.

What is significant for the court's purposes here is that Plaintiffs have not made sufficiently specific allegations with respect to the status of loan during the "middle period" of approximately 2008 that could support a reasonable inference that poor performance on the loan continued to happen. As the court stated above, the end result is known. Sea Island was forced into bankruptcy. But the court cannot make presumptions about what happened to the status of the loan during the "middle" period of Plaintiffs' allegations. Plaintiffs must plead specifics sufficient to support a reasonable inference that poor loan performance continued throughout before the court can make a determination that statements made by Defendants during the "middle" period were false.

<u>October 25, 2007 and November 13, 2007</u>

18

Officials of Synovus, including some Individual Defendants, held a conference call with analysts after the close of the market on October 25, 2007.  During the conference call, an analyst asked about what Synovus was seeing in the Georgia coastal markets, places like Sea Island.  *See* Amended Cmplt., ¶ 97.  Defendant Anthony stated: "But the markets by state that we really have not had any problems with will be South Carolina, Tennessee and Alabama.  And Georgia, outside of the ones we just mentioned in Atlanta." *Id.*  Defendant Holladay also responded:

> Tony, I heard you ask about Sea Island.  I can tell you that area is, believe it or not, doing very well.  Their, you know, sales are on target, their occupancies at the resorts are high.  And we have really not seen anything that gives us any lack of confidence there.

*Id.*, ¶ 97.

On November 13, 2007, after the close of the market, Synovus filed its quarterly Form 10-Q with the SEC.  *Id.*, ¶ 99.  The Form 10-Q did not mention the Sea Island loan. *Id.*  Defendants Anthony and Prescott signed Sarbanes-Oxley certifications in conjunction with the Form 10-Q.  *Id.*, ¶ 100.

Plaintiffs allege the statements of Defendants Anthony and Holladay at the October 24, 2007, closing call and the Form 10-Q were false because:

> (a) Synovus had far greater exposure to losses because of these "insider loans;"
>
> (b) Synovus had far greater exposure to losses because of the loans to Sea Island;

19

(c) Synovus's loans to Sea Island exceeded its borrower policy limit and Synovus did not disclose this fact to investors;

(d) Sea Island was not "doing very well;"

(e) Sea Island's sales were not "on target;"

(f) occupancies in Sea Island's resorts were not "high;"

(g) Synovus had no reasonable basis to claim it had confidence in Sea Island's ability to repay the loan;

(h) Sea Island was "past due" on its payments to Synovus;

(i) Sea Island required an immediate restructuring of the loan; and

(j) the effort to reassure investors was part of a scheme to inflate the stock price.

*Id.*, ¶ 101.

Plaintiffs state that Defendant Anthony's statement that "[b]ut the markets by state that we really have not had any problems with will be South Carolina, Tennessee and Alabama. And Georgia, outside of the ones we just mentioned in Atlanta" is false because Synovus had far greater exposure to losses because of these "insider loans." Plaintiffs have not pled any factual allegations to support a contention that insider loans leads to greater exposure to losses.

Plaintiffs also argue that Defendant Anthony's statements were false because Synovus had far greater exposure to losses due to the Sea Island loans. That is, Plaintiffs aver that the loss exposure for Synovus as a result of the Sea Island loans was very large in

20

absolute terms.  There is also an aspect of Plaintiffs' allegations with respect to these statements which sounds in omission.  The court recognizes that there is no general obligation on the part of a bank to tell analysts where all of the bank's problems lie.  However, once a bank chooses to suggest that there are not problems by means of stating that the loan problems lie in other geographic markets, the bank's lack of discussion about Sea Island could tend to move into the category of a material omission.   Synovus has made a comment about the general state of the loan business as a result of the general economic decline during the Class Period or has pointed to a specific problem area for Synovus, such as in the Atlanta residential real estate market.  Defendants then say that Sea Island does not fall into these problem areas or say nothing about Sea Island in specific. The court finds, therefore, that Plaintiffs have sufficiently alleged false statements or omissions on the theory that the Sea Island loan had a potential great loss exposure that was not disclosed in any meaningful manner.

Plaintiffs further assert that Defendant Anthony's statement was false because Synovus's loans to Sea Island exceeded its borrower policy limit and Synovus did not disclose this fact to investors.  The court finds that even assuming the loans did exceed any internal limits, that is not a material fact because exceeding policy limits alone would not affect stock price so long as the loan is performing

21

Plaintiffs contend that both Defendant Anthony's and Defendant Holladay's October 24, 2007, statements were false because Synovus had no reasonable basis to claim it had confidence in Sea Island's ability to repay the loan; Sea Island was "past due" on its payments to Synovus; and Sea Island required an immediate restructuring of the loan.

As a preliminary matter, the court notes that Plaintiffs have not alleged what kind of loan Synovus made to Sea Island. The court has little or no information before it on whether the loan was a demand loan, a multiplicity of loans with different maturity dates, or a single loan with an annual maturity. Because the court has no information on the structure of the loan, it is more difficult for the court to assess Plaintiffs' allegations that the loan was "past due" or otherwise not performing. Plaintiffs do, however, make numerous allegations in their Amended Complaint concerning the state of the Sea Island loan and the court will consider each in turn.

- Former Synovus insiders described the loans to Sea Island as extremely risky, "terrible," made "on the good ol' boys system," and "everybody in the bank knew it was a bad loan" (¶ 52).

Plaintiffs rely on statements from confidential witnesses to support certain allegations they make in the Amended Complaint. As the court addressed above in discussing *Adams* and the current state of the law with respect to the level of specificity necessary to plead false statements under the PSLRA, it is not a requirement that Plaintiffs name the individuals from whom they received information. However, there must be something either about the

22

description of job responsibilities or at least some indicia from the specificity of statement made that the witness would be a person in a position to know the information. The allegations are evaluated for plausibility and the court may not consider allegations that are simply "rumor or hunch."

Plaintiffs describe their confidential witnesses in the initial portions of their Amended Complaint. However, in the latter portions of the complaint, Plaintiffs will sometimes link a specific quote to a specific confidential witness, but other times will not. On other occasions, the Chief Financial Officer of Sea Island, for example, Plaintiffs have identified an individual as a confidential witness, but in the complaint have not identified any statements of information that came from this individual. It would be more helpful to the court's analysis if when using directly quoted material, Plaintiffs would identify the source or confidential witness who supplied that material.

Paragraph 52 is an example of directly quoted material where Plaintiffs fail to attribute those quotations to any particular confidential witnesses. Furthermore, the quoted material is so general that the words themselves cannot provide the court with any indicia of reliability. The court, therefore, does not find this paragraph helpful to reaching a conclusion that Defendant Anthony's and Defendant Holladay's October 24, 2007, statements contains were false.

23

- • A former General Manager at the Cloister hotel explained that when Sea Island's loans "[were] coming due, there was a lack of funds." (¶ 42).

Although the Amended Complaint indicates that the former General Manager worked from 2003 through February 2008, the Amended Complaint does not give any time frame for when the loan payments were coming due and when there was a lack of funds. Therefore, the court cannot determine that the General Manager's comments provide support for Plaintiffs' contention that Defendant Anthony's and Holladay's statements were false at the time they were made in October 2007. Obviously, the loan becomes "past due" at some point in time as Synovus declared the loan "non-performing" in April 2009. The General Manager's comments, however, do not point to the falsity of Defendants' statements at the time they were made.

Furthermore, the court cannot discern the precise meaning of the statement in Paragraph 42. Does it mean that payments on the loan were not being made? Does it mean that it was difficult to raise the funds to make payments, but those payments were eventually made? Plaintiffs' Amended Complaint does not describe the job responsibilities of the General Manager of the Cloister Hotel. It is not clear to the court that this individual's responsibilities would include payment of the loan to Synovus or whether the responsibilities would be limited to the operations of the Hotel itself without further significance to Sea Island as a whole.

24

AO 72A
(Rev.8/82)

- Every year, when the Sea Island loan would come up for renewal, Synovus would receive a credit memorandum that detailed Sea Island's financial performance. This credit memorandum was prepared by an employee in the Synovus Credit Department at the Columbus, Georgia headquarters and sent to the Presidents of each of the affiliates annually. The credit memo was approximately 20-30 pages and contained detailed information regarding Sea Islands operations. Indeed, it drilled down the Sea Island operations "to how much they were losing each day." (¶ 58).

- The former CB&T VP of Commercial Lending would report to his Board of Directors on what was in the credit memo that was received from Synovus headquarters. Based on this credit memo, "we all knew it was a bad deal." "Sea Island was losing money like crazy – and that was common knowledge" throughout Synovus. Indeed, as detailed below, by the end of 2006, Sea Island had informed Badcock that it could not make principal payment on the loans from Synovus. When the former CB&T VP of Commercial Lending discussed the Sea Island loan with the Board of Directors, "there was a general consensus that we wish we had never done this." "But our board had been castrated." As this former employee explained, when he began working for Synovus in November of 2006, each affiliate board of directors had "some control," but by the time he left the Company in February 2009, the Synovus executives had "chopped away all the power." (¶ 59).

While Plaintiffs do not link the allegation in Paragraph 58 to any particular confidential witness, the level of specificity in the allegation gives the court some indicia of its reliability. The fact that the memo was prepared annually might also give some indication as to timing, but Paragraph 58 does not describe any of the contents of the memoranda in any particular year.

The first, second, fourth, fifth, and sixth sentences of paragraph 59 seem attributable to the former CB&T VP of Commercial Lending. But those sentences contain general

25

allegations of a "bad deal" or "losing money like crazy" or discussions of the powers of the affiliate boards that shed no light on the status of the Sea Island loan.  The third sentence, which is the source for Plaintiffs' "past due" allegation, does not appear to be directly attributed to the former CB&T VP of Commercial Lending.  There appears to be no source for that information, and the information is not specific enough that the court can get some idea of the reliability of the source from the comment itself. Further, without knowledge of the structure of the loan, the court does not understand what was due that could not be paid.

> • Sea Island provided detailed information to Synovus regarding budgeting, financial performance, occupancy rates, and real estate sales.  The same information that was provided to Sea Island's finance committee.  By the end of 2006, it became apparent that Sea Island could not pay the principal due on its loans to Synovus.  Sea Island informed Badcock of the dire situation facing Sea Island. (¶ 81).

It is plausible to the court that Sea Island provided detailed financial information to Synovus, even the same information that was provided to Sea Island's finance committee. But this allegation is unhelpful (outside of the scienter context) without a discussion of what that information might have been.  The meat of Paragraph 81 is the contention that by the end of 2006, Sea Island could not pay on the principal due on its loans.  This allegation, however, has no source or indication of any type as to its origin.  The court has no basis upon which to evaluate this comment and the court cannot rule out the possibility that it is "rumor" and "hunch." Further, what may have been true in 2006 may not have been true on October 25, 2007.  At some point the Cloister Hotel was torn down and rebuilt.  It would not

26

necessarily be disturbing that income was down during or immediately after such a period.

The pleader here may not presume a continuation of the *status quo* from period to period.

> • CB&T held Loan Meetings and Bad Debt Meetings two or three times a week, which took place on Tuesday afternoons and Friday mornings. All CB&T Division heads participated in these meetings, as did Badcock and John Lodge. The meetings were often focused on Sea Island. In preparation for this meeting, the former CB&T Commercial Specialist prepared a report based on loan information he received by a software program. The program showed every past due loan with a balance of at least $1,000,000. According to the former CB&T Commercial Specialist, "[e]very week, [I] would look up the loans, and every week, Sea Island was on the list." Moreover, he also recalled that every week, Dodge and Badcock would talk to Steve Nelson about the Sea Island Loan." (¶ 82).

This paragraph comes closer to describing a confidential witness who might possibly have information about the status of the loan. The Commercial Specialist worked at the CB&T bank which was a Synovus charter bank where the loan originated. *See* Amended Cmplt., ¶ 31 & n.3. However, the Amended Complaint gives no time frame for when the Sea Island loan would show up on these lists, although it does allege the Commercial Specialist worked for CB&T from January 2007 through June 2009. *Id.* Without a specific time frame, it is difficult for the court to determine that any statement made by Defendants Anthony and Holladay were false at the time they were made.

> • As of January 2007, the Sea Island loan was marked "past due" and "showed a negative balance in the millions." Furthermore, by this time, Synovus "switch[ed] the Sea Island loan to non-accruing (stopped accruing interest) "because it was the biggest loan on [Synovus's] books." (¶ 83).

27

Paragraph 83 contains no attribution at all, despite the fact that it purports to directly quote from some source. Although it is a close question, the description in the paragraph allows the court to infer that the information came from the books of CB&T and it is information that would likely be available to a number of bank employees including loan officers and employees of the credit department.

- Synovus attended annual meetings in 2006, 2007, 2008 at Sea Island where Sea Island's entire financial position and future prospects were discussed. At the end of 2006, Synovus was specifically told by Sea Island that it would not be able to repay its loan as they came due and would require a restructuring of the loans. Badcock and other Synovus employees would make quarterly visits to Sea Island to inspect the property and the company's records. Indeed, in 2008, Sea Island was only paying interest and was making no principal payments on its loans from Synovus. (¶ 85).

Paragraph 85 contains statements that are plausible on their face without attribution to any particular source, such as the fact that Synovus attended Sea Island annual meetings and that Babcock and other Synovus employees would make quarterly visits to Sea Island. Those facts, however, do not contain any information about the status of the loan. The court also notes that in Paragraph 83, Plaintiffs aver that in January 2007, the Sea Island loan stopped accruing interest, while in Paragraph 85, Plaintiffs allege that in 2008, Sea Island was paying only interest on the loan.

In summary, the court finds that Plaintiffs have adequately pled that Defendant Anthony's statements were false in that Synovus did face great potential exposure to losses

28

and the statements omitted material information concerning the status of the Sea Island loan in light of Defendants' statements that the only problems for the bank existed in Atlanta. Plaintiffs have pled some facts to support their contention that Defendant Anthony's statements were false because the Sea Island loan was "past due" and required immediate restructuring. However, the court finds at this time that it is not able to assess the plausibility of those facts. Because the court is granting Plaintiffs leave to file an amended complaint, the court anticipates that Plaintiffs will attempt to link their allegations concerning the status of the Sea Island loan to allegations sufficient to withstand scrutiny under the PSLRA. Plaintiffs have not shown that his statements that Synovus had a greater exposure to losses due to its practice of providing insider loans or because the loans to Sea Island violated any internal large borrower limit policy of Synovus were material.

Plaintiff alleges that Defendant Holladay's statement at the October 24, 2007, closing call was false because Sea Island was not "doing very well." The phrase "doing very well" is too vague and general to be a material false statement. In *Anastasio*, the court recognized that similar statements were corporate optimism or puffery. *See* Civil Action No. 08-CV-3462 (N.D. Ga. Sept. 15, 2010) (Forrester, J.).[3]

---

[3] The phrases the court noted in that case were:
- "And we believe that our positioning to capture these opportunities and turn them into increased market share has never been better"
- "Internap has always been a customer-centric company"
- "We have attracted a world class talent to our C-level management team"

29

Plaintiffs also contend that Defendant Holladay's October 24, 2007, statements were false because Sea Island's sales were not "on target." The only factual allegation Plaintiffs make relating to sales of property on Sea Island is their assertion that by 2007, Sea Island was attempting to sell property in order to remain current on the loan from Synovus. Because the property was held as collateral by Synovus, Synovus had to release the parcels before sales could close. *Id.*, ¶ 75. The court finds this statement does not relate to the level of land sales or whether such sales were meeting any "target" (although it might have some relevance to scienter).

Plaintiffs aver that Defendant Holladay's statement is false because occupancies in Sea Island's resorts were not "high." Plaintiffs point to allegations in their Amended Complaint to contest Defendants' claim that occupancy rates were high:

- A former Sea Island Resort Beach Club Manager reviewed reports on the resorts' occupancy levels which were under 20 percent in the second half of 2007. (¶ 40).

- A former Sea Island Guest Services Supervisor confirmed that occupancy reports on Sea Island's intranet showed that occupancy rates were in the area of 20% during 2007. (¶ 41).

---

- "In summary, I can tell you that Internap is a stronger, more competitive company and in a better position now than in any time in our history"
- "Internap has become more relevant in the market than ever before"

*Id.*

30

- A Delivering Service Quality Report on the Sea Island intranet, which showed the occupancy levels for each segment of the resort, including the Cloister Hotel, the Lodge, and the Beach Club, demonstrated "plummeting" occupancy rates. In 2005, occupancy levels were described as being "pretty good." However, by early 2007, "there were long periods of times where the occupancy levels were in the teens," meaning at least 80 percent of the rooms in the Cloister went unoccupied. (¶ 71).

The allegations in Paragraphs 40 and 41 are specific and are tied to individuals who – although might not have been high level employees – held jobs for which occupancy levels would be relevant. Both would plausibly need to schedule cleaning services and/or numbers of employees based on occupancy levels and would therefore logically have access to this information. These allegations also tie into a specific time period directly when Defendants have stated that occupancy levels were "high." Therefore, the court finds that Plaintiffs have sufficiently pled that Defendant Holladay's statement was false at the time it was made if it is shown that the rates were well after the hotel's reopening.[4]

The court also finds that this statement – even standing alone – would be material. Sea Island is a resort hospitality corporation. It is not difficult to imagine that a significant portion of the company's revenue is derived from people staying at the resort. If the resort's occupancy rates were low, this would be a primary indicator of the financial wherewithal

---

[4]Paragraph 71 appears to be perhaps a more detailed description of the material that the witnesses in Paragraphs 40 and 41 might have reviewed. It is also possible that Paragraph 71 describes documentary evidence independent of the allegations in Paragraphs 40 to 41. It would helpful if Plaintiffs' amended complaint had clarified this.

31

of the company to make payments on its loan.  The fact that industry analysts consider the

occupancy rates as part of their evaluation of Sea Island is also a strong indicator that those

rates are an important piece of the financial puzzle and therefore material.

In the final false statement alleged in this time period, Plaintiffs aver that Synovus's

November 13, 2007, quarterly Form 10-Q filed with the SEC is false because it does not

mention the Sea Island loan.  Id., ¶ 99.  The court finds that these quarterly Form 10-Qs are

not false by virtue of the fact that they did not mention the Sea Island loan by name.  It is

possible that the failure to mention the Sea Island loan could be a material omission, but

Plaintiffs do not point the court to any statement that is misleading in light of the omission

of a discussion of the Sea Island loan.  (The court also discusses the impact of these reports

in the scienter section below.)

January 24, 2008 and February 29, 2008

On January 24, 2008, Synovus issued its fourth quarter 2007 results with a press

release which stated:

Synovus Chairman and Chief Executive Officer Richard E. Anthony said,
"2007 was a challenging year for credit.  We continued to experience further
weakness in our residential construction and residential development
portfolios.  These loan categories represent 54.1% of nonperforming loans at
the end of the year and 41.7% of net charge-offs recognized in 2007. ***We
continue to take actions to aggressively manage these portfolios.***  The
increases in nonperforming residential construction and development loans
were in the panhandle of Florida, Atlanta, and Tampa Bay areas.  At
December 31, 2007, 70% of Synovus' total nonperforming assets and 81% of

32

total residential construction and development nonperforming loans are in these markets.

*Id.*, ¶ 103 (emphasis in original).

On January 24, 2008, after the close of the market, Synovus held a conference call with securities analysts. *Id.*, ¶ 104. Defendant Green discussed "credit issues" during the call. *Id.* In discussing residential and construction development loans, Defendant Green stated:

**We've been aggressive in our approach of recognizing problems and reserving appropriately. . . . This past quarter, we've reviewed our entire portfolio with a fine-tooth comb. The purpose was to recognize all of our problems as quickly as possible, and to make sure that we're not inadvertently dragging current problems into future periods. So at this point, our credit issues have been contained both geographically and by product type. We'll be in a continuous review process throughout the year, looking for signs of creepage. But at this point, we don't see any signs that it exists today. On the problems that we do have, we beefed up our special assets, resources so that we can work our way through our nonperforming loans and our other real estate quicker and at a better resolution. . . .**

**So again, we are attacking the problem as quickly as possible. We're aggressively working through it and our desire is as this credit cycle turns, we'll be the one of the first to come out of it.**

*Id.* (emphasis in original).

Defendant Anthony also stated:

**You can tell by Fred's description that we as a company are proactive and aggressive in managing these problems, and we are very sensitive to any potential weakness in other products and in other markets. So, we**

33

> **will watch that carefully.  But at this point, we have not seen any further deterioration.**

*Id.*, ¶ 105 (emphasis in original).  He also stated: "**Our capital position, as I mentioned earlier, is strong, stronger than most**."  And "**[o]ur risk management is stronger than it has ever been.**"  *Id.* (emphasis in original).  Defendants did not mention the Sea Island loan during this conference call.  *Id.*, ¶ 106.

On February 29, 2008, Synovus filed its 2007 10-K, which stated: "Risk of loan defaults and foreclosures are unavoidable in the banking industry, and *we try to limit our exposure to this risk by monitoring our extensions of credit carefully*."  *Id.*, ¶ 108 (emphasis in original).

Plaintiffs allege these statements were false because:

(a) Synovus had far greater exposure to losses because of these "insider loans;"

(b) Synovus had far greater exposure to losses because of the loans to Sea Island;

(c) Synovus' loans to Sea Island exceeded its borrower policy limit and Synovus did not disclose this fact to investors;

(d) Synovus had not been "aggressive" in its "approach to recognizing problems and reserving appropriately;"

(e) Synovus was not "conservatively" examining its loan portfolio and "reserving appropriately;"

(f) Defendant Green had no reasonable basis to state that Synovus would "be the one of the first to come out of" the economic downturn;

AO 72A
(Rev.8/82)

(g) Sea Island was "past due" on its payments to Synovus;

(h) Sea Island required an immediate restructuring of the loan;

(i) Synovus' "risk management" was not "stronger than it ever has been"; and

(j) the effort to reassure investors was part of a scheme to inflate the stock price.

*Id.*, ¶ 111.

The court above held that points (a), (b), and ( c ) are irrelevant or irrelevant as stated. Plaintiffs assert that the portion of Defendant Anthony's statement that the bank continues "to take actions to aggressively manage these portfolios" is false. There is nothing untrue in this statement. Rather, it describes Synovus's general reaction to the position in which the bank finds itself. The Sea Island loan already exists in its portfolio. No action Synovus would take at this time changes that fact. To any other extent, the comments are simply corporate optimism or puffery.

In a similar vein, Plaintiffs take issue with Defendant Green's comments in the January 24, 2008, closing call that Synovus was "aggressive in our approach of recognizing problems and reserving appropriately" and "reviewing the portfolio with a fine tooth comb." Defendant Green also stated that Synovus would be "one of the first to come out of" the credit crisis. In the closing call, Defendant Anthony also added that Synovus's capital position and risk management are stronger than most, and the bank was aggressively and

35

proactively managing credit issues.  The court also finds nothing untrue in these statements and, further, that are typical of corporate optimism or puffery.

Plaintiffs also aver that Synovus's February 29, 2008, 10-K is false in its statement: "Risk of loan defaults and foreclosures are unavoidable in the banking industry, and *we try to limit our exposure to this risk by monitoring our extensions of credit carefully*." The court finds there is nothing false in this statement.  To the extent that Plaintiffs quibble with the statement that Synovus attempts to limit its exposure to risk by monitoring extensions of credit carefully, the court finds it is an aspiration for the future or more corporate optimism or puffery that is unlikely to influence the market.

36

April 24, 2008 and May 12, 2008

On April 24, 2008, Synovus issued a press release in conjunction with its First Quarter 2008 earnings report. In that statement, Defendant Anthony is quoted as saying "**I am confident that we will come out of this credit cycle as a strong financial services institution.**" *See id.*, ¶ 113 (emphasis in original). He also stated that "[w]ith the deterioration in our residential construction and residential development portfolios, primarily in and around Atlanta, **we will continue to take actions to aggressively deal with these portfolios and get these issues behind us as quickly as possible.**" *Id.* (emphasis in original). **"Our primary focus is to proactively manage the credit issues until they are resolved so that we can be the high performing company that we have historically been. We have added resources in our special assets group and are working with our customers to assist them during this challenging economic environment. We believe that our strong capital position gives us the capability to work through this situation effectively."** *Id.* (emphasis in original).

Synovus again held a conference call among analysts after the market closed on April 24, 2008. *Id.*, ¶ 114. During that call, Defendant Anthony stated:

**So, in summary, credit weakness is certainly our top priority to tackle. It is a major part of our story. It is largely confined to the Atlanta market, to some degree, of course, the West Coast of Florida, and Myrtle Beach, as I said earlier. We are confident that we continue to be proactive. We have plans to dispose of these distressed assets using**

37

**techniques, including [auctions], incentives, portfolio sales, and realtor engagement.**

*Id.* (emphasis in original). Defendant Holladay stated:

**We have just finished a review of the top 25 loans that we made in those income categories. I'm walking away feeling very good about it. Our capital requirements have ranged from 21% to 30% cash in the projects. We're stressing those properties to hold rates of about 7.5%. They all have good, strong guarantors. The guarantors have good liquidity. And we're doing very careful global analysis on the customers. The growth is really spread throughout those three or four or five sectors. We've seen some office warehouse, probably the largest area of activity; some hotels would probably fall second in line, and then some multi-family and retail. Our commercial development is down, but those types of properties are – really that's what's causing the growth.**

*Id.* (emphasis in original). On May 12, 2008, Synovus filed its 10-Q for the first quarter of 2008 with no mention of Sea Island. *Id.*, ¶ 117.

Plaintiffs allege these statements were false because:

(a) Synovus had far greater exposure to losses because of these "insider loans;"

(b) Synovus had far greater exposure to losses because of the loans to Sea Island than it told investors;

(c) Synovus' loans to Sea Island exceeded its large borrower policy limit and Synovus did not disclose this fact to investors;

(d) Synovus' credit troubles were not "largely confined to the Atlanta market;"

(e) Sea Island was "past due" on its payments to Synovus;

(f) Sea Island required an immediate restructuring of its loans from Synovus;

38

(g) Synovus' "risk management" was not "stronger than it has ever been;" and

(h) the effort to reassure investors was part of a scheme to inflate the stock price.

*Id.*, ¶ 120.

Plaintiffs contend that Defendant Anthony's statements in the press release are false because Synovus had no basis for asserting that it is confident that it would come out of the credit crisis as a strong financial institution and that the company's strong capital position gave it the capability to work through the situation. The court finds that these statements are immaterial puffery.

Plaintiffs also aver that Defendant Anthony's statements in the press release and the closing call were false because Synovus's problems were not largely confined to the Atlanta market. The court finds that this assertion is closely associated with the "omissions" theory as discussed above. Defendants have discussed the general state of the loan business at Synovus and have even gone so far as to say that issues were largely confined to Atlanta. A reasonable investor would expect under these circumstances that a problem of the apparent significance of the Sea Island would come up in the detailed circumstances of the discussion that Defendant Anthony and Defendant Holladay had during the closing call. Thus, the court finds that Plaintiffs have sufficiently alleged an omissions theory that the Sea Island loan had a potential great loss exposure that was not disclosed in any meaningful manner.

39

The court has discussed above that Plaintiffs have not pled with the required particularity that the Sea Island loan was "past due" and needed immediate restructuring.

On May 12, 2008, Synovus filed its 10-Q for the first quarter of 2008 with no mention of Sea Island. *Id.*, ¶ 117. As the court discussed above, there is nothing about the Form 10-Qs that is false by virtue of the fact that they did not mention the Sea Island loan by name. With respect to an omissions analysis, Plaintiffs have not pointed any particular statement in the 10-Q that is misleading in light of the failure to discuss the Sea Island loan.

<u>July 8, July 24, August 6 and August 8, 2008</u>

On July 8, 2008, Synovus filed a Form 8-K with the SEC which stated that Alfred W. Jones III had resigned as a director of Synovus Financial Group. *Id.*, ¶ 122. On July 24, 2008, Synovus released its second quarter results and held a conference call with analysts after close of the market. *Id.*, ¶¶ 123-24. Defendant Anthony discussed credit issues and the fact that the primary story was in the Atlanta market. *Id.*, ¶ 124. He also stated that **"[w]e would anticipate, for the remainder of the year, our charge-offs remaining in that 1% range. We see our nonperforming asset percentage going up some, but at a slowing pace for the remainder of this year."** *Id.* (emphasis in original). **"I do think that were are definitely doing the right things in credit."** *Id.* (emphasis in original).

40

One analyst then specifically asked about Jimmy Blanchard's resignation from the Sea Island Board and Jones III's resignation from the Synovus Board and whether any conflict of interest existed. Defendant Anthony responded:

**What I would say is, Sea Island Company has been a customer for a number of years and a good one. We have a large relationship that really is easier to manage without Bill being on our Board. He had offered to really move off a couple of quarters ago, and they are certainly a good customer with a good relationship. But for us to work on some of their needs, with his being an insider, would have just really slowed us down. So we think it was best for everybody to eliminate these potential conflicts.**

*Id.*, ¶ 125 (emphasis in original). The following exchange then occurred:

Analyst:    Finally, we shouldn't infer that deteriorating credit was a major factor here?

Anthony:    No.

*Id.*

On August 6, 2008, the Columbus Ledger-Enquirer wrote about Sea Island and quoted Defendant Anthony as stating that none of Sea Island's loans with Synovus were "non-performing" and that Sea Island was a "good customer." *Id.*, ¶ 127. On August 8, 2008, Synovus filed its second quarter 10-Q which failed to address Synovus' loan to Sea Island. *Id.*, ¶ 128.

Plaintiffs allege these statements were false because:

(a) Synovus had far greater exposure to losses because of these "insider loans;"

41

(b) Synovus had far greater exposure to losses because of the loans to Sea Island than it told investors;

(c)  Synovus's loans to Sea Island exceeded its large borrower policy limit and Synovus did not disclose this fact to investors;

(d) Sea Island did have "deteriorating credit;"

(e) Synovus had no reasonable basis to project that for the remainder of 2008, its charge-offs would "remain[] in that 1% range;"

(f) Synovus definitely was not "doing the right things in credit;"

(g) Sea Island was "past due" on its payments to Synovus;

(h) Bill Jones III's resignation from the Synovus Board was directly related to Sea Island's extreme financial hardships;

(i) Sea Island required an immediate restructuring of its loan; and

(j) the effort to reassure investors about Synovus's credit quality and relationship with Sea Island was part of a scheme to inflate the stock price.

*Id.*, ¶ 131.

There is nothing in Synovus's Form 8-K stating that Alfred W. Jones III had resigned as a director of Synovus that is false.  It is possible that Plaintiffs could be pursuing some kind of omission theory here, but Plaintiffs do not point to any statement in the Form 8-K that would be rendered misleading by virtue of the fact that the resignation is presented without any additional information.

Plaintiffs allege greater detail in the discussion of the joint resignations from the Board of Directors during the July 24, 2008, closing call.  The court finds there is nothing

42

false about the statements made with respect to the dual resignations from the Boards of Synovus and Sea Island. Defendant Anthony clearly stated that work needed to be done on the loan and it was too difficult to manage that work with Bill Jones as a Synovus insider. The court finds this is a pretty clear statement about where the companies stood at the time. While Plaintiffs allege that a "major factor" in the dual resignations was "deteriorating credit," as the court has described above, Plaintiffs have not sufficiently alleged what the status of the credit was during this time period. It is possible that the problems pled by Plaintiffs in 2006 and 2007 continued to exist, but the court cannot presume such a continuation. It is clear from the statements made at the time that additional credit was needed and that would be difficult to arrange with Board memberships as they existed. What is not clear from Plaintiffs' allegations is whether Sea Island's credit was "deteriorating" at this time.

Plaintiffs also alleged that Defendant Anthony's statement in the July 24, 2008, closing call is false because Synovus was not "doing the right things in credit." There is nothing false about this statement. As the court discussed above, this statement relates to Synovus's general reaction to the position in which the bank finds itself. To any other extent, the comment is puffery. Similarly, the court finds that Defendant Anthony's August 6, 2008, comment to the Columbus Ledger-Enquirer that Sea Island was a "good customer" is immaterial.

43

Plaintiffs, however, also allege that Defendant Anthony said in the same interview that none of Sea Island's loans with Synovus were "non-performing."  To establish that this statement is "false," Plaintiffs rely on their allegations that the Sea Island loan was "past due" and no principal payments had been made since 2006.  As the court discussed above, however, Plaintiffs' allegations about the status of the Sea Island loan – as they stand now – do not meet the specificity requirements of the PSLRA, but Plaintiffs will have the opportunity to replead those allegations.

Plaintiffs also contend that Defendant Anthony's statement at the closing call was false because Synovus had no reasonable basis to project that for the remainder of 2008, its charge-offs would remain in the 1% range.  The court finds that Plaintiffs have not alleged any facts to indicate that the statement was materially false at the time it was made.  Nor have Plaintiffs alleged any facts to show there was "no reasonable basis" for that claim.

As with the previous statements, Plaintiffs also aver that Defendant Anthony's comments were false because Synovus's exposure to losses was great because of the extent of the Sea Island loan and that Synovus had not disclosed this to its investors.  The court finds that Plaintiffs have sufficiently pled this omissions theory with respect to the July 24, 2008, closing call because Defendant Anthony went into detailed discussions about credit issues and again stated that the primary problems were in the Atlanta market. Under those circumstances, Plaintiffs have sufficiently pled that a reasonable investor would have

44

expected Synovus to mention issues with a loan the size of Sea Island's if the loan was in fact having problems during this time period.

Finally, Plaintiffs contend that the August 8, 2008, 10-Q was false because it failed to address Synovus' loan to Sea Island. The court refers to its analysis above on the Form 10-Q issue.

October 23, 2008 and November 10, 2008

On October 23, 2008, Synovus issued a press release related to its third quarter 2008 results. Defendant Anthony stated:

**As we look out into the fourth quarter of 2008, we believe that the third quarter elevated level of charge-offs and loan loss provision should decrease and should drive improved performance in the quarter as compared to the third quarter. In looking out to 2009, based upon our assumptions regarding current economic conditions and credit conditions persisting throughout 2009, we believe that the 2009 charge-off ratio will be in the 1.15% to 1.30% range.**

*Id.*, ¶ 133 (emphasis in original). During the post-market October 23, 2008, conference call, Defendant Anthony stated that the third quarter charge-offs as a percentage were 153. **"But our guidance for charge-offs in the fourth quarter would be approximately 1.15%. If you use that number in your projections, I believe that you would find that we should have a chance at being profitable, fundamentally, during the quarter. And in 2009 our guidance for the charge-off ratio would be in the 115 to 130 range.** This is our best

45

estimate in a difficult environment that is hard to pin down." *Id.*, ¶ 134 (emphasis in original).

An analyst specifically asked about the relationship between Sea Island and Synovus and inquired whether the loan was on the "watch list or nonaccrual status or in good standing?" *Id.*, ¶ 135. Defendant Anthony stated:

> **The loan is performing, Kevin, and nothing is really different.** They released information to the public a couple of months ago about the fact that their financing package had been modified and increased and was in place. And they have had some successes and continue to really represent a premier brand on the East Coast. Be but [sic] we certainly are in constant contact with them and they are working on strategic flexible [sic] for their future and I think doing the right things.

*Id.* (emphasis in original).

On November 10, 2008, Synovus filed its 10-Q for the third quarter with no mention of the Sea Island loans. *Id.*, ¶ 137.

Plaintiffs allege these statements were false because:

(a) Synovus had far greater exposure to losses because of these "insider loans;"

(b) Synovus had far greater exposure to losses because of the loans to Sea Island than it told investors;

(c) Synovus's loans to Sea Island exceeded its large borrower policy limit and Synovus did not disclose this fact to investors;

(d) Sea Island was not "performing;"

46

(e) Synovus had no reasonable basis to project a decrease in the level of charge-offs and loan loss provisions;

(f) Sea Island was "past due" on its payments to Synovus;

(g) Sea Island required an immediate restructuring of its loans from Synovus; and

(h) the effort to reassure investors was part of a scheme to inflate the stock price.

*Id.*, ¶ 139.

In both the press release and the closing call for October 23, 2008, Defendant Anthony projected a decrease in the level of charge-offs and loan loss provisions. Plaintiffs allege these statements were false because Defendants had no reasonable basis to make such a projection. The court finds that Plaintiffs have not alleged any facts which would provide a reasonable basis to conclude that this statement was false at the time it was made. Given the prevailing economic conditions, it is not surprising that a bank would not meet the financial projections it set out. Particularly, given that these statements are predictions about what would happen in the future, Plaintiffs would have to allege some facts or circumstances which could show that Defendants knew at the time they would not meet those projections and Plaintiffs have not done so.

Plaintiffs also allege that Defendant Anthony's comments with respect to the status of the Sea Island loan are false. To establish that this statement is "false," Plaintiffs rely on their allegations that the Sea Island loan was "past due" and no principal payments had been

47

made since 2006.  As the court discussed above, however, Plaintiffs' allegations about the status of the Sea Island loan do not meet the specificity requirements of the PSLRA.

The court finds that Defendant Anthony's statements that Sea Island has had some successes and represents a premiere brand and is doing the "right things" are immaterial puffery.

Finally, the court reiterates it prior ruling with respect to the November 10, 2008, 10-Q which does not mention the Sea Island loans.

In summary, the court finds Plaintiff have plead the following allegedly false statements with sufficient particularity:

- Defendant Anthony stated: "But the markets by state that we really have not had any problems with will be South Carolina, Tennessee and Alabama.  And Georgia, outside of the ones we just mentioned in Atlanta." *See* Amended Cmplt., ¶ 97.

- Defendant Holladay also responded:  Tony, I heard you ask about Sea Island. . . .  Their, you know, sales are on target, their occupancies at the resorts are high.  And we have really not seen anything that gives us any lack of confidence there.  *Id.*

- Defendant Anthony stated: "**So, in summary, credit weakness is certainly our top priority to tackle.  It is a major part of our story.  It is largely confined to the Atlanta market, to some degree, of course, the West Coast of Florida, and Myrtle Beach, as I said earlier.**  *Id.*, ¶ 114 (emphasis in original).

- Defendant Anthony discussed credit issues and the fact that the primary story was in the Atlanta market.  *Id.*, ¶ 124.

48

As the court explained above, it may be possible for Plaintiffs to adequately plead additional false statements if, on amendment, Plaintiffs are able to plead something more about the specific conditions of credit that existed in this later time period.

Because the court has determined that in some respects, Plaintiffs sufficiently alleged false statements or material omissions, the court goes on to consider scienter and loss causation.

### 2.    Scienter and Confidential Witnesses

Plaintiffs make  several factual allegations that are relevant to the knowledge aspect of scienter.

- Every year, when the Sea Island loan would come up for renewal, Synovus would receive a credit memorandum that detailed Sea Island's financial performance.  This credit memorandum was prepared by an employee in the Synovus Credit Department at the Columbus, Georgia headquarters and sent to the Presidents of the each affiliates annually.  The credit memo was approximately 20-30 pages and contained detailed information regarding Sea Island operations. Indeed, it drilled down the Sea Island operations "to how much they were losing each day." (¶ 58).

This statement does not contain any direct evidence of how this information might have reached Defendants Anthony, Green, Prescott, or Holladay.  However, "lack of direct evidence connecting the defendants to the alleged fraud is not fatal, because plaintiffs may create a 'strong inference' of scienter by circumstantial evidence alone." *See Mizzaro*, 544 F.3d at 1249.  But facts supporting a "strong inference" of scienter must be alleged "for each

49

defendant with respect to each violation." *Id.* at 1238. Further, "access to information, even when accompanied by a duty to monitor that information, is not enough to create a strong inference of scienter." *See Waterford Township General Employees Retirement System v. SunTrust Banks, Inc.*, 2010 WL 3368922, at *3 (N.D. Ga. 2010) (Thrash, J.) (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1264 (11th Cir. 2006) and *In re Coca-Cola Enterprises, Inc. Securities Litigation*, 510 F. Supp. 2d 1187, 1200-01 (N.D. Ga. 2007) (Thrash, J.)). It is also not sufficient for the purposes of pleading scienter to state that based on their positions in the company, the individual defendants must have known the truth. *See, e.g.*, *In re Coca-Cola Enterprises, Inc. Securities Litigation*, 510 F. Supp. 2d 1187, 1200-01 (N.D. Ga. 2007) (Thrash, J.) ("[I]t is not enough to make conclusory allegations that the Defendants had access to the 'true facts' in order to demonstrate scienter, particularly where the complaint fails to allege 'which defendant knew what, how they knew it, or when.'"); *Waterford Township General Employees Retirement System v. CompuCredit Corp.*, 2009 WL 4730315, at *7 (N.D. Ga. 2009) (Thrash, J.) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient" for scienter).

Defendant Anthony is the Chairman of the Board and Chief Executive Officer of Synovus. *See* Amended Cmplt., ¶ 17. Defendant Green was a director, President, and Chief Operating Officer of Synovus until his resignation from the Company on May 28, 2009. *Id.*,

50

¶ 18. Defendant Prescott is Executive Vice President and Chief Financial Officer of Synovus. *Id.*, ¶ 19 (also alleging that he participated in the issuance of improper statements, including press releases and SEC filings). Defendant Holladay is Executive Vice President and Chief Risk Officer. *Id.*, ¶ 20 (also alleging that he participated in the issuance of improper statements, including press releases and SEC filings).

The court recognizes that Plaintiffs have pled under the "group pleading doctrine." *See* Amended Cmplt., ¶ 26 (arguing it is appropriate to treat individual defendants as a group because each officer "by virtue of his high level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition.") and ¶ 170 (same). The group pleading doctrine is defined as a "presumption of group responsibility for statements and omissions in order to satisfy the particularity requirements for pleading fraud under Federal Rule of Civil Procedure 9(b)." *See Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004). The Eleventh Circuit has not yet determined whether the "group pleading doctrine" survives enactment of the PSLRA. *Id.* at 1019. Furthermore, it is not clear that the "group pleading doctrine" is relevant to the issue of scienter, as opposed to the manner in which a false statement is plead. *See In re AFC Enterprises, Inc. Securities Litigation*, 348 F. Supp.

51

2d 1363, 1370-71 (N.D. Ga. 2004 (Thrash, J.) (noting doctrine also referred to as "group-published information" and is means of presuming statements made in prospectuses or through press released are "collective actions of the officers or directors of a corporation"). Because case law is clear that scienter must be pled with respect to each defendant, the court declines to allow Plaintiffs to "group plead" on scienter, but recognizes that a plaintiff may aggregate relevant facts and use reasonable inferences to demonstrate that each defendant had the required state of mind. *See Scientific-Atlanta*, 374 F.3d at 1017-18 & n.6.

Paragraph 58 does aver that a detailed credit memo on Sea Island was prepared at Synovus each year. The paragraph, however, does not provide a direct link to any of the Defendants because it avers that the credit memorandum was prepared for the presidents of Synovus's affiliated banks. On the basis of this statement, alone, there is not even a circumstantial link to any of the individual defendants. But it is possible that read in conjunction with other scienter allegations, this information might be relevant.

- The Sea Island occupancy reports were provided to Philip Badcock on a monthly basis. Indeed, Synovus received the same financial information – on the same e-mail – that Sea Island gave to the finance committee of its own board of directors. Such information included occupancy figures, a real estate sales report called the Lot Sales Report, budgets, cash flows, capital expenditure reports, and detailed reports on Sea Island's actual spending. (¶ 72).

Philip Badcock is the Executive Vice President for Regional Lending and is alleged by Plaintiffs to be Synovus's primary contact with Sea Island. Plaintiffs also contend that

Mr. Badcock would call Sea Island and ask specific questions about the Company's operations. Plaintiffs state that Mr. Badcock participated in the Loan Meetings and Bad Debt Meetings held by CB&T several times per week, and also visited Sea Island quarterly.

Plaintiffs, however, do not allege how Mr. Badcock fit in the organizational chart with respect to the individual Defendants. Plaintiffs only generally allege that "Synovus" attended the 2006, 2007, and 2008, annual meetings at Sea Island, or that "Synovus" was told in 2006 that Sea Island would not be able to repay its loans when they came due. *See* Amended Cmplt., ¶ 85. Plaintiffs do not make any allegations about Mr. Badcock's interactions with the individual Defendants. Therefore, it is not possible for the court to apply any presumption at this stage in the litigation that the individual Defendants would be aware of that information which Mr. Badcock received.

- Synovus was aware that Sea Island was ramping up efforts to sell property. The property was encumbered as pledged collateral to the Synovus loan and therefore, Synovus had to release the property before any transaction could close. (¶ 75).

Again, Plaintiffs generally allege "Synovus" as an entity and this is not sufficient to establish scienter with respect to each individual Defendant.

- Defendant Green admitted on January 22, 2009, that Sea Island was Synovus's largest customer. In addition to the size of the loan, several former Synovus employees revealed that Defendants' internal policies dictated that they be kept apprised of Synovus's loan portfolio and the Sea Island loans. For example, according to the former Synovus Senior Vice President of Commercial Real Estate, a loan the size of Sea Island's was "obviously a corporate commitment," which had to

53

go to the Company Board of Directors for approval. "A loan that size had to be approved by [the Synovus] Board Loan Committee," which met once a month in Columbus, Georgia and reviewed loans internally within Synovus. (¶ 87).

Paragraph 87 comes closer to the mark. It might be reasonable, for example, to presume that the four highest executives in Synovus would be familiar with the bank's lending relationship with its largest customer. The remainder of Paragraph 87, however, lacks some necessary detail. For example, Plaintiffs do not name the former employees who would know about any internal policies that would require the individual Defendants to be kept up-to-date on the Sea Island loans. Nor do Plaintiffs explain what information would be passed to the individual Defendants under the provisions of any such internal policy. The import of the former Senior Vice President's testimony is also unclear. Does the Board Loan Committee only review initial loans or does it also review all outstanding loans? Are any of the individual Defendants members of the Board Loan Committee? This information would be relevant to any determination of what kind of information the individual Defendants would have.

- Moreover, according to the former Synovus Credit Analyst, any loan above $25,000 would have to be approved by Defendant Anthony. Indeed, the credit approval process at Synovus required that any loan over $25,000 must have Defendant Anthony's signature on a credit approval form. Additionally, Defendant Holladay was responsible for setting and maintaining the Company reserves for bad debt. Defendant Holladay was "responsible for letting all of [its] affiliate banks know what each had to reserve." (¶ 88).

54

Paragraph 88 again provides some important specifics to Plaintiffs' scienter allegations – particularly as to Defendant Holladay's knowledge of bad debt – but some deficiencies remain. As with the internal loan policies, it is not clear whether Defendant Anthony's signature would be required for only the initial loan to Sea Island or whether it would also be required for additional outlays of credit. Further, the fact that Defendant Anthony might be aware of the extent of Synovus's lending relationship with Sea Island does not mean that he would be aware of the resort's occupancy rates, for example, or even whether the resort was current on its loan payments.

- In addition, Defendants admitted that they carefully monitored the loans to Sea Island. This is evident from multiple statements made by Defendants throughout the Class Period in which they represented that they were carefully reviewing Synovus's portfolio and were proactively and aggressively managing credit weaknesses. (¶ 89, citing comments from Defendants Green and Anthony).

As a general matter, the court is not necessarily opposed to holding Defendants' words against them, but it is not clear to the court that "aggressively managing credit weaknesses," for example, would make one familiar with the details of occupancy rates at Sea Island. It is more likely that individuals who manage risk would be aware of whether the bank's largest loan customer was current on its obligations. But there are still too many unexplained dots to connect for the court to find that statements such as these are sufficient to support scienter.

55

- Defendants consistently represented that they were monitoring the Sea Island loan portfolio through their "constant contact" and "frequent interaction" with Sea Island – Synovus's largest customer – and its principals. (¶ 90, citing comments from Defendants Green and Anthony).

The court finds the analysis for these statements to be similar to that of Paragraph 89.[5]

In summary, of these statements alleged above, the court finds that the strongest inference for scienter can be drawn from the fact that Sea Island was Synovus's largest customer. The court also sees potential for sufficient pleading in some of the other allegations made by Plaintiffs but considering the court will grant Plaintiffs leave to amend their complaint, the court finds it more helpful at this stage to provide guidance as to some potential problems with scienter as currently alleged. The court notes in particular that there are no factual scienter allegations with respect to Defendant Prescott. Further, Plaintiffs

---

[5]The court recognizes that Plaintiffs have pled other information gleaned from confidential witnesses. But the court does not find those allegations to be particularly relevant. For example, none of the allegedly false statements made by the individual Defendants relate to the manner in which Sea Island conducted the renovation of the Sea Island resort. Thus, statements that Sea Island was the "most wasteful entity," there were "massive cost overruns," or Bill Jones wanted it to be a resort for billionaires bring nothing to the table on scienter. Further, there is no allegation in Plaintiffs' Amended Complaint that Defendants made any statements related to the reconstruction at Sea Island. It is possible that due to the extent of the alleged cost overruns during the reconstruction project that these difficulties could provide relevant context for whether Defendants might have known about the ability of Sea Island to remain current on the loan. But as it stands now, the court does not find allegations concerning the reconstruction to be helpful.

appear to rely heavily on information provided to or known by Phillip Badcock, but lack any allegations tying Mr. Badcock to the individual Defendants.

In addition to those allegations cited above, Plaintiffs allege that with each quarterly earnings report, Synovus filed its Form 10-Q with the Securities and Exchange Commission but the form does not discuss issues related to the Sea Island loan. *See* Amended Cmplt., ¶¶ 99, 117, 137. Plaintiffs also allege that the Individual Defendants Anthony and Prescott signed the Sarbanes-Oxley certifications in conjunction with the 10-Qs. *Id.*, ¶ 100. Plaintiffs do not allege any reason why the Form 10-Qs would have been required to discuss Sea Island, and therefore, their failure to do so cannot be considered a false statement.

The plaintiffs in *Garfield* raised similar allegations. The Eleventh Circuit held, however, that the statutory language of Sarbanes-Oxley did not change the requirements for pleading scienter under the PSLRA. *See* 466 F.3d at 1266. The court further stated that if the plaintiffs' interpretation of Sarbanes-Oxley were accepted, "scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." *Id.* "Instead, we hold that a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Id.* Further, the case cited by Plaintiffs to support their argument concerning scienter and Sarbanes-Oxley statements, *In re OCA,*

57

*Inc. Sec. & Derivative Litig.*, 2006 WL 3747560 (E.D. La. 2006), concerned fraud allegations with respect to overstatement of a company's receivables and shortcomings in the company's internal controls over financial reporting. Plaintiffs' allegations here do not address such accounting issues, nor have Plaintiffs alleged "inaccuracies" in the financial statements.

Plaintiffs also plead that stock trades of Defendants Holladay and Prescott were "unusual and suspicious" and therefore form evidence of scienter. Both Holladay and Prescott made sales of common stock holdings at the end of November 2007. *See* Amended Cmplt., ¶¶ 174-77.

The Eleventh Circuit addressed this issue in *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783 (11th Cir. 2010). There, the plaintiffs had alleged that a large number of stock trades made by insiders were evidence that those individuals knew the "financial statements were false and intended to capitalize on that knowledge at the expense of the uninformed public." *Id.* at 793. The court held that "[s]tock sales by insiders are only relevant to scienter when they are suspicious." *Id.* "The complaint must allege some information about the insider's trading history for us to determine whether 'the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Id.* (quoting *Mizzaro*, 544 F.3d at 1253). *See also Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group,*

58

*Inc.*, 537 F.3d 527, 543 (5th Cir. 2008) (noting that suspicious sales are those made out of line with earlier trading customs).

Plaintiffs' Amended Complaint is devoid of any allegations regarding the prior trading histories of Defendants Holladay and Prescott. Therefore, the sales that took place at the end of November 2007 cannot serve as evidence of scienter in the form of a motivation for any Individual Defendant to make false statements. *See Goodman Life Income Trust*, 594 F.3d at 793 ("We give the conclusory allegations of insider trading no weight in considering the inference of scienter raised by the complaint.").

The court further notes that these sales took place only one month after the start of the Class Period. The only false statement Plaintiffs claim prior to this sale was Defendant Holladay's comments regarding occupancy rates made during an analyst conference call that occurred after the close of the stock market on October 25, 2007. It would hardly seem to be the most fortuitous time to attempt to take advantage of a securities scheme.

The court also notes that according to filings made by Synovus with the Securities and Exchange Commission, Defendant Prescott's sales accounted for only 1.8% of his holdings and he lost over $27 million in stock value during the Class Period. *See* Defendants' Mot. to Dismiss, at 44-45. Further, Plaintiffs' allegations that Mr. Holladay sold 52% of his holdings were based on a mathematical miscalculation on Mr. Holladay's Securities and Exchange Commission forms. *Id.* at 46. The correct calculation on the form

59

results in Defendant Holladay having sold only 2.2% of his holdings. *Id.* Defendant Holladay lost over $20 million in stock value during the Class Period. *Id.* at 47.

Finally, Plaintiffs' Amended Complaint makes no allegations of stock sales with respect to Defendants Anthony and Green, the two individuals who are most often quoted in the Amended Complaint. The absence of inside stock sales which take advantage of allegedly inflated stock prices – while not fatal to a securities claim – certainly creates a significant obstacle. *See Mizzaro*, 544 F.3d at 1253 ("the amended complaint says nothing about suspicious stock transactions by any of the individual defendants, an omission that weighs heavily against inferring scienter"); *see also Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) (failure to plead that defendants sold stock at inflating price negated inference of scienter); *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002) ("evidence that the individual defendants abstained from trading may undercut allegations of motive"); *In re Homebanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1359 (N.D. Ga. 2010) (Batten, J.) ("It is counterintuitive to think that one would fraudulently inflate a stock price without a concomitant intent to sell the stock at an artificially high price. Typical securities fraud complaints detail how and by how much the corporate officers profited by timing purchases and sales of company stock to take advantage of fraud. The fact that Defendants did not take advantage of the purportedly inflated price to sell their holdings overwhelms the

60

inference that they were knowingly withholding from the public damaging and material information.").

The only other possible evidence of motivation noted in Plaintiffs' Amended Complaint is the statement by a confidential witness that Synovus executives would receive "perks" from Sea Island in the form of free vacations there whenever they wanted. *See* Cmplt., ¶ 84. Plaintiffs also note that Bill Jones III was a "close personal friend" of the then-CEO of Synovus, Jimmy Blanchard, and that the loans were "quickly approved with little more than a handshake on the "good ol' boys system." *Id.*, ¶ 4. These allegations are not sufficient to plead scienter.

The court has considered on its own whether the desire to maintain one's job is enough to provide the motivation required for scienter. Courts have held that it is not sufficient for plaintiffs to claim that defendants engaged in a conspiracy to commit securities fraud in order to inflate the price of the company's stock to allow for successful stock offerings, to protect their own executive positions, or to enhance the value of their personal stock holding in the company. *See Melder v. URCARCO*, 27 F.3d 1097, 1102 (5th Cir. 1994). Further, the desire to obtain incentive compensation has also been held insufficient as a matter of scienter. *See Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually

61

every corporation in the United States would be subject to fraud allegations."). *See also Ley v. Visteon Corp.*, 543 F.3d 801, 813 (6th Cir. 2008 ) ("All corporate managers share a desire for their companies to appear successful.  That desire does not comprise a motive for fraud."); *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."). *But see Florida St. Bd. of Administration v. Green Tree Financial Corp.*, 270 F.3d 645, 660-61 (8th Cir. 2001) (magnitude and timing of executive's compensation package provided unusual, heightening showing of motive).

The court recognizes under *Tellabs*, while "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference . . . the absence of a motive allegation is not fatal." 551 U.S. at 326.  But when there is no motive alleged in a complaint, other allegations of scienter must be stronger.  *Green Tree Financial*, 270 F.3d at 660.  Taking Plaintiffs' allegations as a whole, for the foregoing reasons, the court finds that Plaintiffs' Amended Complaint fails to sufficiently allege scienter and the court turns to loss causation.

### 3.    Loss Causation

Defendants argue that Plaintiffs' Amended Complaint suffers because none of the announcements made on April 22, 2009, demonstrated that any previous statement by

Defendants had been false or misleading.  Plaintiffs respond that loss causation is not an appropriate topic for a motion to dismiss.

The court recognizes that under *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), loss causation in a securities fraud case does not impose "any special requirement" on Plaintiffs.  *See id.* at 346.  However, since *Dura*, several district court opinions in the Eleventh Circuit have considered the degree to which loss causation must be pled at the motion to dismiss stage.

In *Waterford Township General Employees Retirement System v. SunTrust Banks, Inc.*, 2010 WL 3368922 (N.D. Ga. 2010) (Thrash, J.), the plaintiff alleged that SunTrust had hidden the extent of the increase in the number of its nonperforming loans by classifying some of those loans as "in-process" during the second and third quarters of 2008 and then reclassified them in the last quarter of 2008 causing the stock price to drop 11% in one day on January 22, 2009, when the corrective reclassification was made.  The court stated that loss causation required the plaintiff to allege that the stock price "fell significantly after the truth became known."  Further, the plaintiff would also have to "allege facts sufficient to support an inference that it was defendant's fraud – rather than other salient factors – that proximately caused" a drop in the share price. *See Waterford Township*, 2010 WL 3368922, at 4 (quoting *Dura*, 544 U.S. at 347 and *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005)).  It was not necessary to show that the defendant's fraud was the exclusive

63

cause, but if multiple factors are at play, the plaintiff should allege facts sufficient to apportion the losses among the factors. *Id.*

In *Waterford Township*, on a motion to dismiss, the court found the plaintiff had failed to sufficiently plead loss causation because the 11% drop occurred in the midst of a financial crisis that hit the financial services industry particularly hard. *Id.* at \*5. The court noted that SunTrust stock had already lost most of its value prior to the January 22, 2009, corrective disclosure, falling 66% over the course of the class period. *Id.* Further, the court noted that the stock prices of six other major banks dropped between 6.66% and 28.57% on January 22, 2009. *Id.* These facts suggested that SunTrust's drop was "caused by general market conditions instead of anything specific to SunTrust." *Id. See also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) ("When the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which if proven would show that its loss was caused by the alleged misstatements as opposed to intervening events."); *HomeBanc Corp. Securities Litigation*, 706 F. Supp. 2d at 1361 (rejecting as conclusory, plaintiffs' allegations that once "truth" was "revealed," value of HomeBanc stock declined; further finding that none of "truth" alleged by plaintiffs actually revealed falsity of any alleged prior statement; and

64

criticizing allegations because they failed to allow court to distinguish between losses caused by alleged misrepresentation and collapse of mortgage industry as a whole).

Plaintiffs' allegations suffer from the same analytical issues with respect to Synovus's stock price as did the allegations in *Waterford Township*, *Coca-Cola*, and *HomeBanc*. Synovus stock generally declines throughout the Class Period. A decline early in November 2008 takes hold and deepens with a decline in early January 2009 from which the stock never recovers, taking another steep dip at the end of January 2009 into early February 2009. The stock reaches a low point on March 5, 2009, before making a shaky rise in mid-April 2009. The stock does dip at the end of April, but rises slightly again soon thereafter. These movements are not lock-step with Plaintiffs' allegations of misstatements and revelations of truth.

It is particularly problematic for Plaintiffs' theory that the stock reaches its low point in early March 2009. Under Plaintiffs' theory, the stock should be held artificially high while material information is being withheld from the market. Therefore, the stock should only begin to drop on April 22, 2009. Plaintiffs try to fudge through the reality of the stock prices by contending that some poor information begins to "leak" out beginning in July 2008 with the announcements of the board resignations. But again, this theory does not fit reality in that the stock generally held at a certain range from June 2008 through November 2008. The big decline began in November 2008 and Plaintiffs point to no particular "truths" that

65

"leaked" in that time frame.  In fact, Plaintiffs allege no other "leaking" of poor information between July 8, 2008, and January 22, 2009.

The more plausible explanation is that the drops in Synovus stock were matching the general economic malaise hitting the financial services industry.  Starting from its January 2, 2008, level of 10.8 (when the stock was adjusted based on dividends) to the last day of the Class Period, April 22, 2009, when the stock was 4.06, Synovus stock declined 62.4%. Even pegging the decline from the date of stock adjustment to when the information first started to "leak" according to Plaintiffs (on July 8, 2008), the stock had dropped 21%. Under Plaintiffs' allegations that more significant negative information was revealed on January 22, 2009, the stock had dropped 56% from its January 2, 2008, level.

Finally, Plaintiffs allege that after the market learned the true nature of the Sea Island loan and that Synovus had to classify the loan as non-performing in the first quarter of 2009, Synovus stock dropped from $4.06 per share on April 22, 2009, to $3 per share on April 27, 2009, a drop of 26%.  *Id.*, ¶ 162.  Plaintiffs do not explain, however, why they chose April 27, 2009, as the comparator date.  In fact, a review of Synovus's stock price at the end of April shows wide variation from day-to-day.

66

| Date | Share Price |
|------|-------------|
| April 22 | 4.06 |
| April 23 | 3.26 |
| April 24 | 3.24 |
| April 27 | 3.00 |
| April 28 | 3.20 |
| April 29 | 3.58 |
| May 1 | 3.09 |

Obviously, Plaintiffs chose April 27 because it was the stock's lowest point in the ten days after the announcement, but Plaintiffs allege no particular significance to the date. If Plaintiffs had chosen April 29, the percentage drop would have been only 12%.

With this analysis, the court does not mean to imply that Plaintiffs have to come forward with expert causation testimony at the complaint stage. Rather, the court is following established case law that Plaintiffs must do more than simply allege that the stock price fell. Plaintiffs must allege some facts which distinguish movement of the stock Plaintiffs contend happened because of fraudulent misstatements from the movement of the stock that happened for other economic reasons obvious during the Class Period. A simple review of Synovus's stock price reveals that Plaintiffs' theory of the case has not alleged any facts to make this distinction.

67

Because the court has determined that Plaintiffs have failed to adequately plead scienter or loss causation, the court need not reach Plaintiffs' § 20(a) claim which depends on the existence of an underlying § 10(b) claim.

Case law supports Plaintiffs' position that the court should grant them leave to file an amended complaint to address the deficiencies noted in the court's order. The court GRANTS Plaintiffs' leave to file an amended complaint within thirty (30) days of the date of this order.

AO 72A
(Rev.8/82)

## III.   Conclusion

Because certain allegations have been sufficiently pled, the court declines to dismiss Plaintiffs' Amended Complaint in whole.  However, the court does dismiss those false statements where the court finds Plaintiffs have not pled with the required particularity. Those statements will form no part of the allegations going forward except to the extent Plaintiffs sufficiently re-plead them.

The court DENIES Defendants' motion to dismiss [45] and GRANTS Plaintiffs' motion to strike certain exhibits [48].  Plaintiffs are DIRECTED to file an Amended Complaint within thirty (30) days.

**IT IS SO ORDERED** this 19th day of May, 2011.


/s/   J. Owen Forrester
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)